UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No. 3:06-cr-196 |
| | . | |
| Plaintiff, | . | |
| | . | *Sentencing* |
| - v - | . | |
| | . | Monday, October 24, 2011 |
| MICHAEL E. PEPPEL, | . | 9:05 AM |
| | . | |
| Defendant. | . | Cincinnati, Ohio |

. . . . . . . . . . . . . . .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE


For the Plaintiff:     DWIGHT K. KELLER, ESQ.
                       BRENT G. TABACCHI, ESQ
                       Assistant United States Attorneys
                       United States Attorney's Office
                       Federal Building
                       200 West Second Street
                       Room 602
                       Dayton, Ohio  45402

For the Defendant:     RALPH W. KOHNEN, ESQ.
                       JEANNE M. CORS, ESQ.
                       ARTHUR F. McMAHON III, ESQ.
                       Taft, Stettinius & Hollister LLP
                       425 Walnut Street, Suite 1800
                       Cincinnati, Ohio  45202-3957

Also present:          Robert C. Frommeyer, Jr., Probation
                       Officer
                       Laura A. Groves, Probation Officer
                       Dale Cannon, Postal Inspection Service
                       Ronald Verst, Postal Inspection Service

Law Clerk:             Laurie J. Nicholson, Esq.

Courtroom Deputy:      Mary C. Brown

Court Reporter:        Luke T. Lavin, RDR, CRR


*Proceedings recorded in stenotype;
transcript prepared by computer.*

P R O C E E D I N G S

1

2     (In open court at 9:05 AM.)

3        COURTROOM DEPUTY:  Case Number 3-6-CR-196, *United*

4  *States of America versus Michael E. Peppel.*

5     Will Mr. Peppel and his attorney please approach the

6  lecturn.

7        MR. KOHNEN:  Good morning, Your Honor Judge Beckwith.

8  On behalf of Mr. Peppel, Ralph Kohnen.

9        THE COURT:  Good morning.  To begin, Mr. Kohnen, have

10  you read the presentence report in this matter, together with

11  the order that issued previously on August 16th resolving the

12  outstanding objections?

13        MR. KOHNEN:  We have, Your Honor.  And Mr. Peppel has

14  read the report and the associated paperwork as well.

15        THE COURT:  Is that correct, Mr. Peppel?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  Have you had an adequate opportunity to

18  discuss the report and the subsequent paperwork, the motion and

19  the order entered by the Court, before this hearing today?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  Okay.  Very good.

22     Good morning, Mr. Keller.

23        MR. KELLER:  Good morning, Your Honor.

24        THE COURT:  And have you read the presentence report

25  and also the order that the Court issued in August resolving

1   the outstanding objections to the presentence report?

2           MR. KELLER:  I have, Your Honor.

3           THE COURT:  Very good.

4       I will place the presentence report in the record under

5   seal.  If an appeal is taken, counsel will be permitted access

6   to the sealed report.

7       Although I'm aware that the matter of the victims in this

8   case has essentially been resolved in the sense that restitu-

9   tion has been determined to be impractical, I suppose I would

10  like to hear that from your lips, Mr. Keller.

11          MR. KELLER:  Your Honor, the United States is aware of

12  that, and we don't contest that.

13          THE COURT:  Very good.

14      You agree, Mr. Kohnen?

15          MR. KOHNEN:  Absolutely, Your Honor.

16          THE COURT:  All right.  Then as best I understand, we

17  have no issues that are in dispute at this time that we should

18  take up.  That's correct, Mr. Keller?

19          MR. KELLER:  From the United States' perspective

20  that's correct.

21          THE COURT:  Mr. Kohnen?

22          MR. KOHNEN:  Your Honor, there are no remaining

23  unresolved objections to the presentence investigation report.

24  Obviously, the Court solved the most important or settled the

25  most important issue, which was the 2B1.1 United States

1   Sentencing Guidelines amount of the loss in its order at docket

2   206.

3            THE COURT:  Okay.  Very good.

4        Just to review the conclusions reached in the document 206,

5   the August order of the Court -- and correct me if I'm wrong

6   here in any respect, counsel -- Mr. Peppel's base offense level

7   is six.  There is a 20-level increase for the actual loss; as

8   the Court determined that there are more than 50 victims in

9   this case, for a four-level increase; there is a two-level

10  increase for sophisticated means; there is a one-level increase

11  for money laundering pursuant to Section 2S1.1(b)(2)(A); there

12  is a three-level reduction for acceptance of responsibility and

13  timely plea; for an adjusted offense level of 30.

14       Mr. Peppel is in criminal history category I, and the

15  sentencing range, pursuant to the Guidelines, is 97 to 121

16  months.  Remaining for discussion this morning, then, is what

17  would be a fair and appropriate sentence, whether there are

18  grounds for a departure or variance.  I know that counsel have

19  raised the question of the disparity between the loss amounts

20  attributed to Mr. Peppel and co-defendant Mr. Stanley, together

21  with other similarly situated defendants.  Imperfections in any

22  market equity approach to loss may be discussed, although I

23  believe we've resolved that for the most part.

24       Any other basis for departure or variance certainly may be

25  raised and discussed, so I don't intend to limit counsel to

1    those particular arguments, but they were arguments that

2    occurred to us as we were completing the order.

3        So, Mr. Kohnen, what would you like to say about a fair and

4    appropriate sentence in this case?

5            MR. KOHNEN:  Your Honor, I would like to start by just

6    giving the Court, as brief as possible, the -- let's start

7    with, if we could, the 3553(a) factors under Title 18.

8        As the Court's aware, Section 3553(a) is what the Court is

9    bound to follow by statute.  Most of those sections I'll

10   address with my remarks, and I will try to keep them brief.

11       Subsection (1) of 3553(a) instructs that the nature and

12   circumstances of the offense and the history and character-

13   istics of the defendant should be considered.  We will address

14   with some presentations by friends and associates and family

15   members of Mr. Peppel a good bit about his personal history and

16   characteristics.  But the presentence investigation report and

17   the various memoranda that have been filed clearly disclose --

18       As well as, by the way, 113 letters that I think the

19   Court's received in support.

20           THE COURT:  I have received them, and I have read each

21   and every one.

22           MR. KOHNEN:  Thank you very much, Your Honor.

23       This is a family man.  Family means everything to him.  He

24   provides for his wife and his five children.  He's a provider

25   to his disabled mother and his seriously disabled brother, both

1    of whom need him.  His mother is in the court today, Your

2    Honor.

3        He's a hard-working business person who, with the exception

4    of this, frankly, desperate and aberrational activity at MCSi,

5    has been a stellar leader within the business community and

6    within the businesses where he's worked.  HealthWarehouse.com

7    is the best example, of course.  And as a co-founder of that

8    company, he remains a crucial member of the team that runs a

9    growing local company which will add, hopefully, with his help,

10   as many as 200 jobs in the next two years.

11       You will hear from the co-founder of that company, and

12   he'll tell you that Mr. Peppel's continued employment there is

13   critical to his continued success and perhaps even its

14   continued existence.

15       Sticking with the 3553(a)(1) factors, as the Court's aware,

16   primarily from the presentence investigation report, Mr. Peppel

17   comes from humble beginnings, yet he worked tenaciously, first

18   to attend and graduate from a top-flight university, and then

19   to achieve success, continuing success, frankly, in business.

20   His history of charitable work both before this legal odyssey

21   began and after, much of it anonymously, until now, speaks

22   volumes about his selflessness and his desire to help others,

23   particularly children.

24       It is his optimism, all agree -- even Mr. Tabacchi said

25   that his crimes -- to me personally -- that his crimes were not

1    motivated by greed.  They were motivated by his optimistic

2    belief that MCSi could and would succeed if he could just get

3    the company past the rough patch we've all heard about which it

4    experienced after 9/11.

5        The Court will recall, I hope, that even Mr. Geraghty, the

6    government's witness, believed for a while that he and his team

7    could save MCSi.  MCSi could not be saved.

8        Subsection (2) of 3553(a) tells the Court to consider the

9    need for a sentence imposed to reflect the seriousness of the

10   offense, to promote respect for the law, and to provide just

11   punishment.

12       Your Honor, this case has been highly publicized.  Mr.

13   Peppel has been humiliated.  He's been embarrassed.  His

14   reputation has been destroyed, and he's experienced animosity

15   from others.  He has forfeited virtually all of his and his

16   family's personal assets.  That was a condition imposed by the

17   government as part of the plea agreement.

18       He and his family live on his comparatively small salary

19   thanks to the generosity and appreciation of many of his

20   friends who are here.

21       As the cases which we cite in our sentencing memo that's at

22   docket number 213 and was filed on September 19th, as they

23   reveal, a sentence of combined home incarceration and

24   probation, even, can provide just punishment in a case like

25   this.  The cases we cite to the Court recognize that loss of

1   reputation, loss of livelihood, loss of all financial resources

2   are particularly acute forms of punishment to defendants like

3   my client Mr. Peppel.  That's true especially when combined

4   with deprivations of his liberty, which we would respectfully

5   submit include home imprisonment, probation, alternatives such

6   as that.

7       Your Honor, this case has lasted more than five long years.

8   Mr. Peppel has been penalized in one form or another all that

9   time.  The government has attacked him.  They've humbled him

10  with a SEC civil enforcement action, with a particularly

11  aggressive asset forfeiture proceedings and tactics, and as I

12  mentioned, they have taken virtually everything of material

13  value from him.

14      He is no threat to the public.  The director and officer

15  ban, which he agreed to already as part of the resolution of

16  the SEC enforcement action, makes repeating this crime by this

17  man virtually impossible.  It prevents him from occupying any

18  formal leadership role in any publicly traded company ever

19  again, yet the company where he works now needs him, and jobs

20  depend on it.

21      Protecting the public is a factor that the Court's

22  instructed to consider.  And, ironically, incarcerating Mr.

23  Peppel for any appreciable period of time will harm the public,

24  not protect the public.

25      In addition to the needless expense of imprisonment, jobs

1   would be jeopardized at HealthWarehouse, or at least its growth

2   would be stymied.  Mr. Peppel's family, including his mother

3   and his brother, who I mentioned, will be dependent on others

4   for help and support.  Over 200,000 HealthWarehouse customers

5   could lose access to affordable prescriptions.

6       Section 3553(a)(3) talks about kinds of sentences

7   available, and we would respectfully submit that virtually any

8   sentence is available to the Court here.  It goes almost

9   without saying that *United States versus Booker* makes the

10  Sentencing Guidelines only advisory, and the probation officer

11  has herself recommended a downward variance from her Guidelines

12  calculations.  She recognized the principle, and she recognized

13  that a variance downward is appropriate.

14      The Guidelines themselves in this case are and were very

15  difficult to apply.  Under these facts -- and there is,

16  frankly, some question as to their applicability to a person

17  who did not intend for anyone to lose money -- application of

18  Section 2B1.1 and the associated Guidelines is particularly

19  difficult.

20      Section 3553(a)(6) instructs that we need to avoid

21  unwarranted sentencing disparities among defendants who are

22  found guilty of similar conduct, and the Court asked us to

23  address that particularly, and I hope we did to the Court's

24  satisfaction in our sentencing memo.

25      Here the government has inexplicitly -- inexplicably,

1   pardon me, recommended a loss figure for Ira Stanley, who could

2   easily be a co-defendant, that is between 300 and 750 times

3   lower than that which it recommends, insists on, for Mr.

4   Peppel.  The government recommends a loss figure for Mr.

5   Stanley of 400,000 to a million dollars despite the fact, as

6   the evidence has revealed, as the charging documents in the

7   respective cases disclose, and as the Court has heard through

8   testimony, despite the fact that Mr. Stanley was much more

9   deeply involved in MCSi's improper revenue recognition than Mr.

10  Peppel was.

11      Also, at the Court's request, we have in our sentencing

12  memo cited many examples where defendants in cases like this

13  have been sentenced to a fraction of the time called for by the

14  Guidelines.  We respectfully submit that this Court should do

15  likewise.

16      The Court asked us and mentioned again this morning the

17  imperfections in the market equity approach to loss and the

18  Guidelines approach to securities fraud defendants.  We hope

19  that at pages 20 to 25 of our sentencing memo we've answered

20  those questions satisfactorily, but suffice to say for now that

21  many, if not most, authorities agree at this point that the

22  Guidelines as they would apply in this case and others like it

23  are flawed and they result in recommended sentences that are

24  unreasonably punitive because they fail to take into account,

25  among other things, factors that are very important in this

11

1    case which apply to Mr. Peppel.  Those are things like the

2    intent of the defendant, his role in the offense, the monetary

3    gain or lack, loss, the defendant himself got.

4        So, Judge, to reiterate just a little bit, the SEC

5    enforcement action and the civil litigation that Mr. Peppel has

6    been subjected to have resulted in him being barred for life

7    from being an officer or director of a public company.  He's

8    paid fines, damages, and legal fees associated with those

9    actions.  The aggressive asset forfeiture proceedings, which

10   have punished him, has caused he and his family to lose their

11   house and virtually all their material assets.  His family has

12   suffered with him.

13       And I should note, Your Honor, that the home where the

14   Peppel family currently lives is being rented, and the rent has

15   been paid by friends and family members.

16       So he and his family have been shamed, they've been

17   ridiculed, they have been embarrassed due to public accounts in

18   the media, which we know from reading the media are based on

19   information that's been shared directly with the media by the

20   government, and his reputation has been forever damaged.

21       We appreciate the Court's extraordinary attention to the

22   2B1.1 calculations, especially in light of their complexity and

23   the number of reasonable options that the Court has.  We think

24   that the Court, while it had to choose one, should perhaps in

25   this case place greater reliance then on the 3553(a) factors

1   that we've just discussed.

2       Interestingly, the Sixth Circuit recently wondered, in a

3   case before Judge Spiegel, why the proxy loss provided for in

4   Section 2B1.1 wasn't used, and we have our same curiosity.  We

5   understand the Court made the call the Court had to make, but

6   we think that, as a result, other factors should weigh more

7   heavily in this case.

8       So now Mr. Peppel stands before you for what will be the

9   final penalty, hopefully a fair and just sentence that takes

10  all of what I've just said into account.

11      Your Honor, I have prepared a summary -- the highlights, if

12  you will -- of some of the letters.  If you'd like to hear that

13  now or later, I'll be happy to provide the summary after some

14  of the people who are here to speak on Mr. Peppel's behalf have

15  spoken.

16          THE COURT:  That's fine.  And I sort of jumped to the

17  assumption that you were in agreement that my recitation of the

18  Guidelines calculation and sentencing range from document 206

19  was accurate, if not to your liking or that you agree with it.

20  Is that fair enough?

21          MR. KOHNEN:  Everything in the order is accurate.  I

22  guess what we're saying, Your Honor, is we believe that there

23  were probably several reasonable choices that the Court could

24  have made.  The Court chose the one that -- we can understand

25  why you chose the one you did.  We would have preferred that

13

1   you chose a different one, but we understand.

2        Does that answer your question?

3            THE COURT:  I think so.  But my recitation of the

4   ultimate conclusion in the August order, document 206, was

5   accurate.

6            MR. KOHNEN:  Correct.

7            THE COURT:  Correct?

8            MR. KOHNEN:  Correct.

9            THE COURT:  And, Mr. Keller, you concur?

10           MR. KELLER:  We do.

11           THE COURT:  Thank you.

12       Mr. Kohnen, it's entirely up to you whether you want to do

13  the summary of pertinent quotes from the various letters now or

14  after presentation of live testimony.

15           MR. KOHNEN:  Thank you, Your Honor.  I'll wait.

16       One housekeeping matter.  I assume that the Court is

17  satisfied with the material it's received recently on the

18  substantial assistance efforts of Mr. Peppel.  If the Court

19  would like to hear more about that, we're willing to share it

20  with the Court.  We're not suggesting that it needs to be done,

21  but if the Court would, we'd obviously like to be heard at

22  sidebar on that matter.

23           THE COURT:  Okay.  I appreciate your stance.  Of

24  course, the government is not obliged to file a Section 5K1.1

25  motion, and it has the exclusive authority to make that choice.

1    How Mr. Peppel's assistance is characterized may vary, but

2    certainly the Court, nevertheless -- and the government I

3    believe agrees -- can take it into consideration in selecting a

4    fair and appropriate sentence.

5              MR. KOHNEN:  We agree with that 100 percent, Your

6    Honor.  In fact, it's provided for in the plea agreement, as I

7    think the Court will recall, that even if the threshold that

8    the government decides to set is not met, the Court will be

9    advised.

10             THE COURT:  Okay.

11             MR. KOHNEN:  Your Honor, with the Court's permission,

12   I'll ask Mr. Lalit Dhapphale to come and address the Court at

13   this time.

14             THE COURT:  That would be fine.  Perhaps Mr. Peppel

15   would like to be seated while these other folks speak.

16             THE DEFENDANT:  Yes, Your Honor.  Thank you.

17             THE COURT:  Sure.

18             MR. KOHNEN:  I assume that means I can sit as well.

19             THE COURT:  You can sit as well.

20     Let me ask each of you who are going to make some remarks

21   to state your name first and spell your name for the record and

22   then tell us what you'd like to say.

23             MR. DHAPPHALE:  Thank you, Your Honor.  Thank you for

24   the opportunity to speak.

25     My name is Lalit Dhapphale.  First name is L-a-l-i-t.  Last

1    name is D-h-a-p-p-h-a-l-e.

2                THE COURT:  Thank you.

3                MR. DHAPPHALE:  I'm the co-founder and CEO of

4    HealthWarehouse.com.  In 2008, when we started our company, we

5    had six people.  Ron Ferguson, our pharmacist, in his infinite

6    words of wisdom, told a fresh University of Cincinnati graduate

7    who quit after one month due to a long commute, "You only get a

8    few, maybe three great opportunities in a lifetime.  Don't pass

9    up too many.  You just passed up on your first one of three and

10   maybe your best."

11       I was lucky not to pass up on my first great opportunity,

12   which was to meet Mike Peppel.  Having only met him for eight

13   hours in the Denver airport in 1998, I went back to San

14   Francisco and quit my job the very next day.  I didn't know

15   what we were going to do, but I knew definitively I wanted to

16   work with Mike, and my life's never been the same since.

17       We started HealthWarehouse.com in August 2007 with $9,000,

18   from a house and a pickup truck, in the worst recession in U.S.

19   history.  Our first month we had three orders, for total sales

20   of $51.  For most people these numbers would have been

21   disheartening, but to someone with long-term vision like Mike

22   Peppel, it was a huge opportunity.  For what we had discovered

23   was a way to save the U.S. consumer billions of dollars and

24   revolutionize the way prescription drugs are sold in this

25   country.

1    Let's fast forward to today.  HealthWarehouse is now a

2    public company, growing from $67,000 in sales in 2007 to more

3    than 10 million in annualized sales this year.  We sell more in

4    one minute than we did in the entire month in 2007, shipping

5    more than 30,000 packages a month to all 50 states, the U.S.

6    territories, U.S. military bases around the world.  We now

7    employ more than 50 people, providing free health benefits to

8    our employees and their families, many of whom were laid off

9    locally from their previous jobs and faced financial hardships.

10    We have had new graduates move to Cincinnati from warm,

11    sunny states like Florida.  We've had MBAs come from

12    prestigious business schools like the University of Michigan.

13    We've had senior management people who have run large retail

14    pharmacy chains move from West Virginia.  We've had skilled

15    financial people move in from New York, and we've had very

16    savvy software people move in from Silicon Valley.

17    Now, one has to wonder how we were able to attract so many

18    skilled and talented people to come here and work in Cincinnati

19    when all we read in the newspapers is high unemployment, lack

20    of opportunities, and companies not hiring.  While it could be

21    the beautiful weather we have here in January, I am fairly

22    certain it is the huge opportunity we have created in

23    HealthWarehouse.com in four short years.

24    To give you a little background, traditional drug

25    distribution to the consumer utilizes retail pharmacies such as

1    Walgreens or CVS.  Big box retailers such as Wal-Mart and

2    Target, as well as grocery stores such as Kroger, also sell to

3    consumers.  HealthWarehouse.com can significantly undercut

4    retail, big box, and grocery store pharmacies for a few

5    reasons.  The first is that we ship from one location based

6    here in Florence, Kentucky, to the entire United States.  This

7    means we don't have thousands of retail stores with retail

8    rents, inventory, and personnel.  On average, it costs $7

9    million to open a Walgreens, so they have many costs to recoup.

10       The second reason is we do not accept insurance.  60

11   percent of the cost of the drugs U.S. consumers purchase today

12   is related to insurance reimbursement.  Now why, you might ask,

13   is that the case.  A typical pharmacy incurs significant

14   overhead in the form of a back office to manage reimbursement

15   from insurance companies and all of the paperwork that it

16   entails.  Since we do not accept insurance, we do not have this

17   unnecessary overhead.

18       Now, our ability to contain costs allows us to sell generic

19   pharmaceuticals to consumers at significantly reduced cost.

20   The significance of this is enormous, given the trend towards

21   the use of generic drugs.  There are 212 billion worth of brand

22   name drugs that will be coming off patent and become generic in

23   the next four years.  Once a drug becomes generic, it is

24   usually priced below the insurance co-pay.

25       Now, according to McKesson, which is the world's largest

1    drug wholesaler, 94 percent of the drugs sold in this country

2    will be cash generics by 2015.  And the reason for that is

3    because it will be cheaper to pay cash for these drugs than use

4    your insurance.

5        That, Your Honor, is the heart of our business and why we

6    can do it cheaper and more efficiently than our competitors.

7    Wal-Mart sells hundreds of common generic drugs for four

8    dollars.  We're able to sell those same generics for $3.50,

9    with free shipping anywhere in the United States.

10       Now, we recently did a price comparison in the city of San

11   Francisco for 20 of our top-selling generic drugs.

12   HealthWarehouse's price was 20 to 95 percent cheaper than the

13   comparable pharmacies.  To give you one example of many, a drug

14   called Arimidex, or the generic name is anastrozole, is a drug

15   that's used for breast cancer patients.  It's a drug that we

16   sell for $22.  Now, that same drug, if you buy that drug at

17   Walgreens, is $345.  If you buy that at CVS, it's $247.  And

18   even if you buy it at Wal-Mart, it's $107.

19       HealthWarehouse today is one of only 29 VIPPS-accredited

20   pharmacies in the United States.  VIPPS stands for Verified

21   Internet Pharmacy Practice Sites, and it's an accreditation

22   given by the National Boards of Pharmacy.  It's a very detailed

23   process.  It goes through all of our operating procedures.

24   They look into the source of where we get our drugs, which

25   manufacturers we work with, very in-depth analysis of our

1    company.

2         Now, out of the 29 pharmacies, we're the only pharmacy

3    that's approved to sell online nationwide to the consumers.  We

4    are individually licensed in all 50 states, a process which

5    took us almost four years, and today we stand as the largest

6    mail order -- Internet mail order pharmacy in the United

7    States.

8         We look at our business as an evolution of pharmacy and a

9    solution to high drug prices.  Because of our efficient

10   distribution model, we feel we are well positioned to

11   revolutionize the industry, much the way Amazon did with books

12   and Netflix did with movies.  In a time when companies are

13   downsizing or have stopped hiring, we continue to grow at an

14   astounding pace.  Our goal is to create hundreds of new jobs in

15   the next three years.

16        And while we can congratulate ourselves for putting local

17   Cincinnatians to work and providing jobs at a time when our

18   local economy needs it the most, there is a very sad and dark

19   side to our business.  Our country is in the midst of the

20   biggest challenge we have ever faced as a nation.  Our

21   unemployment rate hovers at just under ten percent.  While this

22   is the published number, this number is closer to 20 percent

23   when you take into account people who have simply given up or

24   have taken part-time jobs to survive.  There are close to 60

25   million Americans living on food stamps and nearly the same

1   number with no health insurance benefits.  The effect that this

2   recession has had on the American people is unfathomable and,

3   in terms of health, the suffering is unimaginable.

4       On October 20th, just four days ago, two customers wrote on

5   our Facebook wall.  A customer from Seville, Ohio, wrote, "I

6   lost my job in August 2011.  I have COPD and other chronic

7   diseases, and no, I do not smoke.  I had a need to continue my

8   meds. and inhalers to keep my chest pain at bay.  Since I no

9   longer have medical insurance and limited funds, I found

10  HealthWarehouse, who has been wonderful to me and have made it

11  easier for me to keep my long-term medication in a reasonable

12  price zone.  I thank them for their care and concern and the

13  wonderful people who work there, because without them I would

14  have a much shorter life."

15      Another customer from Moscow, Idaho wrote, "I have a

16  pregnancy disease called hyperemeses gravidarum.  Without my

17  prescription, I would be unable to sustain the pregnancy.  In

18  2008, my weekly dosage cost my insurance $1,000 a week.  I

19  don't have insurance right now, but thanks to your company, I

20  am almost 14 weeks along and can afford to pay out of pocket

21  for my medication.  My husband and I are so thankful for the

22  service you provide."

23      In the greatest, richest country in the world, this is a

24  national tragedy.  In HealthWarehouse, we have the ability to

25  help tens of millions of people live healthy lives free of pain

21

1   and suffering and to do so in a way that doesn't cost taxpayers

2   a penny.  We are taking action to help these families in need,

3   while politicians talk about it.  For these people,

4   HealthWarehouse is one of their three lucky chances in their

5   lifetime.  Without HealthWarehouse, these people have no

6   options, period.

7       Imagine if you had a migraine headache and couldn't afford

8   the medication to make the pain go away.  Even worse, imagine

9   if your child couldn't breathe due to asthma and you couldn't

10  do anything to stop it.  For each of the examples I mentioned,

11  which are all true, our company has changed people's lives

12  forever.  People who call us routinely break out in tears

13  because they are so grateful to be able to afford their

14  medications.  You could say that we are providing the service

15  that Americans need at a time when it's needed the most.

16      Mike Peppel's lifetime goal has been to help people.  He

17  has consistently helped people anonymously his entire life,

18  whether he had money or not.  The list of deeds is too long to

19  mention here.  HealthWarehouse is an extension of who Mike is,

20  and it's his mechanism to push the cause he is most passionate

21  about, which is helping people less fortunate than himself,

22  especially children.

23      Mike's role at HealthWarehouse has been to serve as an

24  adviser to me and to mentor our younger employees.  For me,

25  Mike has been most helpful giving strategic advice on how to

22

1    help grow the company, primarily in the area of finance and

2    mergers and acquisitions.  It is undescribably hard, especially

3    in this economy, to find attractive financing and investors who

4    are interested in the company's long-term growth and not for a

5    quick profit.  Mike has a unique talent for identifying these

6    rare investors who are willing to provide financing on sensible

7    terms and are committed to the company for the long haul.

8        Similarly, carefully selected acquisions and strategic

9    partnerships help the company grow quickly and safely in both

10   size and efficiency.  Mike brings unmatched creativity and

11   insight to this process.  He can identify opportunities that

12   literally no one else sees and find ways of structuring

13   transactions that make impossible deals seem attractive to

14   everyone involved.  Mike's unique skills and talents cannot be

15   replaced at any price.  I and HealthWarehouse will miss them

16   sorely.

17       Mike's importance to our employees is perhaps even greater.

18   The average age of our company is in the mid-20s, in terms of

19   employees' age.  Just as Mike guided me in my 20s, these kids

20   need Mike to reach their full potential and help

21   HealthWarehouse grow to its full potential.  One such example

22   is Danny Biser, who is here today.

23       Danny, would you mind standing up for a second.

24       (Mr. Biser complies.)

25            MR. DHAPPHALE:  Now you can sit down.  Thank you.

23

1    Danny was our first employee at HealthWarehouse, joining us

2    in May of 2008.  He grew up in Cincinnati, and he was a college

3    dropout.  He was floating from job to job, no real direction or

4    purpose in his life.  When the restaurant Danny was managing

5    finally closed down, he was floating again.  As was the case

6    for me years ago, Danny's first big opportunity in his life was

7    to meet Mike Peppel.  Mike immediately took Danny under his

8    wing, and his life has been completely transformed.  He has

9    grown from a punk college dropout into a key member of our

10   accounting department and is now a leader to the younger

11   employees in our company.

12   He single-handedly planned, executed, and managed our move

13   from Loveland to Florence, barely sleeping for four straight

14   nights.  Mike even convinced Danny to complete school and get

15   his college degree.  He is now taking the remaining credits

16   needed to graduate from the University of Cincinnati with a

17   degree in accounting, and he'll get his degree in 2013.

18   Danny also recently got married and has become a

19   responsible member of society, adding value rather than being

20   another college dropout with limited opportunities, costing our

21   society money to support.

22   Mike has been instrumental in turning kids like Danny

23   around, giving them direction, confidence, and the ability to

24   contribute to society at their full potential.  It is

25   reminiscent of how I met Mike and how he inspired me to reach

24

1   my full potential.

2       Having met hundreds, if not thousands, of people in

3   business over the past 13 years, I never imagined in my

4   lifetime I would be speaking on behalf of the most honest,

5   trustworthy, loyal and genuine person I know in a setting such

6   as this.  I really hope I've been able to give you a glimpse of

7   who Mike Peppel is and the impact he has daily on his family,

8   the lives of our employees and, most importantly, the tens of

9   millions of Americans who need HealthWarehouse as their only

10  means of getting lifesaving medications.

11      I hope that you will give Mike that one lucky break which

12  he has given to me and so many others, including the more than

13  100 people from six countries and 15 states who are present

14  today in this courtroom and came from so far away.

15      Thank you, Your Honor.

16          THE COURT:  I've read your letter, sir.  It was the

17  longest letter.  But, actually, I had marked it to be perhaps

18  quoted in the course of these proceedings.  It was very

19  thoughtful, and I appreciate your sharing your thoughts with me

20  today.

21      Mr. Keller, do you have any questions?

22          MR. KELLER:  No, Your Honor.  Thank you.

23          THE COURT:  Thank you, sir.

24          MR. DHAPPHALE:  Thank you, Your Honor.

25          MR. KOHNEN:  Your Honor, Mr. Biser is here, and we've

1   asked him if he would be willing to address the Court briefly.

2       I'd like to point out to the Court that, in addition to

3   what Mr. Dhapphale said, we have over a hundred people here

4   supporting Mr. Peppel.  They're out in the hallway even now

5   because they couldn't find seats.  They come from six foreign

6   countries, including Mr. Peppel's son Michael, who is here all

7   the way from Australia, where he is studying.

8       Danny Biser, as indicated, was HealthWarehouse's first

9   employee.

10          MR. BISER:  Thank you, Your Honor.  My name is Danny

11  Biser, D-a-n-n-y.  Last name is B-, as in boy, i-s-e-r.

12      Your Honor, as Lalit said earlier, I grew up here in

13  Cincinnati and attended Mason High School, where I graduated in

14  2001.  I began attending the University of Cincinnati in the

15  fall of 2001, where I planned on obtaining a degree in

16  electrical engineering.

17      While at the university I made some bad decisions that

18  caused my life to take a turn for the worse.  In 2003, I

19  dropped out of university because of those decisions and began

20  working odd jobs.  I was a delivery driver, a server, a

21  landscaper, a bartender.  The list goes on and on.

22      When I met Mike in April of 2008, I had just lost my

23  restaurant manager job because the company that I was working

24  for was closed down for financial reasons.  I had taken yet

25  another odd job as a banquet server just weeks before I met

1   Mike.  Mike offered me a job at HealthWarehouse as the first

2   employee a few weeks after we met for the second time.  About a

3   year into working at HealthWarehouse, I began to realize the

4   amount of business knowledge that I was getting from Mike.  He

5   took the time out of his day for me.  He taught me, and he

6   believed in me.

7       Shortly after I began to realize and appreciate the

8   mentoring that Mike had provided to me, he asked me why I never

9   finished school.  I explained to him that when I dropped out, I

10  was making poor decisions, working jobs simply to pay my bills,

11  and thought the pipe dream of returning to college to make

12  something out of myself had slipped out of my reach.  Mike

13  didn't see it that way.

14      I am proud to say, because of Mike, I returned to the

15  University of Cincinnati in 2009, where I take classes on a

16  part-time schedule after work, on the weekends, and online.  I

17  am making the appropriate steps to graduate from the university

18  with my accounting degree in 2013.  My once pipe dream has

19  become a reality.

20      Between the education that I'm receiving at the University

21  of Cincinnati and the mentoring that I have been given by Mike

22  over the last three and a half years, I stand before you today

23  as a productive member of society again.  I didn't know when I

24  met Mike in April 2008 that he would change my life like he

25  has.  I just know that I don't want to look back, because my

1  future is very bright now.  I have been given a second chance

2  at living a successful life.  I ask that you do the same for

3  Mike.

4      Thank you for giving me the opportunity to speak today.

5          THE COURT:  Mr. Biser, I've read your letter as well.

6  One of the things you said is that, "Our customer base consists

7  of people who are uninsured and can barely afford the

8  medication necessary for survival.  We touch lives every day

9  and save people across the country hundreds of dollars a

10 month," and you requested that Mike Peppel be allowed to

11 continue building the foundation of this company.

12     Do you still feel that way?

13         MR. BISER:  Yes, Your Honor.

14         THE COURT:  Thank you.

15         MR. BISER:  Thank you.

16         MR. KOHNEN:  Your Honor, next I'd like to introduce

17 the Court to Mark Whitacre.  Mr. Whitacre is a friend of Mr.

18 Peppel's.  He also has written to the Court.  But I think that

19 he has a little bit different and more complete offering here

20 this morning.

21         THE COURT:  Okay.  Thank you.

22         MR. MARK WHITACRE:  Your Honor, my name is Mark

23 Whitacre.  That's M-a-r-k W-h-i-t-a-c-r-e.  And I appreciate

24 the opportunity to say a few words here today.

25     I stand here in full support of my good friend Mike Peppel.

28

1   My wife and I flew here from Pensacola, Florida, today to

2   support Mike, his wife Melanie, their children, and Mike's mom.

3       Almost 20 years ago, in the early 1990s, I became the

4   highest ranking executive of a Fortune 500 company to ever

5   become a whistleblower in U.S. history, in what still remains

6   one of the largest worldwide price fixing conspiracies in U.S.

7   history, still today 20 years later.  I wore a wire for the FBI

8   for three long years during that historic case in the early and

9   mid-1990s.  However, while I was undercover I engaged in

10  fraudulent activity, and for my crime I was sentenced to 128

11  months of incarceration.  I have no one to blame but myself,

12  Your Honor.

13      It should be noted -- I served eight and a half years of

14  that sentence.  It should be noted that my crime was greed

15  driven with no doubt, but Mike Peppel's crime was not greed

16  driven, and I really would like to emphasize that today.  I

17  share with you that during my prison sentence I worried

18  immensely about my family, because it was a decade-long prison

19  sentence.  And I also worried if I would ever be able to have a

20  career again after prison, even though I have an ivy league

21  Ph.D. in biochemistry.

22      Because of the fact that my marriage of 32 years, along

23  with my whole family, survived the prison sentence, with the

24  divorce rate of over 90 percent for the incarcerated, and

25  because of the fact that I was able to rebound back into my

29

1  career in the biotech business world even after prison, because

2  of those two reasons, Mike Peppel reached out to me several

3  years ago looking for some hope, and since that time our

4  families have grown close.

5      Your Honor, I stand here today not to address my past

6  conduct, for which I take full responsibility, but instead I

7  stand in front of you to share some experiences.  One important

8  item that I would like to discuss is the following.  During my

9  case I learned firsthand that harsh sentences are often imposed

10  in high profile white collar cases when the emotions are high,

11  only to be regretted later.

12      For example, in my own case, following my prison release

13  five years ago in 2006, following that prison release four FBI

14  agents and one of the former prosecutors responsible for my

15  case went public, stating that I should have received only a

16  fraction of the lengthy sentence that they had recommended back

17  in the '90s when the emotions were high.

18      For the record, there are approximately a dozen such recent

19  interviews, from CNN to Fortune Magazine, by the FBI and other

20  government officials archived on a Web site called

21  MarkWhitaker.com, a dozen such recent interviews.

22      Remarkably, these same four FBI agents and my former

23  prosecutor have become my biggest supporters and lobby

24  diligently to the White House, and continue to lobby even today

25  to obtain for me a full presidential pardon.  The FBI

1    supervisor of the case, who was 25 years with the FBI and who

2    is now retired, even flew to Washington, D.C. with me in order

3    to present to government lawyers their case for a pardon.

4        The bottom line and the reason why I'm emphasizing that is

5    the following:  is that the government now has the opposite

6    reaction as compared to when the emotions were high.  The toll

7    on my family over that eight and a half years in prison was

8    unimaginable.  I can tell you from firsthand experience that

9    the toll of prison on the defendant, up to the point of

10   sentencing, is worse on the defendant than the family, up to

11   this point of sentencing.  But then the toll is much greater on

12   the family than the defendant during incarceration.  The family

13   suffers more.

14       Because my marriage and family relationship survived, I

15   learned firsthand that America is indeed a country where second

16   chances really do exist, and I am living proof of that fact.

17   Since my release in 2006, I have been very fortunate to resume

18   my career in biotechnology as a top executive again.

19   Additionally, in light of my experiences in what has been

20   viewed by government officials as a very successful re-entry, I

21   spend a lot more time at the government's table in other

22   districts than the table of the defendant.  This is the first

23   time in five years that I've been at a table of the defendant,

24   and it may be my last, because I do spend a lot of time at the

25   government's table.

1    For example, I have been and continue to be a frequent

2 participant in panels and training seminars with prosecutors,

3 FBI agents, and U.S. chiefs of probation, which sometime focus

4 on the issue that you are struggling with today, which is how

5 do we deal with first time nonviolent offenders.  These

6 appearances include me being a guest speaker at the Quantico

7 FBI Academy earlier this year.  And I also served as a keynote

8 speaker for a U.S. district federal judge, The Honorable Casey

9 Rodgers, in April of this year at her groundbreaking re-entry

10 court program graduation in Pensacola, Florida.  I was her

11 keynote speaker.

12    In addition, at the U.S. Federal Court in St. Louis, where

13 I was selected to speak, I was selected to speak by U.S. Chief

14 of Probation Douglas Burris regarding my experiences of

15 incarceration and going through the justice system.  Following

16 that speech in St. Louis, I was asked to join all the federal

17 judges of that district for a private luncheon.  You would not

18 be surprised to learn that the conversation focused on two

19 topics.  First was re-entry after incarceration, and the second

20 was alternatives to prison for first time nonviolent offenders.

21    Some of those federal judges during that private luncheon,

22 which was just no more than a year ago, several of those

23 federal judges questioned, in hindsight, whether my sentence of

24 128 months was overly harsh for a first time nonviolent

25 offender.

1        Your Honor, many states, including your own state of Ohio,

2    are implementing smart-on-crime rather than tough-on-crime

3    policies.  Because of overcrowded prisons and reduced budgets,

4    that trend is moving rapidly, and one can easily see by the

5    number of state systems that are actively implementing

6    alternatives to prison for nonviolent offenders such as

7    community service, probation, and mandatory restitution.

8        Many states, in addition to Ohio, have changed already to

9    smart-on-crime policies, including Mississippi, Alabama, and

10   California.  Based on my recent interactions with U.S. federal

11   judges, the FBI, federal prosecutors, and U.S. probation

12   officers, I see the same interest starting to take place in the

13   federal system.  It is important to emphasize that U.S. Supreme

14   Court Justice Anthony Kennedy spoke to the American Bar

15   Association a few years ago urging the ABA to lobby for more

16   lenient sentences in both the federal and state systems for

17   first time nonviolent offenders.

18       In my 54 years I have never felt compelled to stand in

19   court to support a criminal defendant at sentencing, never, but

20   I'm here today because I believe wholeheartedly that leniency

21   for Mike Peppel is justified.  I have come to know Mike and his

22   family very well over the past several years, and he is a man

23   of character and immense compassion who, above all, is

24   committed to his family and helping others less fortunate than

25   himself.  He has a very, very charitable heart, and he's an

1    extraordinary businessman, as Lalit mentioned, who even under

2    the immense strain of this process has found a way to

3    contribute to a growing local enterprise.  It is nothing less

4    than remarkable in what he has accomplished.

5        My respect for Mike is evidenced by the fact that my wife

6    and I support our youngest son Alex, who finished his college

7    degree and is now in the process of finishing his MBA degree,

8    we supported him to move from Florida to Cincinnati earlier

9    this year and to work with Mike at HealthWarehouse.com.  My

10   wife and I did not make such a decision lightly.  Our son Alex,

11   who is also here today, has seen Mike consistently setting the

12   standard for the highest ethics at everything that Mike does at

13   that corporation.  He sets the standard for high ethics.

14       I also know firsthand, because Mike and I have had a lot of

15   personal discussions because of what I've lived through in the

16   last 20 years of my own case.  I was in my early 30s when it

17   happened, and I'm in my early 50s now.  I also know firsthand

18   the remorse that Mike feels for his past conduct, and I've seen

19   firsthand how those experiences of the past five years have

20   changed him for the better.

21       Your Honor, in conclusion, please take into account the man

22   Mike is now, the man that Mike is today, in deciding his

23   sentence.  And I especially urge you to please consider in your

24   deliberations what is the benefit to the judicial system or

25   what is the benefit to the society by incarcerating a man who

```
 1   has touched and continues to touch so many lives for the
 2   better.
 3       Thank you, Your Honor.
 4           THE COURT:  Thank you.
 5       Mr. Keller, any questions?
 6           MR. KELLER:  No questions, Your Honor.  Thank you.
 7           THE COURT:  Thank you.
 8       Thank you, Mr. Whitacre.
 9           MR. MARK WHITACRE:  Thank you.
10           MR. KOHNEN:  Your Honor, Mr. Whitacre touched on Mr.
11   Peppel's charity and his care for others, and a gentleman from
12   the University of Notre Dame is here to address the Court:  Mr.
13   Kirt Bjork.
14       Is Mr. Bjork in the courtroom?
15       It may be that he couldn't get in, and it may be that he
16   couldn't get here, but I believe the Court's received a letter
17   from Mr. Bjork.
18           THE COURT:  Could perhaps -- Mr. Bjorn?
19       I can't remember how he pronounces his name.
20           MR. KOHNEN:  Bjork.
21           THE COURT:  Bjork.
22           COURTROOM DEPUTY:  Do you want me to check?
23           THE COURT:  Yeah, if you would.
24       (Mr. Kirt Bjork enters the courtroom.)
25           THE COURT:  Ah.
```

```
 1              MR. KOHNEN:  If I may have a moment with him, Your
 2   Honor.
 3              THE COURT:  You may.
 4      (Mr. Kohnen and Mr. Bjork confer privately.)
 5              MR. BJORK:  Thank you, Your Honor.
 6              THE COURT:  Good morning.  If you'll start with your
 7   name, spell your name, and then proceed.
 8              MR. BJORK:  Sure.  My name is Kirt Bjork, K-i-r-t
 9   B-j-o-r-k.
10              THE COURT:  Please go ahead.
11              MR. BJORK:  Okay.  Thank you.  I appreciate the
12   opportunity to speak this morning, Your Honor.
13        As I said, my name is Kirt Bjork, and I'm the director of
14   development for the University of Notre Dame.  I live in
15   Mequon, Wisconsin.
16        As I shared with you in my letter, Your Honor, my role for
17   the university is very simple.  I try to identify people who
18   are willing to shape the hearts and minds of our next
19   generation of leaders, and I humbly stand before you today to
20   share with you and others here my belief in Mike Peppel as a
21   person willing to give of himself for others.
22        Starting in 1999, Mike and his family established several
23   scholarships at Notre Dame that are truly helping shape and
24   transform the lives of 20 young people on many levels.  I
25   actually met Mike Peppel six years ago at a coffee shop in
```

1    Dayton, Ohio.  Within the first five minutes of that meeting I

2    knew that Mike was a man of character, a driven man with a very

3    big heart.

4        I learned how Mike ultimately ended up in South Bend,

5    Indiana, how hard he had worked to get to college, how hard he

6    worked when he was there.  What was most striking is that at

7    the conclusion of our meeting Mike said how thankful he was for

8    the people, most of whom he had never met, that helped him

9    realize the dream of a college education.

10       Another thing that stayed with me from that first meeting

11   with Mike was what he said to me at the close of our meeting.

12   He said to me, "Kirt, let me know what else I can do to help

13   those students in greatest need, because if I and others are

14   willing and able to help those students in some small way, the

15   many -- of the many things that they will learn in college one

16   of the most important lessons will be why it is so important to

17   give back, to sacrifice for the greater good of others."  In

18   fact, there hasn't been a meeting with Mike, since that very

19   first meeting, when he doesn't ask me what he can do to help

20   others.

21       I have met Mike's darling wife Mel and four of his five

22   children.  They are genuine caring, giving human beings.  As a

23   husband and father of four, I can tell you, Your Honor, and

24   many of the people sitting in here that raising compassionate,

25   caring, thoughtful, hard-working children is very difficult.

37

```
 1    Mike and his wife Mel are doing that.
 2         I can also tell you what I learned from my parents and my
 3    parents' parents, is that one of the true marks of a person's
 4    character is how he or she treats others in good times and in
 5    bad.  And I can tell you that Mike Peppel always treats people
 6    with respect and dignity.
 7         I do not take the opportunity to speak to you lightly, Your
 8    Honor, and I appreciate the opportunity I've been given.  And
 9    what I am here simply to say is that I have come, in a very
10    short period of time, to know and trust Mike Peppel, and I
11    think the world of him and his family and hope that he will
12    remain a valuable contributor to society.
13         Thank you very much.
14              THE COURT:  Thank you.  Thank you for coming so far.
15              MR. BJORK:  I appreciate it.  Thank you.
16              THE COURT:  Questions, Mr. Keller?
17              MR. KELLER:  No questions, Your Honor.  Thank you.
18              THE COURT:  Mr. Kohnen?
19              MR. KOHNEN:  Thank you, Your Honor.
20         Your Honor, we have Mr. Peppel's wife Melanie, who would
21    like to address the Court.
22              MS. PARSONS:  Thank you for this opportunity to speak,
23    Your Honor.  My name is Melanie Parsons, M-e-l-a-n-i-e P-,
24    Peter, a-r-s-o-n-s.  I have been married to Mike Peppel for
25    five years.
```

Eight years ago in Sydney, Australia, I met the most amazing man.  I had never been around someone with such a passion for life, motivation, and drive.  His magnetic energy swept me off my feet.  The fact that Mike had three children when I met him did not discourage me.  It made me love him even more.  After seeing how committed he was to them, I knew I wanted him to be the father of my children.

Mike and I have been able to provide a stable, loving home for all of our children, even in the face of these diffi- culties.  The older three from his first marriage accepted me as part of the family from the very beginning.  I feel very blessed to be able to have a good relationship with each of them.

When the other two came along, there was never any mention of half brother or sister.  We have worked hard to enjoy a close family unit.  I would like you to know our family, the innocent ones who will be hurt the most.

I first met Michael Junior when he was 12 years old.  From the beginning, we had a friendship that was based on mutual respect.  I am so proud to see him mature into an intelligent, charismatic young man.  Like his father, he is passionate about everything he does and follows his heart.

He is currently enrolled as a freshman at Notre Dame in Sydney, Australia, following his love of travel and the development of knowledge.  He is presently living with my

1  parents.  His Australian grandparents are thoroughly enjoying

2  having him live with them.  I am sure both sides have been

3  enriched by the experience.  But please understand how

4  important Mike is to Michael Junior's development.

5      Michael and his father have a very strong father-son bond

6  that has now grown into a wonderful friendship.  Mike has been

7  instrumental in guiding Michael.  I see how Michael Junior,

8  even as an adult, relies on his father's wisdom to make life

9  choices.

10      Marissa, who is now 17, has always said she had the best

11  childhood, and I can tell you from personal experience that

12  Mike is her rock.  Mike has always taken time out of his busy

13  schedule to spend time with her, including playing his favorite

14  pastime:  Barbie dolls.  Marissa is now getting ready to head

15  to college.  She is a strong-willed, confident young woman who

16  has the ability to do anything she sets her mind to.  She is

17  very hard working and motivated, thanks to her father's

18  guidance and influence.

19      She is now entering what we all know to be challenging life

20  change, and she needs her father, her closest confidante and

21  friend, more than ever.  I am looking forward to seeing the

22  wonderful accomplishments Marissa will achieve in her life, and

23  I pray she will be able to accomplish those with her father at

24  her side.

25      Max was six when I first came to Ohio.  He is an adorable,

energetic boy.  He has Mike's outgoing personality and, like Mike, adapts easily to any situation with enthusiasm and ease. Mike has always said that Max could do anything with the right guidance.  As he enters his teenage years, it is crucial for Max to have the same love and guidance Mike has been able to provide Michael and Marissa.  I would hate for Max to miss out on the father-son bond that would be so instrumental in his development as a young man.

Monte, our four-year-old, seems to be a combination of all the other three children.  He is very passionate, confident, and easygoing.  He has such a close, loving relationship with his father.  The thought of him losing this relationship for any period of time is heartbreaking.

Michaela, our newborn daughter, has the most gentle, alert personality.  I pray that she can have the wonderful memories of her father that Marissa has experienced.  I am amazed at how she has not been affected by all the stress that has been around her.  I am saddened at the possibility that she might not even get the chance to know her father.

I have seen how difficult it has been on the older three children seeing their father being portrayed so negatively in the media for the past five years.  As a father, Mike has tried to shield them from the impact of negative publicity, and to their credit, they still see their father as the loving dad and not the villain described, even when they were taunted at

school and enduring the consequences of leaving their family home of 14 years.

I also depend on Mike emotionally and cannot fathom how I will guide this family alone.  I always felt like such a beginner at parenting.  Mike has been an invaluable resource as I struggle to be the best mother I can.  Not only is there the worry of being a single-parent family; there is also the loss of income and health insurance.  Any time without him will be a huge financial struggle for the six members of our family left behind.

Mike is a protective, supportive and responsible father. He is the foundation of our family.  I can assure you our family will not be the same without him present.  As I have spoken with others who have been through this, I have learned that it's 100 times harder for the family than the person incarcerated from here on.  Relationships are never the same, and the children's scars take a long time to heal.  The stress our family has endured the past five years has been tremendous. It sickens me to hear that it will only get worse.

From the bottom of my heart, please have leniency for my husband and the father of our children.  Our family has been through a terrible five years, and without the support of friends, both financially and spiritually, we would not have survived.  It is a testament to Mike's character that we have the support of so many friends, many of whom are here today.

1        Mike is a wonderful man.  I am honored to be his wife, and

2   I appreciate you considering my perspective as you seek to

3   fashion a fair sentence.

4        Thank you, Your Honor.

5             THE COURT:  Any questions, Mr. Keller?

6             MR. KELLER:  No, Your Honor.  Thank you.

7             THE COURT:  Mr. Kohnen?

8             MR. KOHNEN:  May I have just a moment?

9             THE COURT:  Sure.

10   (Mr. Kohnen and the defendant confer privately.)

11             MR. KOHNEN:  Your Honor, I'm going to try to stay

12   brief with respect to the quotes from the letters, but there's

13   a couple of themes that run through them that I'd like to

14   mention to the Court, and we appreciate your review and your

15   obvious recall from them.

16        Before I get there, Your Honor, as you know, as you well

17   know, the offenses involved here occurred a long, long time

18   ago.  This case was initiated several years ago.  Somehow this

19   court (verbatim) ended up on your docket.  We don't really know

20   how.  We've inquired but were unable to learn.  But the

21   important thing from these letters and the important thing that

22   I hope the Court is discerning is that through that time Mr.

23   Peppel has not changed.  He's learned, no doubt about that, and

24   he's recognized and admitted the offense he committed, but he

25   remains an optimist, a valued friend, a loved family member.

1    So the themes of the many letters that you've received

2  reveal him to be a committed and loving family man.  You've

3  received letters from his brother Mark and his brother Mark's

4  caregiver.  The caregiver wrote, "I know that without Mike,

5  Mark will lose himself and the only freedom he has left."

6    His mother sent a poignant letter --

7    Thank you.

8    -- saying that she could always count on Mike.  Family and

9  friends have written to the Court telling you what a quality

10  person he is.

11    And there was what we'll categorize as, I guess, a series

12  of letters that describe him as a friend and supporter to those

13  in need, a letter from a Mr. Nix, who was suffering from an

14  aggressive form of cancer, and Mike dropped everything to give

15  him his full attention.  He said, Mr. Nix did, and I quote, "It

16  is a wonderful feeling to know someone truly cares."

17    I don't want to overaccentuate the Make-A-Wish trip for the

18  young man that got to go to a Notre Dame game, but, my

19  goodness, what touching generosity.

20    A letter came from a Mr. Marra, who was grateful that Mike

21  arranged for his daughter to receive medical supplies and

22  machines that she needed.  His sister, pardon me.  Mike had

23  never met the woman.

24    You've heard from Mr. Biser and others about Mr. Peppel's

25  role as a mentor and teacher.  Mr Biser's letter and his

1 statement here today pretty well sums it up, but there were

2 many other letters too. One that came from a childhood

3 neighbor friend named Joe Hollenshead. Essentially even at,

4 what, 14 or 15 years old Mike helped this young man get on

5 track. He said in the letter, "Needless to say, Mike's

6 mentoring motivated me beyond comprehension."

7 And interestingly, there was a letter from an MCSi

8 employee, a fellow named Joe Whitfield, who had worked there

9 from 1999 to 2003 and described himself as just a normal

10 employee. He wrote, in part, "I'm writing this note to make it

11 known that Michael Peppel was, for me, a mentor, friend, and

12 someone who always thought of the company and its people

13 first."

14 We had seen precious few victim impact statements. I don't

15 know whether they were submitted to the Department of Justice

16 and there were more that were submitted that weren't shared

17 with us or not. There's one, though, that we did see because a

18 gentleman sent it to us himself. I believe his name is Joe

19 Navarino.

20 THE DEFENDANT: Savarino.

21 MR. KOHNEN: Savarino, S-a-v-a-r-i-n-o. If the Court

22 hasn't read that statement, we'd appreciate it if you would,

23 because Mr. Savarino tells it like it is.

24 There's a letter from Terek Shrit, who learned from Mr.

25 Peppel that, if he put his mind to it, he could do the same

1   thing that Mr. Peppel did, and that is, go to college, spend

2   his freshman year at a school, get great grades, gain admission

3   to the University of Notre Dame, and flourish from there.

4       There was a letter from Hong Ha-Tran, H-o-n-g H-a, dash,

5   T-r-a-n.  This was a woman who was a Vietnamese boat person, a

6   single mom on welfare with a nursing degree when she met Mr.

7   Peppel.  And she said, and I quote, "You could say he gave me

8   self-confidence.  Through our professional relationship he has

9   taught me that I have the skill and intelligence that I should

10  be proud of.  Mike is not just my boss but also my mentor, a

11  friend, a brother, a father whom I respect and look up to."

12      There was a particularly interesting letter from a Veronica

13  Malinczak, M-a-l-i-n-c-z-a-k.  This is a woman who went to work

14  or works currently for one of the survivers, the surviving

15  companies of MCSi, currently known as Diversified Computer

16  Supplies.  She said that, "Mr. Peppel encouraged me to continue

17  my education.  Now, 15 years later," long before -- long after

18  she met him, she says, "15 years later, I have a college degree

19  and am the executive assistant to the CEO of Diversified

20  Computer Supplies."

21      The letters refer to him as an entrepreneur, a man of

22  vision.  There are letters there from business people, which I

23  won't spend a lot of time with, but there's a subset of those

24  letters from business people, particularly the CEO of Centurion

25  Labs, who make clear that Mr. Peppel is an ethical and honest

1   businessman.

2       There is a letter from a Sareen Stone, S-a-r-e-e-n

3   S-t-o-n-e, who transacted business with Mr. Peppel for 20

4   years.  He said, noted that Mike, quote, "exhibits qualities of

5   honesty, personal integrity and humanitarianism."  And he

6   stated, quote, "I have never had any doubt whatsoever regarding

7   Mike's integrity."  Similar letters came from, among others,

8   the chief operating officer at Centurion Labs.

9       Then there is a slew of letters that make known his

10  critical contributing factor to the success of HealthWarehouse,

11  the fact that he is a critical contributing factor and

12  continues to be.  They need him.

13      And we heard from Mr. Bjork, of course, about his lifelong

14  support, an example of his lifelong support of charitable

15  causes.

16      So this happened years ago, and he's learned, indeed, but

17  he hasn't changed from the same altruistic optimist that he was

18  long before the events that led to this case took place.

19      Mike, would you like to speak?

20          THE DEFENDANT:  May I speak, Your Honor?

21          THE COURT:  Yes.  Please do, Mr. Peppel.

22          THE DEFENDANT:  Thank you.

23      The conduct which brought me before this Court was wrong,

24  and I knew it was wrong when I did it, Your Honor.  I broke the

25  law, but I honestly had no idea about the seriousness or the

breadth of the implications of doing so.  I am ashamed and I am

ashamed of my failures, but most of all I'm ashamed and

embarrassed about the terrible position that this has put my

family in.  My wife and my children and all these wonderful

supporters are here for me, and I am grateful beyond words.

As Mr. Kohnen said, Your Honor, I am an optimist and I'm

loyal.  In a sense, at least, it was my optimism and loyalty

that got me into this mess.  I believed that if we could just

get MCSi through a rough period, we could get the company back

on a solid foundation, preserve the jobs relying on the company

and me for their livelihood, and get back to the growth, job

creation, that we once experienced.

I know that I was too optimistic, with the benefit of the

hindsight.  I can now see I was trying desperately to save a

business that couldn't be saved, at least as it was organized

at the end of 2000, nearly a decade ago.  I was too optimistic,

I was naïve, and I took and authorized transactions which I

knew were wrong but which I thought were for greater good, the

good of the company, the good of its employees, and the good of

the shareholders.  I was wrong, and I am sorry.

I remain optimistic, as I have throughout this very

difficult odyssey.  The government has taken everything of

value from my family, and I have been living under significant

stress for the past five years.  Still, I have struggled

mightily to keep my family together and have worked very hard

1  to remain a productive member of the business community and a

2  positive role model for others and a leader in whatever the law

3  will allow of a great company known as HealthWarehouse.

4       Your Honor, people still rely on me, and I'm flattered and

5  humbled by that.  I will remain optimistic, and I will strive

6  to continue to contribute to society in a positive way.  It is

7  my fervent hope that you will fashion a sentence which allows

8  me to remain with my family and which allows me to continue to

9  help HealthWarehouse do the great things it does.

10      Thank you, Your Honor.

11          THE COURT:  Thank you.

12      Mr. Keller, comments, remarks with regard to what should be

13  a fair and appropriate sentence in this matter?

14          MR. KELLER:  I do have some remarks.  I would inquire

15  if the Court would like to invite any other members of the

16  gallery.  I am informed that at least one individual identify-

17  ing himself as a victim had requested an opportunity to speak

18  to the Court, if that might be appropriate before inviting

19  comments.

20          THE COURT:  All right.

21      Is there someone present, one or more people present who

22  would like to speak with regard to a fair and appropriate

23  sentence?

24          MS. MALAY-PEPPEL:  (Raises hand.)

25          THE COURT:  Yes, ma'am.  Please come up and give us

```
 1   your name, spell it, and then tell us what your position is.
 2         MS. MALAY-PEPPEL:  Hi.  I'm Natalie Malay-Peppel
 3   N-a-t-a-l-i-e M-a-l-a-y, hyphen, P-e-p-p-e-l.
 4       I have known Mike since early 1980s.  I'm his first wife.
 5   His mother, my mother were best friends.  His mother was always
 6   at our side, my sister and I.
 7       I went on to college.  That summer I graduated college in
 8   1987, Mike and I started hanging out as friends and then our
 9   relationship began.  He and I moved to Ann Arbor when he
10   started Diversified Data Products with his friend, his
11   childhood friend Joe Hollenshead.  And we had a nice life.
12       We had two children at that time, and he saw an
13   opportunity --
14       I'm sorry.  This is so impromptu.
15       He saw an opportunity to not only help his friends and me
16   and his children and his family but other people, and we moved
17   to Dayton, Ohio, and he acquired Miami Computer Supplies, and
18   later it turned into MCSi when he took it public.
19       I am here on behalf of my children.  We have three children
20   together, and he has two lovely children to a wonderful woman:
21   Melanie Parsons.  I was on the inside of our entire life at
22   MCSi.  We opened up our homes and our hearts to everybody at
23   MCSi.  My children used to walk in to the office, and instead
24   of handing out Halloween -- or taking Halloween candy from the
25   employees, they would come in with their little pumpkin buckets
```

1    and pass candy out to the employees.  We were family oriented,

2    and we wanted to include the business in that way.

3         The past years have been very hard on my children.  And I

4    will do anything for my children, but I will not lie and I

5    cannot.  And I have to tell you, I do not see any benefit of

6    Mike going to jail or a sentence.  My children need him.  I

7    have a son in college.  My daughter's trying to figure out

8    where she's going to go to college.  I have a 13-year-old son

9    who's at home, and I don't want to think about what he's going

10   to face tomorrow when he goes to school and this is in the

11   papers again.

12        He's a good man.  He has helped so many people.  His mother

13   has been my saving grace when I was a child in high school.

14   I'm not exactly sure what all transpired during those years at

15   MCSi, but I know Mike had the best intentions.

16        Many nights we had people eating at our house.  Many times

17   our doors were open because somebody needed a place to stay.

18   There was a joke around the company that people would rather

19   stay and eat my spaghetti than go and eat at l'Auberge.  Okay?

20        As a mother, I need help to raise these children.  He and I

21   both grew up without fathers, and I don't see the benefit of my

22   children and these two little ones with him and Melanie, I

23   don't see the benefit of he receiving such a harsh judgment.

24        Thank you.

25             THE COURT:  Is there anyone else in the gallery who

1  would like to speak on the subject of what would be a fair and

2  appropriate sentence in this case, either for the government or

3  for Mr. Peppel?

4           MR. ALEX WHITAKER:  I would, Your Honor.

5           THE COURT:  All right.  Please step up.

6      Tell us your name and spell it, please.

7           MR. ALEX WHITACRE:  My name is Alex Whitacre,

8  W-h-i-t-a-c-r-e.

9      I have known Mike for about a year now, and he is the most

10  interesting, smartest, and charismatic person I've ever met,

11  and it's hard to meet people like that, you know, nowadays.

12  And seeing what he's going through has -- it kills me.

13      My father was in prison for eight and a half years.  I was

14  12 when he was sentenced.  And people say, you know, oh, you're

15  punishing the -- you're punishing, you know, the people you're

16  sending to prison.  You're not.  You're punishing the children.

17      And I look and I see -- I see his kids, and it kills me,

18  because I know what it's like, and I know what it's like to go

19  through it.  I was picked on, I was beat up, black eyes.  You

20  know, I didn't even want to go to school.  The year my father

21  was sentenced, I missed over 60 days at school because I just

22  couldn't take it.  I was 12 years old when I attempted suicide

23  because of the situation, 15 on my second attempt.  I'd given

24  up hope.  I didn't know what to do.  Because eight and a half

25  years is a long time, and you don't know what's going to

1  happen, you know?  You don't know what -- when they get out,

2  who are they going to be?  You know, who are they?

3      You know, I sat there for eight and a half years in a

4  visiting room -- and I love my father to death.  He's my best

5  friend.  He's my mentor.  He means everything to me.  But, you

6  know, it's different when they got out.  And, you know, things

7  did get better, you know, but what we went through is something

8  that I would never wish upon my worst enemy.

9      You know, you're not punishing Mike.  You're punishing

10  those kids.  You know, Max is 12 years old, the same age as me,

11  or I was when my father went through it.  I just pray for him,

12  because I know what it's like.  It's the worst feeling in the

13  world having your world crumble around you.  And I pray for his

14  kids, you know.  Mike and Marissa, they're older, you know,

15  they have some grasp of it, but Max and Monte, they're six and

16  12.  They're never going to understand.

17      When I was a little kid, you know, my father was wearing a

18  wire, and I asked my mom why.  And she said, "It's to save him

19  from the bad men," and I never understood what it was all

20  about.  And even when he was being sentenced I didn't under-

21  stand it.  And I remember my father was about to be sentenced

22  and the phone rang.  I answered the phone, and a man said, "If

23  you think your father's going to live after this court hearing,

24  you're fucking stupid."  I was 12 years old.  12 years old and

25  a man is telling me they're going to kill my father.  How do

53

1    you -- how do you go past that?  How do you go to school and

2    learn?  How do you pay attention?  How do you do things like

3    this?

4         We all make mistakes.  We're all human, you know.  And for

5    a crime where there's no victim, he didn't hurt anyone, things

6    happen, it's -- it makes no sense.  And the decision that's

7    going to be made is going to have the largest impact on these

8    kids than anyone will ever realize.  It affects me today.  I'm

9    25, and it still affects me.  I have severe anger issues.  I

10   have a hard time with people.  I have no friends in my life.

11   If it was me in that seat, this room would be empty, because I

12   push people away because I don't trust them because of what

13   happened.

14        You know, going to school and having everyone tell a joke

15   about your father being in jail and being beat up and made fun

16   of is the worst feeling in the world when you're a 12-year-old

17   kid and you're just trying to understand life.  I'm just asking

18   that:  do it for these kids.  He's a great father.

19        The kids are so smart.  I honestly believe their six-year-

20   old is smarter than me.  I mean, he's an absolute genius.  But

21   that can change.  The kid, you know, could be a genius today,

22   but with the stress of life and not knowing what's going on --

23   who knows who he could be.  That kid could be the president of

24   the United States or he could become nothing because everything

25   was taken away from him.  You know?  And it makes me wonder

54

1    what I could have been, what I could have done, you know, and

2    why it was me.  Why did I have to suffer?

3        My father tried to kill himself twice, and I was there both

4    times.  Those are images that flash in my head every day.  And

5    I wish it could go away, but it's made me a stronger person,

6    it's definitely made me a better person, but I don't wish it on

7    anyone.  I don't wish it on the worst person in the world.

8    Seeing your father taken away, having threats made against him,

9    everyone against him, is the worst, the worst feeling in the

10   world, and no kid should ever have to go through that.

11       Thank you.

12            THE COURT:  Thank you, Mr. Whitacre.  I appreciate it.

13            MR. ALEX WHITACRE:  Thank you.

14            THE COURT:  Mr. Keller, any questions?

15            MR. KELLER:  No questions, Your Honor.  Thank you.

16            THE COURT:  Is there anyone else who wishes to speak?

17            MR. KRUEGER:  (Raises hand.)

18            THE COURT:  Yes, sir.  Please step forward.

19       Give us your name first and spell it.

20            MR. KRUEGER:  Sure.  My name is Patrick,

21   P-a-t-r-i-c-k, Krueger, K-r-u-e-g-e-r.

22       I come here today as a friend of Mike's, and I'm just going

23   to speak from the heart, much like the letter that I wrote to

24   you, Judge.  I've known Mike for 12 years, since I was a

25   development director at the University of Notre Dame, and it

1  was at that time that Mike created the first scholarship at the
2  University of Notre Dame, an endowed scholarship.  Now, the
3  first endowed scholarship was created at Oxford University in
4  1510.  That's 501 years ago.  That's about as close as you and
5  I get to immortality.  So as long as there's a University of
6  Notre Dame, Mike Peppel will be remembered there with this
7  endowed scholarship.

8      And he's helped countless people through that scholarship,
9  and he did it because he grew up in an area that has seen a lot
10 of tough economic times, and he believed in the people who
11 mentored him, the DeBartolo family who, through hard work and
12 their example and their sacrifice, were also very generous to
13 the University of Notre Dame.  And I've grown -- you know, I've
14 been friends with Mike and known him for about 12 years.  I
15 have five children, and he was generous to them, buying them
16 gifts, mostly, you know, items like T-shirts and baubles,
17 bangles and beads, things like that.  He's been a guest in my
18 home; I've been a guest in his home.

19     He helped that young man realize a dream of coming to the
20 University of Notre Dame to a football game and meeting the
21 coach.  He's done countless things for countless people.  And
22 much like our parents, you know, he's an entrepreneur and he
23 grew up in a country where he believed that anything was
24 possible and if you do your best, work hard and have dreams,
25 you can create a great future, not just for your family but for

1    lots of other people who are your employees.  And that's what

2    he's tried to do, and he's done it again with HealthWarehouse.

3        But the people who are going to be affected the most,

4    obviously, are his family.  As I said, I've been fortunate

5    enough to raise my five children.  My youngest son is now a

6    freshman in college and is friends with Michael and Marissa.

7    And, you know, there are countless things that Mike might miss,

8    especially with these children in the most formidable years of

9    their life.

10       So I hope that, as someone who is in business and who is a

11   job creator, much like our parents who were part of that

12   greatest generation, they're going to continue to have dreams

13   and aspirations.  And as a businessman who is creating jobs and

14   has a vision for the future and long-term success, as the

15   country begins to pull out of this economic recession that

16   we're in, I think it helps to have job creators who are putting

17   a lot of people to work and who are helping us reduce the debt

18   that we have in this country.

19       So I hope that Mike will continue to be able to do that

20   and, more importantly, to spend time, important time, on

21   birthdays and anniversaries and high school graduations and

22   college graduations and weddings and all the things that life

23   entails.  He's a man who realizes what he's done, and he, you

24   know, will accept whatever his fate happens to be, but I guess

25   I wouldn't be a friend if I wasn't here to ask for some

57

 1   compassion for the people who it's going to affect the most.

 2        You have my letter and you've read that, I hope.  Again, it

 3   just comes from the heart.  And I just want to thank you for

 4   the opportunity to be here today.

 5             THE COURT:  All right.  Thank you, Mr. Krueger.

 6             MR. KRUEGER:  You're welcome.

 7             THE COURT:  Anyone else who wishes to speak on the

 8   subject of a fair and appropriate sentence for Mr. Peppel?

 9             MR. CORONA:  (Raises hand.)

10             THE COURT:  Yes, sir.

11             MR. CORONA:  How you doing, Judge?  Thank you for

12   giving me the opportunity.  My name's Brian Corona.  B-r-i-a-n.

13   Last name Corona, C-o-r-o-n-a.

14        I'll keep this brief.  I do just want you to know, as many

15   people have said before me, Mike is a good guy.  I first met

16   Mike about four years ago when he gave me the opportunity to

17   work at HealthWarehouse.com.  I can never repay him for that

18   opportunity.  I can honestly sit here and say that I've learned

19   more from Mike with the -- I've learned -- with the exception

20   of my parents, I've learned more from Mike than any other

21   person in my life.  The experience that I've had over these

22   past four years, it's unbelievable, and I have all -- Mike is

23   to thank for that.  I can't thank him enough.

24        When I first moved out here, I knew no one.  He has -- he

25   always invited me out with his family and friends, made me feel

1    like I was part of his family.  And like I said, I can't thank

2    him enough for that and for the opportunity he's given me over

3    these past four years.

4        Mike is a lot more than just a boss.  He's a mentor and

5    he's a friend.  I've developed a great relationship with Mike

6    over this time, and I just wanted to come up here and show my

7    support for him and hope that you are lenient on his sentence

8    and just know that all the people here support him and need

9    him, and it's important that he's there for everybody,

10   especially his family.  So thank you.

11             THE COURT:  Okay.  Thank you.

12       Anyone else who would like to share something that they did

13   not already include in their letter?

14      (No response.)

15             THE COURT:  All right.

16      Mr. Keller?

17             MR. KELLER:  Thank you, Your Honor, ladies and

18   gentlemen.

19       I would agree with Mr. Kohnen in his initial comments that

20   this has been a long journey getting to today in this courtroom

21   here in Cincinnati, reaching what is really I think accurately

22   best described as judgment day.

23       This case has, indeed, spanned over five years.  This case

24   has found itself on three separate federal district court

25   judges' dockets.  During the course of this five-year journey,

1   Mr. Peppel has had the good fortune to be able to be

2   represented by 12 separate attorneys, all extremely able,

3   hailing from such far away places as Coconut Grove, Florida;

4   Indianapolis, Indiana; Dayton, Ohio; and even here in the Queen

5   City:  Cincinnati, Ohio.

6       On judgment day it is this Court's responsibility, sworn

7   duty, to fashion, to determine what is that appropriate

8   judgment for the crimes that Michael E. Peppel has committed,

9   after considering who he is, the nature of the crimes, the

10  people and entities that have been victimized by his actions.

11      Congress in its infinite wisdom has set forth in the

12  federal law the standard under Title 18 Section 3553(a), which

13  simply states that the punishment must be sufficient but not

14  greater than necessary.  At first blush a very simple standard,

15  but sometimes not as easy as it may sound to apply.  Like a lot

16  of things in the law, Your Honor, this standard, this

17  responsibility, this judgment that you will hand down today for

18  this defendant requires balancing.  On the one hand, the

19  prosecution representatives of the people ask you to consider

20  what is sufficient.  Then on the other hand, from the defense,

21  from the defendant's perspective, they ask you to tilt the

22  scale as to determining what is necessary.

23      In order to accomplish this task, this responsibility, the

24  United States would suggest that three basic questions need to

25  be addressed.  Number one, we need to consider what is the

1    nature of the crimes that Michael E. Peppel stands convicted of

2    today.

3        Number two:  Who is Michael E. Peppel?  And more

4    specifically, what drove him to commit these crimes, these

5    self-admitted crimes?  He pled guilty to these three crimes.

6        And third and finally, and we've heard this question, this

7    rhetorical question asked in virtually every one of the 113

8    character statements that have been submitted to this Honorable

9    Court:  For what purpose is served in punishing this defendant?

10        Let's go to the first question, Your Honor.  What is the

11    nature of the crimes this defendant has been convicted of?

12        Back on August 11th of last year, Mr. Peppel stood in this

13    courtroom in back of this podium and submitted guilty pleas to

14    three crimes:  Count Number 1 of the 32-count Superseding

15    Indictment, specifically, conspiracy to commit mail, wire and

16    securities fraud; secondly, Count 17:  willful false certifi-

17    cation of a corporate financial statement by a corporate

18    officer, which is a violation to what has become commonly

19    referred to in the public and the press as the Sarbanes-Oxley

20    Act; and third and finally, Count 24:  money laundering.

21        Now, what was this case about?  This was a classic case of

22    white collar corporate fraud.  White collar crimes, by

23    definition, refer to those crimes committed by individuals who

24    hold positions of respectability and high social status in the

25    course of their occupation.  These aren't the crimes that this

1   Court and most of the common pleas courts throughout this state

2   deal with and concern with their time on a daily basis, the

3   violent crimes, the murders, the rapes, the gun crimes, the

4   drug crimes.

5       None of those characteristics apply to white collar.  We

6   deal with defendants that you would least expect would find

7   themselves in front of the bar of justice.  This case involved

8   a young, ambitious, aggressive businessman --

9       None of those characteristics, none of those attributes,

10  are crimes.  In fact, in our society, in our culture, often-

11  times they're admired.

12      -- who aspired to make a success of himself in business,

13  who wanted to be that successful young chief executive officer

14  who made that first million dollars before he was 40.  And from

15  the long history of this case, being intimately familiar with

16  the background of what happened, our defendant achieved that

17  goal.  We heard the term, which is commonly referred to by one

18  of the speakers this morning, referencing this case as an

19  example of a victimless crime.  I think the quote was, if I

20  wrote it down correctly, "No one was hurt."  "No one was hurt."

21      Well, we know that's not true.  We know a lot of people

22  were hurt.  We know a lot of money was lost.  Millions of

23  dollars were lost.  This Court, as a result of a day-and-a-half

24  evidentiary hearing, concluded that, at a bare minimum, $18.5

25  million were lost as a result of the crimes committed by this

1    defendant.  Some of the loss that is directly attributable to

2    the actions of Mr. Peppel you really can't put a dollar value

3    on.

4        How do you value the loss of dreams?  We heard about

5    dreams.  It's estimated 1300 individuals up in Kettering who

6    worked for MCSi, who worked for Mr. Peppel, had their dreams

7    extinguished when MCSi collapsed.  This Court in its findings

8    as a result of the three contested issues in the Sentencing

9    Guideline calculation concluded that, at a bare minimum, 281

10   shareholders had their dreams dashed, had their investments

11   dashed by the reckless criminal acts of this defendant.

12       And we know also from the facts of this case that, in

13   conjunction with a public share offering in December of 2001,

14   Mr. Peppel did take advantage of an opportunity -- timing is

15   everything in business -- an opportunity to unload 300,000

16   shares of his personally held stock of MCSi, and which

17   generated a net sale, proceeds of $6.5 million.

18       We know, after spending an incredible amount of time and

19   effort and hearing testimony and having briefs submitted to

20   this Court, that the key fraudulent transaction that Mr. Peppel

21   was involved with dealt with a British company called Mercatum

22   in which there was fabricated out of thin air $37.1 million in

23   sales revenue.  And a close reading of the Court's most recent

24   decision, specifically on pages 24 and 25, indicates that it is

25   indeed fit and proper to acknowledge and conclude that this

1   defendant, Michael Peppel, clearly had knowledge of other

2   fraudulent actions associated with this case that were set

3   forth in the Indictment.  And the order specifically set forth

4   those transactions, those fraudulent transactions, that he was

5   intimately involved with and had knowledge of, specifically the

6   ClearOne, the FedEx, the Skytron, Major Projects one and two,

7   and there was a common thread.  There was a common thread in

8   Mr. Peppel's *modus operandi*, on how he conducted himself in

9   each of these transactions.  The same thread where revenues

10  were inflated, where transactions were created out of thin air,

11  financial statements were fabricated that were submitted to the

12  Securities and Exchange Commission that were relied upon by the

13  American investing public.

14      When you consider the crimes that this defendant has pled

15  guilty to, you can't help but conclude that these weren't

16  mistakes.  They were deliberate calculated acts by an

17  individual who is very bright, we've all heard about that, very

18  calculating, very successful.  And they were crimes that really

19  go to the foundation, the foundation of our equity trading

20  market system in this country, which is really a foundation, a

21  cornerstone to capitalism.  But for the fact that you can -- if

22  you can't trust the accuracy, the truthfulness, the integrity

23  of the information coming out of corporate leaders in this

24  country to make decisions as to whether or not you, as an

25  investor, should or should not invest in a corporation, the

1  entire equity system, the entire equity market system, would

2  collapse.

3  Let's move on to question number two: Who is this

4  defendant and why did he commit these crimes? I'm not going to

5  stand here in front of this Court and contest the various good

6  attributes that this Court has heard testimony from Mr.

7  Peppel's friends, relatives, and business associates. We'll

8  stipulate to that. We'll stipulate that he is a very savvy

9  businessman. We'll stipulate that he has a beautiful family,

10  lovely wife, cares very much for his family. We will not

11  contest the fact that he has been a paragon of philanthropy, of

12  good works, being the individual that we would hope our sons

13  would grow up to, the good Samaritan.

14  But, Your Honor, having sat through many, many trials

15  during your career, I believe you'll agree that, unfortunately,

16  human nature being what it is, it is not particularly uncommon

17  for people to have two faces, two sides of their life.

18  This defendant is 44 years of age. We've heard about his

19  family and his children. He was the proverbial whiz kid in the

20  business world, that *wunderkind*. In the military, in the air

21  force, they refer to people like Mr. Peppel as fast burners.

22  He was on his way up. He was ambitious, he was driven, he was

23  successful. He has been described, looking at the various 113

24  letters, as the ultimate salesman. He is the kind of

25  individual that could sell ice cream to Eskimos.

1    Is there anything wrong with that?  Absolutely not.  And

2    when you take a look at Mr. Peppel's background, he admittedly

3    came from humble background, humble family, humble beginnings,

4    and worked his way up through bulldogged determination.  Again,

5    that is the characteristic, the typical American success story,

6    the Horatio Alger, that individual who through just brute

7    determination pulled himself up by the bootstraps to make a

8    success of himself.  He achieved the American dream.

9    And we've heard a description of that American dream.  If

10   you work hard and you dream, a great future is possible for you

11   and your family.  That's true.  But there was one element that

12   was left out of achieving that American dream, and that is you

13   play by the rules.  You don't break the law.  And, unfortu-

14   nately, Mr. Peppel did exactly that.

15   We know he has that classic Type A personality.  He was

16   described as the overly aggressive manager.

17   We also know that he enjoyed the perks that came with

18   financial success:  the big houses, the fancy cars, the

19   overseas trips, that lavish, opulent lifestyle that he

20   continues to enjoy today, after the government which apparently

21   had been mean enough to seize his house up in Washington

22   Township, relocated to the upscale community outside of

23   Cincinnati of Indian Hills.

24   To a great extent, Your Honor, these personal character-

25   istics that we have heard so much about sitting here in this

1    courtroom for the last hour and a half, while they're

2    interesting, are largely irrelevant to your task ahead.  If you

3    accept the basic argument that has been presented that it is

4    inappropriate to place in prison individuals with large

5    families, individuals who are job creators, individuals that

6    commit white collar crimes, then who do we put in prison?

7        Is it fair?  Is it fair that we only put white collar

8    criminals in prison who don't have families, who don't have

9    children, who are not job creators, who are not savvy

10   businessmen?  Is that what the Lady Justice with the blindfold

11   and the arm stretched out with the two scales, is that the

12   significance, is that the symbology of that traditional symbol

13   of American justice, that there's a different standard based on

14   your background, your bank account, your undergraduate

15   education degree, your pedigree, that that makes a difference?

16   The United States would respectfully suggest that it doesn't

17   and it shouldn't.

18       Why did Mr. Peppel commit these crimes?  Mr. Kohnen said

19   that it was definitely not a result of greed.  Well, the answer

20   really is as old as the ages.  Back in the sixth century Pope

21   Gregory the Great sat down and attempted to put down on a piece

22   of paper what were the motivations, the human motivations, that

23   caused people to sin or do -- or break the law.  And he came up

24   with seven of them, and they've become known over the centuries

25   as the seven deadly sins.

1    And Mr. Peppel fell into those, those two human weaknesses,
2    in this case.  One was greed.  We know that personal enrichment
3    was a huge motivator for the actions that he had taken.  But
4    there was a second, a second motivation that appeared on that
5    list of seven, and that was pride.  He was too proud to
6    acknowledge that he was a failure, and as a result, he cut
7    corners.  As a result, he made a decision.  As a result, he
8    broke the law.  And those decisions that he made back in 2001,
9    2002 have consequences, and those consequences will be
10   communicated to Mr. Peppel through the judgment that this Court
11   hands down today.

12       Who is this individual?  If you look at page two of the
13   defense sentencing memorandum, there is a statement that the
14   United States believes is very revealing.  It reads as follows:
15   "Though his conduct is admittedly regrettable, Mr. Peppel does
16   not deserve to spend the next eight to ten years in prison."
17   Admittedly regrettable.

18       On to the third and final question:  Why do we punish
19   people in this society under our criminal justice system?  Is
20   it because we have such a surplus of prison space in this
21   country that we need to fill it up?  Is that the reason?

22       Congress in its infinite wisdom set forth a number of the
23   traditional, long accepted reasons for punishing criminals, and
24   Mr. Peppel is a criminal.  We punish criminals, first and
25   foremost, to see if we can rehabilitate them.  If we can

68

1   separate him from society, give him an opportunity to fully

2   appreciate the criminality of his actions, so hopefully he will

3   conclude that his actions were more than just merely regret-

4   table.

5       We punish criminals for retribution.  Retribution under our

6   system is an accepted and acknowledged purpose of punishment.

7   You punish an individual for punishment's sake to make sure

8   that they understand they have done wrong, they've broken the

9   law, that society cannot tolerate chief executive officers of

10  publicly traded corporations lying and fabricating on

11  periodically filed financial reports.  We punish people to

12  protect society.  As a representative of the people, of the

13  United States, society and the people have a stake in this

14  case.

15      Respect for the law.  There's an old saying, Your Honor,

16  that laws that aren't enforced tend to be ignored.  Are these

17  security violations, are these crimes of conspiracy, are these

18  crimes of money laundering, are they just really not crimes?

19  Is that what we're saying?  Is that what the defense is asking

20  this Court, to view these crimes and this defendant's

21  involvement in these criminal activities as:  not really crimes

22  but just, oh, mistakes?

23      And we also impose punishment on criminals for deterrence.

24  What punishment is going to be sufficient, appropriate in this

25  case for this defendant based on his crimes so that he is not

1   going to ever, ever take the chance of committing them again?

2   That's specific deterrence.  But there's another flip side to

3   deterrence, Your Honor, and that's general deterrence.

4        What punishment is this Court going to hand down so that

5   those other Michael Peppels out there, those other 30-year-old

6   Type A personality aggressive managers who want to become

7   millionaires by age 40 are going to sit up and take notice of,

8   that these rules, these laws, are serious and they need to be

9   obeyed and, if they're broken, punishment will be meted out?

10       That brings us back to:  What is the appropriate punish-

11  ment?  What punishment is sufficient?  What punishment is

12  necessary?

13       Well, we know that Congress has determined that the

14  statutory maximum for Count 1, the conspiracy, is 20 years.  We

15  know that Congress has determined that the statutory maximum

16  for violation of the Sarbanes-Oxley Act is 20 years.  We know

17  that Congress has determined that the statutory maximum sen-

18  tence for money laundering is ten years.  We know that, based

19  on the findings of this Court, that the advisory Sentencing

20  Guideline range in this case spans 97 to 121 months.  And we

21  also know that from the case law that the advisory Sentencing

22  Guidelines, there is a presumption of reasonableness.

23       So what is the appropriate punishment in this case for

24  these crimes for this defendant?  Considering all the facts and

25  circumstances, who he is, his background, his friends, his

1  family, his business associates, the government would argue

2  that a Sentencing Guideline sentence is appropriate.  And

3  respectfully, Your Honor, that is what we ask, for a sentence

4  in this case against the defendant Michael Peppel.

5       Thank you, Your Honor.

6            THE COURT:  Counselors, ordinarily we would take a

7  break after an hour and a half of proceedings just for

8  everyone's benefit, and we have been now in excess of two

9  hours.  It occurs to me that we should take a brief recess, 15

10  minutes, till 11:20, at which point I'll give Mr. Kohnen an

11  opportunity to respond.  And we can discuss the additional

12  matter of Mr. Peppel's assistance to the government at sidebar

13  if you wish.  Okay?

14       All right.  We'll take a recess for 15 minutes.

15            COURTROOM DEPUTY:  All rise.  This court is in recess

16  until 11:20.

17       (Recess taken:  11:05 AM - 11:20 AM.)

18            THE COURT:  Mr. Kohnen, I'll give you some additional

19  time to respond or reply.

20            MR. KOHNEN:  I would like some time.  Thank you, Your

21  Honor.

22       Your Honor, let's, if we could, please, get some facts

23  straight, first of all, in response to Mr. Keller's remarks.

24  To our knowledge, and we haven't seen anything to the contrary,

25  virtually all MCSi employees who left the company in 2003 are

1   still at work.  They're at work at 25 companies which are doing
2   over $1 billion in business.
3       You've received letters from people at those companies,
4   like Diversified Computer Supply that's located in Ann Arbor,
5   and Consolidated Media Systems in Nashville, and I hope the
6   Court will recall, during the lengthy sentencing hearing on the
7   amount of loss issues and the other Guidelines issues, the
8   testimony about those employees landing on their feet in the
9   other companies that are still in existence, some thriving
10  today.
11      The other thing that I think bears repeating from that
12  hearing, something that in its best light Mr. Keller glossed
13  over, is that the Mercatum transaction and others were
14  approved, presented to and approved by the board of directors
15  of MCSi and, at least with respect to the Mercatum transaction,
16  which is the court charge to which Mr. Peppel pled guilty, were
17  actually approved and, I guess, smoothed through by the
18  PricewaterhouseCoopers auditors.
19      Your Honor, Mr. Keller, again, remarked about the case
20  spanning over five years.  And he mentioned that the case has
21  been on three separate judges' dockets, and he referenced 12,
22  or thereabouts, reputable attorneys.  But we would, if we're
23  going to go there, and it's not something we had intended to
24  do, then I think the Court should inquire, at least internally,
25  about some of the reasons why.  Here are some of the things,

1   the highlights of what we know:

2        First of all, the case was moved from Judge Rice's docket,

3   by our understanding, as a result of conduct, or perhaps

4   misconduct, at least as Judge Rice saw it, by the very same

5   prosecution team that occupies this courtroom here today.  Not

6   sure why it took an intermediate stop before it ended on your

7   docket -- we're grateful, of course, that it did -- but I

8   suspect that there was a similar reason.

9        Why so many lawyers?  Well, the Court is well aware, and we

10  think we are, why the lawyers from south Florida that Mr.

11  Keller mentioned are no longer on the case, and that's because,

12  in an extraordinarily aggressive asset forfeiture tactic, the

13  United States Attorney's office actually seized the money that

14  Mr. Peppel had given to those attorneys for their legal fees.

15  No money, no representation.  Mr. Peppel is grateful to this

16  Court for liberating that money so that he was able to pay

17  counsel.

18       There were occasions in this five years' time when,

19  frankly, Mr. Peppel exercised his constitutional rights and put

20  the government to its burden of proving what it had to prove,

21  not on guilt that was admitted.  But as this Court is well

22  aware and as these folks are learning, guilt is just the first

23  step after a criminal conviction.

24       So why did we have to go through that lengthy sentencing

25  hearing involving the amount of loss calculations and other

73

1    things?  Well, it might have something to do with the fact that
2    despite the fact that his own expert found an amount of loss of
3    over $200,000 less than he claimed, Mr. Keller and the U.S.
4    Attorney's office insisted until the bitter end that the
5    appropriate amount of loss in this case was $300 million.

6        The Court has concluded, of course, that the appropriate
7    amount of loss that's attributable to Mr. Peppel is but a
8    fraction of a fraction of a fraction of that.

9        So when we look at the five years that this case has taken,
10   everybody bears responsibility.  Mr. Peppel responsibility for
11   making sure -- and his counsel, frankly -- for making sure that
12   his constitutional rights were protected; and the prosecution
13   for whatever reasons they might have had.

14       Interestingly, however, Your Honor, when you talk about
15   delay, we're talking about events in this case that happened
16   now more than 11 years ago.  We're talking about a case that
17   was indicted, when it was indicted, four days before the
18   statute of limitations expired.  It causes one to ask the
19   rhetorical question:  Who is responsible for all this delay?

20       And I'm sure that the Court will conclude that, whether it
21   was the government's attorneys or in part his attorneys, he
22   should not and must not be blamed for it.

23       Your Honor, Mr. Keller cited Pope Gregory's seven deadly
24   sins, and one that he neglected to refer to was the sin that in
25   Latin is *invidia*, i-n-v-i-d-i-a, which when literally

1    translated to English means bad seeing, bad seeing, and when

2    euphemistically transferred into English means jealousy.

3    Jealousy.

4        It is respectfully submitted, Your Honor, that the

5    government, principally in the form of the lead prosecutor in

6    this case, has perhaps been less than objective. Are we

7    talking about retribution, as he refers to it here, as one of

8    the purposes for sentencing, or are we talking about jealousy?

9    Are we going to punish a kid because he's a whiz kid, a fast

10   burner, or are we jealous of that?

11       Are we going to punish him because he enjoyed all the perks

12   of his success, or as Mr. Keller put it, his, quote, lavish,

13   opulent lifestyle, are we going to punish him for that, or are

14   we jealous of that? Do we punish millionaires because they

15   become millionaires before 40 for any reason whatsoever?

16       Now, taking a couple of words from a 25-page memorandum

17   written by a defendant's lawyers and criticizing their client

18   with that word choice is inappropriate. While it is certainly,

19   quote, admittedly regrettable that Mr. Peppel committed the

20   crimes which he's admitted to, two things are very important to

21   remember about that: one, they are not his words; two, it is

22   far more than admittedly regrettable to him that he finds

23   himself in this place, and his statement said as much.

24       Mr. Keller stressed that the second prong, as he sees it,

25   of deterrence is to prevent other Michael Peppels. Well, I

1    respectfully submit, Your Honor, the media and other attention

2    that this case has garnered, the five years of living hell that

3    this process has put Mr. Peppel and his family through, should

4    be plenty to discourage any future Mike Peppels.  And if it's

5    not, I respectfully submit that a 20-year statutory maximum

6    sentence isn't going to do any better.

7        Your Honor, the government in this case brought both

8    simultaneous -- a simultaneous SEC enforcement action and a

9    criminal prosecution.  That's rare.  Normally the civil action

10   is stayed.  They chose not to.  I'm not sure why.  They

11   insisted that resolution of the SEC enforcement action, that

12   resolution of the various asset forfeiture matters, and that

13   this criminal case all be resolved at one time in the form of

14   the plea agreement.

15       We'll get to this at sidebar, but they have discouraged and

16   dismissed substantial assistance opportunities, forcing Mr.

17   Peppel's lawyers to take it upon themselves, in refusing, at

18   least initially, to even make the Court aware of what was being

19   done.

20       As I mentioned earlier, the government held fast to its

21   ridiculously high U.S.S.G. Section 2B1.1 amount of loss figure,

22   despite the fact that at one time they offered this defendant a

23   $6.8 million amount of loss figure, despite the fact that Ira

24   Stanley's loss, as I mentioned, was pegged at 400,000 to a

25   million dollars, despite the fact that their own expert, as I

1  mentioned, pegged the loss at over $200 million less than what

2  Mr. Keller made us all come to court and fight over just a few

3  short months ago.

4      And then they tried to salvage some higher loss figure by

5  presenting, at the last minute and for the first time, dubious

6  creditor loss testimony through the former receiver Joseph

7  Geraghty.  And as I mentioned, they were so aggressive in the

8  asset forfeiture action that they even went after the money he

9  paid his attorneys to defend him.

10      Their actions prompted this Court to pay what I think I

11  earlier described as extraordinary attention to the amount of

12  loss calculations, and we do appreciate the Court's attention

13  in that regard very much.

14      We also, as I mentioned earlier, have heard that among the

15  victim impact statements that have been received there's one

16  that's actually positive.

17          THE COURT:  Is that Mr. Savarino?

18          MR. KOHNEN:  Mr. Savarino.

19          THE COURT:  During the break we reviewed what we have,

20  and I don't believe that we have that one.  I thought perhaps I

21  just didn't remember the name.

22      Anyone care to offer a copy of that?

23          MR. KOHNEN:  I don't have an answer.

24          MR. KELLER:  Your Honor, if I may have a moment.  I

25  believe I have a copy of that.  If I may have a moment.

1          THE COURT:  Well, Mr. Kohnen, if you have it before

2     you and there are portions you feel are important for the Court

3     to note, as an officer of the court, I'll accept your represen-

4     tation as to what it says.

5          MR. KOHNEN:  Your Honor, we got a copy of it over the

6     weekend.  I have it here.  I have not yet had -- apparently we

7     did.  This is the first I've seen of it, and I haven't had an

8     opportunity to review it.

9       I have been assured that it is, you know, the victim impact

10    statements as solicited by the prosecutors, and it speaks both

11    highly of Mr. Peppel and that it addresses the risk that

12    investors take when they invest in a company like MCSi.

13      Is that fair?

14          THE DEFENDANT:  (Nods head up and down.)

15          MR. KOHNEN:  May I have just a moment?

16          THE COURT:  Sure.

17      (Mr. Kohnen and Mr. McMahon confer privately.)

18          THE COURT:  I know there was one letter that we

19    received that the gentleman mentioned that he had invested in a

20    number of various well-known corporations, all of which have

21    gone defunct, so --

22          MR. KOHNEN:  I don't know if that was Mr. Savarino.

23      Really, Your Honor, the message he seems to leave is that

24    he didn't lose anything.  His shares became worthless, but

25    that's what happens.

1      And we just thought it was interesting that, despite the

2  fact that we've been assured the government has received this,

3  that neither we nor the Court got a copy of a positive impact

4  statement.  We certainly got a copy of a couple of negative

5  impact statements.  Maybe the postal service works more quickly

6  with those.

7           THE COURT:  I think it was -- go ahead.

8           MR. KOHNEN:  But I, Your Honor, am ready, really, to

9  wrap up at this point.  You know, during this representation of

10  Michael Peppel, he has shown remarkable patience.  He has been

11  anxious to tell his side of the story.  He has been anxious to

12  be able to counter all of the sometimes relevant and often

13  irrelevant remarks about him that have been made both by the

14  government and in the media, and he's gotten his chance.

15      We're not sure what went on behind the scenes in the court.

16  We got a flavor of it from a letter we received a copy of by an

17  attorney named Neil Freund, and I assume the Court received

18  that letter as well.

19      The bottom line is this:  Michael Peppel has had his say.

20  We've admitted our guilt.  We've had our opportunity to address

21  the Court.  We trust the Court, and we trust the Court to

22  impose at this point a sentence that is, as the statutes

23  require, sufficient but not greater than necessary.

24      Thank you, Judge.

25           MR. KELLER:  Your Honor, I have located a copy of Mr.

1    Savarino's victim impact statement.

2           THE COURT:  Okay.  Counselors, did you want to come to

3    sidebar and discuss Mr. Peppel's assistance?

4        Mr. Keller, you can bring that along with you.

5           MR. KELLER:  Yes.

6        One other additional housekeeping matter.  During the break

7    I was informed that there was a gentleman who identifies

8    himself as a victim witness, who was unable to gain entrance

9    into the courtroom based on the large attendance, that had

10   expressed a desire to speak to the Court.

11          THE COURT:  Okay.

12          MR. KOHNEN:  Judge, perhaps we could address that at

13   sidebar.  I think that time has come and passed.

14          THE COURT:  Okay.  Let's talk about it at sidebar.

15       And if you want to stand and stretch while you're waiting,

16   feel free to do that.

17       (A sidebar conference was held and placed under seal.)

18          THE COURT:  All right, folks.  It's my understanding

19   that there is one person who was actually outside in the

20   hallway who wished to speak and was not aware that his

21   opportunity was at hand because of being out in the hallway.

22   Is that person in the courtroom?

23          MR. SMITH:  Yes, I am.

24          THE COURT:  Please step forward.

25       Sir, if you would give us your name and spell your last

80

1    name.

2         MR. SMITH:  My name is Denny Smith, Dennis Smith.

3    D-e-n-n-i-s S-m-i-t-h.

4         THE COURT:  Okay.  What would you like to say?

5         MR. SMITH:  Well, before I get started, there's a lot

6    of wonderful people I know that work at HealthWarehouse here,

7    and I know Mike's family.  He has a lovely family.

8       This is very difficult for me.  I've known -- I've known

9    Mike I guess -- I'm not good with dates, but I'm going to say

10   five, six years, maybe longer.  It started out as a business

11   relationship and grew to a friendship.

12      There's a lot of people in this courtroom that will testify

13   on behalf of Mike and against Mike, victims.  I'd like to say

14   that I know Mike very well.  I mean, those victims and those

15   defendants -- I mean, I broke bread with Mike almost every

16   night till late, cocktails, work, business.  I know Mike, and

17   I'm a victim.

18      I got into the courtroom late, but I heard Mike's counsel

19   talk how the government held some money back.  During that

20   period of time when Mike wasn't working I was one of the people

21   that have either gifted or given, rather, given or lent Mike in

22   excess of a half million dollars, which I'm expecting that I'll

23   get nothing back, because every indication from Mike is he's

24   done with me, as he's done with a lot of people.  I can't speak

25   for those people.  I'm sure some of those people will come

81

1    forward.

2        I'm saying some unfavorable things, and I'm probably going

3    to lose some friends here today in court, but I felt compelled

4    to come down here and tell you, Your Honor, and tell this court

5    that Mike's really good at what he does.  And I think -- I

6    think -- I think Mike doesn't have a problem with hurting

7    people if money's in the deal.  You know?  Mike has the money

8    to pay me right now, and he has the money to pay a lot of

9    people, and some stock in Cape Bear in his mother's name or

10   whatever, but it's his.

11       I was one of the founders of HealthWarehouse.  And I've

12   made a lot of money on HealthWarehouse, and that's what they'll

13   say.  They'll say, he's made a lot of money and I've been paid

14   for my stock, and I have, but that doesn't mean you get to clip

15   somebody and not pay them.  It's just wrong.  Right is right;

16   wrong is wrong.  We all know that.  There's no gray in between.

17       And I'm here to tell you I've seen Mike hurt a lot of

18   people through HealthWarehouse, taking away stuff that was

19   promised.  And I was his good friend, and people don't treat

20   good friends like that.

21       I may not be as articulate as the counsel here and some of

22   the people that may step forward to this podium.  I mean, I

23   think that Mike loves his family dearly.  He likes to make

24   money.  There's nothing wrong with making money, but at the

25   expense of others, it's wrong.

1    And I'm after the fact.  I'm after MCSi.  I did not know

2 Mike during those days, because I'm after the fact.  And I

3 believed Mike, and that's why I helped him.  And other people

4 have helped him and other people have not been paid.

5    You know, I got in this courtroom so late, you'll have to

6 forgive me, but I heard the name Joe Savarino.  Well, of course

7 he's going to get a nice letter from Joe.  Joe is his friend.

8 He's a stockholder of HealthWarehouse.  But you view -- however

9 many letters were sent in here, 500, five, 5,000, I want you to

10 add up all those people that have gifted Mike or lent him

11 $500,000.  Not too many in those letters.  And I've traveled,

12 broke bread, done business deals, worked late, socialized.  I

13 know Mike.

14    So prepare for more of the same, that's what I say.  If it

15 looks like a duck and it walks like a duck and it quacks like a

16 duck, it's a duck.

17    And I apologize to his family, and that's all I have to

18 say.

19         THE COURT:  Okay.  Thank you.

20    Mr. Kohnen and Mr. Keller, any response to Mr. Smith's

21 comments?

22         MR. KELLER:  Nothing from the United States, Your

23 Honor.

24         THE COURT:  Mr. Kohnen?

25         MR. KOHNEN:  Just to confirm, Your Honor, because I

1   think he said it pretty quickly, Mr. Smith admitted that he did

2   not ever own any MCSi shares, and I think he said that he

3   didn't even know Mr. Peppel back then.

4           THE COURT:  Okay.  All right.

5     Well, I'll state a tentative sentence, and then I'll give

6   both sides an opportunity to make any objections that have not

7   heretofore been raised and argued, as well as make suggestions

8   for corrections or amendments.  Before I do that, I'll just

9   give you what some of my thoughts are that are going into the

10   choice of sentence.

11     We all know that the United States Sentencing Guidelines no

12   longer control the determination of a sentence in this case

13   subsequent to the United States Supreme Court decision in

14   *United States versus Booker*.  However, the Court must consult

15   the Guidelines when determining a sentence under Title 18,

16   United States Code, Section 3553.  Sentencing courts are also

17   authorized to engage in fact-finding relevant to calculating

18   the advisory Guideline sentence pursuant to the *United States*

19   *versus Stone* case from the Sixth Circuit, a 2005 case.

20     Mr. Peppel has pleaded guilty to Counts 1, 17 and 24 of the

21   Superseding Indictment charging him with conspiracy to commit

22   securities fraud, in violation of Title 18, United States Code,

23   Sections 371 and 1349; willful false certification of a

24   financial report by a corporate officer, in violation of Title

25   18, United States Code, Section 1350; and money laundering, in

84

violation of Title 18, United States Code, Section 957.

His plea agreement includes the parties' binding stipulation that the Court shall use the Sentencing Guideline manual dated November 1st, 2002, to calculate the advisory sentencing range.  The plea agreement does not include an agreed sentence.  And the parties also stipulated that the Court may make factual and legal determinations that may result in an increase or decrease from the advisory Guideline range.

The Court has already addressed and ruled upon the parties' objections to the presentence report's calculation of the advisory Guideline range.  That is reflected in document 206 filed August 16 this year.

Applying the November 2002 Guidelines manual, the Court concluded that Mr. Peppel's adjusted offense level is 30, his criminal history category is I, and his advisory sentencing range is therefore 97 to 121 months.

His sentencing memorandum urges the Court to impose a below Guideline sentence based upon the factors set forth in Title 18, United States Code, Section 3553.  He contends that a lower sentence, or one combining home confinement and probation, would be more than sufficient.

Taking the factors set forth in Title 18, United States Code, Section 3553 in order, the Court must consider the nature and circumstances of the offense and the history and character-istics of the defendant.  The circumstances surrounding Mr.

1   Peppel's fraudulent scheme have been addressed throughout this
2   case.  In essence, Mr. Peppel, in conspiracy with MCSi's CFO
3   Ira Stanley, overstated company revenues through a series of
4   accounting irregularities and bookkeeping entries.  Overstated
5   revenues led to a more rosy public picture of the fiscal health
6   of the company, which in turn propped up the share price.

7       As this Court concluded in its order determining the amount
8   of loss, the eventual failure and bankruptcy of the company
9   cannot be solely attributed to the fraudulent schemes of Mr.
10  Peppel or Mr. Stanley or the pair of them.  But it is
11  undeniable that the company's loss of value and ultimate
12  failure resulted in losses to many shareholders and employees.
13  There, however, is no evidence that Mr. Peppel actually looted
14  the company or stole from the company.

15      Mr. Peppel's sentencing memorandum and the many letters, in
16  excess of 100, that the Court has received from friends and
17  business acquaintances note Mr. Peppel's humble beginnings and
18  his many community and charitable activities both before and
19  after the charges in this case.  Mr. Peppel has five dependent
20  children and provides financial and emotional support to his
21  brother, who is stricken with multiple sclerosis and has
22  suffered from that disease for many years.  To his credit, Mr.
23  Peppel is now involved in a business venture that is apparently
24  a growing success and provides a very much needed service to a
25  large number of people, not to mention jobs.

1    The Court has reviewed many letters received from the
2  officers and employees of that company describing Mr. Peppel's
3  contributions and his drive to see the company succeed.  It's
4  not unusual for the Court to see in a white collar crime case a
5  defendant who presents himself as a good person, perhaps even a
6  charitable person.  Quite often the charity is a result of
7  stolen money, embezzled money, looted money spent for the
8  aggrandizement of the defendant, but in this case Mr. Peppel
9  appears to be not just a good man, a charitable man, but also a
10  remarkably good man.

11    The Court declines to engage in some variety of class envy
12  or jealousy for Mr. Peppel's hard work and success.  What he
13  has he has, in large measure, earned.

14    Everything Mr. Keller said is true.  It's very important in
15  selecting a sentence in this case that the Court consider the
16  importance of deterring others, the importance of deterring Mr.
17  Peppel from future similar behavior.

18    Mr. Whitacre, perhaps inadvertently, has suggested that the
19  Court might be well advised to require as a part of Mr.
20  Peppel's sentence that Mr. Peppel share his lessons learned
21  from these activities.  Retribution and punishment are in the
22  mix.  But while the Court is obliged to see both the big
23  picture and the individual before the Court, that makes it all
24  the more difficult to select what should be a fair and
25  appropriate sentence.

1    There's no doubt that manipulating financial statements of

2  a publicly traded company is a serious offense and one that

3  must be punished.  While many of the individuals who have

4  written the Court expressed their belief that Mr. Peppel was

5  trying to save the company, the fact is that he broke the law.

6  Misguided attempts to save the company may be an explanation,

7  but they are not an excuse for that type of behavior.  Well

8  functioning financial markets rely, as Mr. Keller has argued,

9  upon honest and transparent financial statements from public

10  companies.

11    Promoting respect for the law is another factor the Court

12  must consider in imposing sentence.  This factor along with the

13  concern that so-called white collar criminals were historically

14  treated with far greater leniency than other types of criminals

15  have spurred many statutory and Guidelines changes over the

16  last two decades.  For instance, recent Guideline amendments

17  have increased offense levels for actual loss caused by

18  corporate fraud and added enhancements for officers and

19  directors of public companies who engage in fraudulent conduct.

20  An unduly light sentence does not promote respect for the law,

21  but neither does one that is unduly harsh.

22    The Court also considers Mr. Peppel's family.  It's not

23  unusual for the Court to hear from a defendant, white collar or

24  otherwise, that he has a significant critical key role in the

25  welfare of his family, and that is quite often true.  However,

1   I think Mr. Peppel's commitment to his family, as demonstrated

2   over the years, is to an unusual remarkable degree.  And I

3   would note that, as Mrs. Peppel has pointed out, a number of

4   his children are at critical stages in their development and

5   their lives.  Mr. Alex Whitacre's remarks are compelling in

6   that regard.

7       Along with providing just punishment to the defendant, the

8   sentence imposed should serve as a deterrent to criminal

9   conduct.  The Court has little concern about deterring Mr.

10  Peppel from future criminal conduct.  He is already subject to

11  a lifetime SEC bar, forbidding him from serving as an officer

12  or director of a public company.  He stands as a convicted

13  felon, a fact that will remain on his record.

14      And with regard to general deterrence, several jurists and

15  commentators have concluded that relatively short sentences of

16  incarceration for white collar economic crimes are generally

17  more than sufficient to serve this goal.  And I would refer

18  counsel to the case of *United States versus Adelson*, which can

19  be found at 441 F.Supp.2d 506, particularly pages 514 to 515.

20  That is a Southern District of New York 2006 case, and that

21  case cites numerous authorities for that proposition.

22      The Court must also consider avoiding unwarranted sentenc-

23  ing disparities among similarly situated defendants.  And this

24  is a broad consideration that goes beyond any co-defendant in

25  this case or in this set of circumstances.

1        Mr. Peppel has argued that a within Guideline sentence

2   would be unduly harsh when compared with sentences imposed on

3   other corporate criminals.  Clearly, the aim of this statutory

4   directive is to avoid sentencing disparities on a national

5   basis, and the advisory Guidelines serve as a basis for avoid-

6   ing such disparities.  In cases where the ultimate sentence

7   lies outside of the Guidelines range, it is difficult to assess

8   disparity without some consideration of other similarly

9   situated defendants.

10       Yet despite Mr. Kohnen's efforts to comply with the Court's

11  instruction, the Court nevertheless feels that and believes

12  that specific knowledge of the myriad of facts that resulted in

13  the particular sentences to which we are attempting to compare

14  Mr. Peppel's situation is probably not very productive.  The

15  amount of loss, however calculated, is not the critical point,

16  not always the critical point, and so I think other cases,

17  specific cases, are not helpful.

18       At least one district court has acknowledged this

19  difficulty, and that is found in *United States versus Parris*,

20  P-a-r-r-i-s, again a case arising out of one of the New York

21  districts.  It can be found at 573 F.Supp.2d 744.  This is an

22  Eastern District of New York case from 2008.  The defendants

23  were convicted of what the trial court described as, quote, a

24  rather typical pump and dump scheme in the world of the high

25  risk penny stock investor, close quote, and that's at page 746.

1    The defendants lacked any prior criminal history, but the

2    Guidelines range was 360 months to life.  The Court labeled

3    that range, quote, patently absurd, close quote.  The Court

4    requested the government to prepare a survey of other similar

5    white collar fraud cases and compare the sentence length to the

6    loss amounts involved in those cases.

7        The government basically agreed that a within Guideline

8    sentence was inappropriate, urged the Court to consider cases

9    that were factually similar as a benchmark reference.  The

10   Court also considered data obtained by the Sentencing

11   Commission on the mean national terms imposed for crimes other

12   than securities fraud, such as drug trafficking, firearms

13   offenses and pornography, among others.

14       The Court observed, and the government survey revealed,

15   that cases where losses were less than $100 million generally

16   resulted in sentences in single digits.  Larger losses resulted

17   in double-digit terms.

18       While the Court noted that there is undoubtedly a host of

19   factors that entered into these sentences, it was plain to the

20   Court that the defendants were not in the same league with

21   offenders who directly caused enormous losses and received

22   lengthy double-digit sentences.  In the latter category, the

23   primary defendants in Enron, WorldCom, and Global Crossing

24   cases were particularly mentioned.

25       In this case the Court agrees that a double-digit sentence

1    would be greater than necessary and likely would contribute to

2    perceived sentencing disparity in the broad sense.  The Court's

3    estimate of actual loss in this case of approximately $18

4    million is not and cannot be exact for the reasons discussed in

5    the Court's prior order.

6        Mr. Peppel's admitted conduct of improperly reporting the

7    Mercatum income and certifying MCSi's Form 10-Q is not

8    comparable to the conduct that led to lengthy sentences for,

9    among others, Enron and WorldCom officers.  Cases involving

10   outright theft of company or investor funds or looting company

11   resources to enrich oneself obviously calls for much harsher

12   sentences than this case merits.

13       Mr. Peppel also argues that the disparate position taken by

14   the government with respect to the loss he caused and the loss

15   Mr. Stanley caused merits consideration in fashioning his

16   sentence.  Stanley's plea agreement includes the government's

17   stipulation that the actual loss attributable to Mr. Stanley is

18   between 400,000 and $1 million.  In contrast, the government

19   asserted that Mr. Peppel caused a loss of $298 million, as

20   reflected in the report by John Hlavacek, an SEC accountant.

21   In response to the final presentence report loss calculation of

22   approximately $8 million, the government presented several

23   alternate loss calculations during the August 2011 evidentiary

24   hearing.

25       The government has explained the discrepancy by stating in

1    the four years since Mr. Stanley's plea the government has

2    developed more information that showed or allowed it to

3    appreciate more fully the loss at issue in this case.  By

4    pleading early in the investigation, much like an investor who

5    bought shares in Apple before its resurgence, Mr. Stanley

6    obtained the benefit of good timing.  In crafting a sentence,

7    the Court, of course, may consider the need to avoid

8    unwarranted sentencing disparities between co-defendants.

9         The explanation from the government is somewhat

10   disingenuous.  The SEC began investigating MCSi in 2003, and

11   the company declared bankruptcy in 2004.  The August 14, 2006,

12   expert report of Alan Funk, on behalf of the SEC in its civil

13   suit against Messrs. Peppel, Stanley and David White,

14   calculated the overall financial effect of the materially -- or

15   the material fraudulent transactions on the company's reported

16   income.

17        Stanley pled guilty on July 9, 2007, nearly a year after

18   that expert report, to an Information charging him with con-

19   spiracy to commit securities fraud, willful false certification

20   by a corporate officer, and mail fraud, essentially similar

21   charges to those to which Mr. Peppel pled guilty.

22        While the government has every right and prerogative to

23   recommend a lighter sentence for Mr. Stanley based on his early

24   cooperation and plea, the large unexplained discrepancy in the

25   government's position on loss is puzzling.  Given that Messrs.

93

1  Peppel and Stanley worked together and that Stanley admitted he

2  falsified company records concerning several transactions --

3  Mercatum, ClearOne, FedEx, Skytron, and others -- the Court

4  agrees with the government's concession that this large

5  difference in estimates of cost caused by the same and similar

6  conduct could lead to an unwarranted sentencing disparity

7  between similarly situated defendants.

8      The presentence report recommends that the Court not order

9  restitution pursuant to Title 18, United States Code, Section

10  3663(b)(3) and states that restitution need not be ordered if

11  the number of identifiable victims would make restitution

12  impracticable and if complex factual issues concerning both the

13  actual cause and the amount of any victim's losses would unduly

14  complicate the sentencing process.  The government does not

15  object to this recommendation, and the Court concludes that

16  restitution is simply not feasible in this case.

17      After fully considering all of the pertinent statutory

18  factors, the Court's duty is to impose a sentence that is

19  sufficient but not greater than necessary to meet all of the

20  concerns embodied in the statute.  The Court is convinced that

21  a sentence within the Guidelines range would be greater than

22  necessary to punish the defendant, to promote respect for the

23  law, and afford adequate deterrence.

24      As noted above, Mr. Peppel has already been punished for

25  his offenses by way of the SEC bar order, his permanent felony

94

```
 1  record, and forfeiture of most of his current assets.  The
 2  Court accepts Mr. Peppel and his family's representation that
 3  the last five years have been punishing, literally and
 4  figuratively, for Mr. Peppel, and the Court takes that into
 5  consideration as well.
 6      Mr. Peppel is a talented businessman, entrepreneur, and the
 7  Court considers imposing a substantial fine upon Mr. Peppel,
 8  and a significant, actually maximum under the law, period of
 9  supervised release, but the Court sees very little benefit to
10  be gained by incarcerating Mr. Peppel for an extended period of
11  time as the Guidelines suggest.
12      Mr. Peppel is key to the welfare of his mother and brother,
13  his wife and children, a company that depends on him in a
14  difficult economic situation, and the Court is satisfied, as I
15  previously stated, that Mr. Peppel will not engage in this type
16  of behavior again.  Certainly if he does, he has a prior felony
17  record at this point, and his sentence would be significant and
18  harsh in the future.  The Court concludes that a variance
19  sentence would be sufficient but not greater than necessary in
20  this case.
21      So having said all that, I will state a tentative sentence.
22  One last bit of information more particularly comparing Mr.
23  Peppel and Mr. Stanley's situations.  Mr. Stanley's base
24  offense level will be six levels less than Mr. Peppel because
25  of the disparity in the charged loss amounts, so that Mr.
```

1    Stanley's Guideline range would be 70 to 87 months.

2        I also note that Mr. Peppel has made significant efforts to

3    assist the government in the investigation of other question-

4    able activities of which he has become aware.  Whether that

5    information ultimately bears fruit, at least it was a good

6    faith effort, and I assume and believe that it was.

7        Mr. Kohnen has quoted from some of the letters that were

8    sent to the Court, and I choose to do likewise.

9        Mr. Youssef Bennani said, "Mistakes do not define us.  I

10   firmly believe that Michael's mistakes do not define him

11   either."

12       Mr. Dattilio wrote, "While there were losses in this case,

13   I don't believe that anyone lost access to a loved one.  Mike

14   is no threat to anybody, so simply putting him in prison

15   doesn't really protect anyone.  Any time Mike spends in prison

16   is time taken away from his five children, and I don't see how

17   this has a positive impact on society."

18       Larry Liebers wrote, "I personally believe that what Mike

19   is doing at HealthWarehouse will ultimately change the health

20   care industry within the United States.  He is doing something

21   that everyone said could never be done, but that didn't stop

22   him.  He took the chance and created something worthwhile.  The

23   world is not going to be a better place with Mike incarcerated.

24   He is a very generous and kindhearted person who, over the

25   years, has become a thread in the fabric of the community."

1    He went on to say, "I see it to be wasteful for the

2 government to spend taxpayers' money to incarcerate someone

3 that has the ability to create so much more for this country

4 and economy."

5    So while those are the, perhaps, most quotable letters or

6 bits of letters that have resonated with me in making the

7 sentencing choice, they are only a tiny percentage of what has

8 been received.  And for the record, I do formally accept Mr.

9 Peppel's guilty pleas at this point and the plea agreement.

10    Just to reiterate, Mr. Peppel has pleaded guilty to Counts

11 1, 17 and 24 of the Indictment, and they are, in particular,

12 conspiracy to commit securities fraud, in violation of Title

13 18, United States Code, Sections 371 and 1349; willful false

14 certification of a financial report, in violation of Title 18,

15 United States Code, Section 1350; violation of the money

16 laundering statute, which is Title 18, United States Code,

17 Section 1957.

18    My tentative sentence would be that Mr. Peppel serve a term

19 of seven days in the custody of the United States Bureau of

20 Prisons, followed by three years of supervised release on the

21 standard conditions of supervised release in the Southern

22 District of Ohio, and those will be set forth in detail on the

23 sentencing order.

24    Mr. Peppel also shall not possess a firearm, ammunition,

25 destructive device, or any other dangerous weapon.

1    He shall cooperate in the collection of DNA as directed by

2  his probation officer.

3    He shall participate in substance abuse treatment,

4  including random drug testing, at the probation officer's

5  direction.

6    He shall complete a mental health assessment and follow all

7  treatment recommendations, including adherence to prescribed

8  medication.

9    He shall obtain no new credit, loans, or accrue new charges

10  on existing credit lines absent prior approval from his

11  probation officer.  He shall disclose all financial information

12  as requested by his probation officer.

13    He shall not be employed or act as chief financial officer,

14  chief executive officer, or as a board member for any company

15  or business while on supervised release.

16    He shall disclose his criminal conduct to all potential

17  employers.

18    He shall engage in community service by making himself

19  available to speak to such appropriate groups as he and his

20  probation officer may select, to speak on the subject of the

21  lessons learned from his mistakes, his crimes.

22    I will impose a fine of $5 million.  I will not impose

23  interest on that amount.  And I will impose a $100 mandatory

24  special assessment for each count, for a total amount of $300.

25    I assume that Mr. Peppel is not in a position to pay that

1  fine and assessments at this time, so I will permit him to

2  develop a payment schedule with the aid of his probation

3  officer, and that will be submitted to the Court for its

4  approval within the next 30 days.

5       Mr. Peppel shall forfeit his interest in certain property

6  to the United States.

7       Mr. Keller, I do not have a list of the property to be

8  forfeited.  Do you have a list to be submitted to the Court?

9            MR. KELLER:  Not at this time, but we will forthwith.

10           THE COURT:  All right.

11      Satisfactory, Mr. Kohnen, if the government submits a

12  statement of forfeited assets to be added to the sentencing

13  order within the 30 days for the payment schedule as well?

14           MR. KOHNEN:  Yes, Your Honor.  And I think that those

15  are specified in the plea agreement if the Court would like to

16  refer to that later.

17           THE COURT:  All right.  I will need Mr. Peppel's

18  current address for the judgment order, which I trust Mr.

19  Kohnen will be able to provide after the hearing.

20      So while I recognize this is a significant, perhaps even

21  huge, variation from the Guideline sentence, I believe it

22  adequately will protect the public.  It will punish the

23  defendant, who has also suffered, as I said.  It will give him

24  an opportunity to repay society in more ways than just the

25  fine, and it will avoid significant hardship to Mr. Peppel's

1    mother, brother, wife and children.

2         So, counselors, objections not previously raised, sugges-

3    tions for amendment or changes?

4         Mr. Keller?

5              MR. KELLER:  No, Your Honor.

6              THE COURT:  Mr. Kohnen?

7              MR. KOHNEN:  No.  And thank you, Judge Beckwith.

8              THE COURT:  All right.  For the record, Mr. Peppel's

9    plea agreement limits his right to appeal.  And I formally

10   notify him at this time that if he chooses to appeal this

11   sentence and he is unable to pay the cost of an appeal, he has

12   the right to apply to this Court for leave to proceed *in forma*

13   *pauperis*.

14        Mr. Peppel, I further advise you, in accordance with the

15   provisions of Rule 4(b) of the Rules of Appellate Procedure,

16   that you must file your notice of appeal with the clerk of the

17   United States District Court within 14 days of the filing of

18   this judgment.  I anticipate that it will be filed today,

19   October 24, 2011, and, therefore, you must file your notice of

20   appeal on or before November 7, 2011.

21        I also want to advise you that, if you request, I will

22   direct the clerk of the court to prepare and file forthwith a

23   notice of appeal on your behalf.

24        Mr. Peppel, would you like a notice of appeal filed?

25              THE DEFENDANT:  No, Your Honor.

1              THE COURT:  All right.  Mr. Peppel, you have 14 days

2       within which to consider whether you wish to appeal or not.  I

3       will rely on Mr. Kohnen and his fellow counsel to protect your

4       appellate rights, but you need to be aware that that 14-day

5       window of opportunity is pretty rigid and, if you miss it, it's

6       very likely you will have waived your right to appeal.

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Do you understand?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Okay.

11         Counselors, is there any other matter that the Court should

12      consider before we recess?

13             MR. KELLER:  None from the United States, Your Honor.

14             MR. KOHNEN:  Nor from Mr. Peppel, Your Honor.  Thank

15      you.

16             THE COURT:  All right.

17         Mr. Peppel, don't disappoint us.

18             THE DEFENDANT:  I will not, Your Honor.  Thank you.

19             THE COURT:  All right.  We'll be in recess.

20             COURTROOM DEPUTY:  All rise.  This court is in recess

21      until 1:30.

22         (Proceedings concluded at 12:30 PM.)

23                             - - -

24

25

1                    C E R T I F I C A T E

2          I, Luke T. Lavin, RDR, CRR, the undersigned, certify

3    that the foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter.

5

6                              s/Luke T. Lavin
                               _____
                               Luke T. Lavin
7                              Official Court Reporter

8                              - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25