1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


- - -


UNITED STATES OF AMERICA,   .  CRIMINAL ACTION NO. 3:06-CR-196
                            .
            Plaintiff,      .  Cincinnati, Ohio
                            .
                            .
        - v -               .  Tuesday, May 14, 2013
                            .
MICHAEL E. PEPPEL,          .  **First Day of Re-Sentencing**
                            .
            Defendant.      .  **Testimony of John Backus and**
............................   **Eduardo Altamirano**

EXCERPT OF TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE
TRANSCRIPT ORDERED BY:  Stuart Dornette, Esq.

APPEARANCES:

For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
                      BY:  Dwight K. Keller, Esq.  (AUSA)
                      and  Brent Tabacchi, Esq.  (AUSA)
                      200 W. Second Street
                      Room 602
                      Dayton, Ohio   45402

For the Defendant:    TAFT, STETTINIUS & HOLLISTER, LLP
                      BY:  Ralph W. Kohnen, Esq.
                      and  W. Stuart Dornette, Esq.
                      and  Jeanne M. Cors, Esq.
                      425 Walnut Street, Suite 1800
                      Cincinnati, Ohio   45202

Also Present:         Mark Grawe (U.S. Probation)
                      Laura Shannon (U.S. Probation)
                      Robert Frommeyer (U.S. Probation)
                      Many interested persons

Law Clerk:            Laurie J. Nicholson, Esq.

Courtroom Clerk:      Mary C. Brown

Court Reporter:       Mary Ann Ranz

2

1          TUESDAY, MAY 14, 2013

2           First Day of Hearing

3         P R O C E E D I N G S

4  BEFORE THE COURT:                    (9:04 A.M.)

5         THE CLERK:  Please be seated.

6     Case Number CR-3-6-196:  *United States of America versus*

7  *Michael E. Peppel.*

8         THE COURT:  Good morning, everyone.

9         ALL PRESENT:  Good morning.

10         THE COURT:  You can see there's a lot of paper

11  involved in this situation.  I need to reorganize briefly

12  here.

13     For the record, Mr. Kohnen, have you read the

14  post-sentencing addendum to the pre-sentence report?

15         MR. KOHNEN:  I have, Your Honor.  Good morning.

16     We've been over it.  Our client, Mr. Peppel, has read it,

17  reviewed it as well.

18         THE COURT:  Okay.  Very good.

19     Mr. Keller, et al., have you read the post-sentencing

20  addendum to the pre-sentence report?

21         MR. KELLER:  Your Honor, we have.

22         THE COURT:  And I assume everyone has read the

23  decision from the Sixth Circuit Court of Appeals that brings

24  us together today to reconsider Mr. Peppel's sentence.

25     Am I correct in that assumption, Mr. Keller?

3

1        MR. KELLER:  Yes, Your Honor.

2        THE COURT:  Mr. Kohnen?

3        MR. KOHNEN:  Yes also, Your Honor.

4        THE COURT:  Very good.

5    I asked my secretary to put the stack of documents up here

6 so that counsel can see them, and I anticipate we will be

7 discussing them.

8    This stack consists of the letters sent in support of

9 Mr. Peppel before the last sentencing hearing.

10    To the extent there were letters I would call "against"

11 Mr. Peppel, in favor of the government's position for a

12 substantial prison sentence, somehow those letters have gone

13 missing and I cannot account for that, but I did read several.

14    This stack is letters after Mr. Peppel's sentencing, first

15 sentencing, that are from people who were unhappy with the

16 sentence.

17    And that one letter, in that stack, is a letter in support

18 of the sentence.

19    The next stack are the letters I've received in support of

20 Mr. Peppel.

21    And the final stack is the stack of letters that I

22 received asking for a more severe sentence.

23    And I believe counsel have been copied on all of those

24 things either through the Clerk's Office or from the original

25 author.

4

1    There are 24 letters in support of Mr. Peppel, and there

2    are 41 letters in support of a more severe sentence.  I expect

3    counsel to address the matters raised in those letters.  And

4    to the extent that you do not, I will bring them to your

5    attention and ask you to address those.

6        So, for the record, I will place the post-sentencing

7    addendum to the pre-sentence report under seal.  If an appeal

8    is taken, counsel on appeal will be permitted access to the

9    sealed report.

10       The only dispute, I believe, or the only issue for today

11   is Mr. Peppel's period of incarceration, whether the original

12   sentence might still be justified or may not be justified, and

13   how, if at all, it should be adjusted.

14       There are specific matters raised in the Court of Appeals'

15   decision; in particular:  Deterrence, general deterrence and

16   individual deterrence, also the subject of whether or not

17   Mr. Peppel's original sentence was adequate punishment,

18   whether it represented what message should be sent from

19   Mr. Peppel's sentencing, to put it broadly.

20       Since the government is the prevailing party in the

21   appeal, I would assume that Mr. Keller and his team will go

22   first.

23       Is that agreeable?

24           MR. KELLER:  That's fine from the perspective of the

25   United States, Your Honor.

1          MR. KOHNEN:  Yes, Your Honor.

2          THE COURT:  Counselors, do you have opening remarks

3    that you would like to make before we proceed?

4          MR. KELLER:  Your Honor, the United States does not

5    wish to make any opening remarks.  We're prepared to proceed.

6          THE COURT:  Mr. Kohnen?

7          MR. KOHNEN:  Your Honor, we likewise defer the

8    opening remarks until, I guess, our case.

9          THE COURT:  Okay.  Mr. Keller, please proceed.

10         MR. KELLER:  Your Honor, with the Court's permission,

11   we call to the stand Mr. John Backus.

12         THE CLERK:  Please raise your right hand.

13        (Duly sworn by the Clerk.)

14         MR. KOHNEN:  Your Honor, I'm sorry to interrupt.  But

15   since we have a large crowd here, I thought it might be a good

16   idea for the Court to remind everyone on the stand of the

17   separation order.

18         THE COURT:  Mr. Keller?

19         MR. KOHNEN:  I just don't know, Your Honor, if

20   there're any people here who are intended to be witnesses that

21   don't know they shouldn't be here until it is time to testify.

22         THE COURT:  Well, Mr. Keller -- I mean Mr. Kohnen, I

23   don't know that there's a standing separation order.  And

24   since this isn't a trial, I'm not 100 percent sure that's

25   appropriate, and I would hear from Mr. Keller on that point.

```
1              MR. KELLER:  Your Honor, there are a number of
2    witnesses that the government intends to -- anticipates to
3    call who are present in the gallery.
4       Again, as the Court alluded to, we are in a proceeding in
5    which the rules of evidence/procedure are greatly relaxed.
6    I'm not sure that sequestration would be appropriate.  We
7    would respectfully inquire as to the necessity of that and we
8    don't think it's really -- really needed.
9              THE COURT:  Mr. Kohnen, if you wish to elaborate, I'm
10   certainly happy to hear from you.
11             MR. KOHNEN:  Your Honor, we'll leave it entirely in
12   the Court's discretion.
13             THE COURT:  I'll make everyone's day.  Go ahead.
14             MR. KELLER:  Thank you.
15                        JOHN C. BACKUS, JR.
16   a witness herein, having previously been sworn, testified as
17   follows:
18                        DIRECT EXAMINATION
19   BY MR. KELLER:
20   Q.  Sir, could you please state your full name for the record?
21   A.  John Carlton Backus, Jr.
22   Q.  Sir, where do you currently reside?
23   A.  Live in Great Falls, Virginia.
24   Q.  Are you here pursuant to a trial subpoena?
25   A.  Yes, I am.
```

1  Q.  What do you do for a living, Mr. Backus?

2  A.  I run a venture capital fund called New Atlantic Ventures.

3  Q.  In layman's terms, what -- what does that work entail?

4  A.  We invest in young, promising technology companies.  We

5  work with them for a period of time and help them grow, and

6  ultimately work to sell those companies or take them public.

7  Q.  Tell us a little bit about your educational background,

8  sir.

9  A.  Sure.  I went to Stanford University; graduated with a

10  bachelor's degree in economics in 1981 and with a master's in

11  business administration in 1984.

12  Q.  Very briefly, could you tell the Court your professional

13  employment history on graduation?

14  A.  Sure.  After graduating college, I went to work for a

15  company called Bain & Company, B-A-I-N & Company, which is a

16  Top Three Strategy consulting firm.

17       I went back to business school.  I went back to Bain &

18  Company.  I worked then at Bain Capital when it was just

19  getting started and went into their first investment company

20  called the Key Airlines -- which is basically consulting --

21  based in Salt Lake City, Utah, which fly troop support for

22  some classified missions.  I obtained a security clearance

23  from the U.S. Government at that point in time; became an

24  airline guy for four years.  We were bought by a larger

25  airline.  Left, in 1990, the airline to start a technology

1  company called US Order.  Was one of the four co-founders of

2  that company.  Sold part of that business to Visa; took the

3  rest public in 1995.  Took over as Chief Executive Officer in

4  1995 or 1996.  Built it up to about a $50 million dollar

5  business.  Stepped down in 1998 to start a venture capital

6  fund called Draper Atlantic, which was a predecessor fund to

7  New Atlantic Ventures which I started in 2006.

8  Q.  Is it fair to say, Mr. Backus, you know what it means to

9  be a Chief Executive Officer of a publicly traded corporation?

10  A.  Yes.  I've been one.

11  Q.  If I was to describe -- if I was to ask you to describe

12  the key characteristics you normally would associate with an

13  individual who holds the position of a Chief Executive Officer

14  in a publicly traded corporation, what characteristics come to

15  mind?

16  A.  Well, a CEO is a leader, first and foremost.  They need to

17  lead by inspiring.  They set a strategy for the business; have

18  to understand what's happening in the marketplace.  They have

19  to be good at finances, financial controls.  They raise money.

20  They have to generally balance a budget at some point; to keep

21  raising money.  It has to be able to manage an organization,

22  you know, hire the best talent, retain that talent, motivate

23  them, train them through the ranks.  Those are a few of the

24  qualities.

25  Q.  We're here today to consider the re-sentencing of a

1    Michael E. Peppel.  Are you aware of that?

2    A.  Yes, I am.

3    Q.  Prior to this morning, have you come to know an individual

4    by the name of Michael E. Peppel?

5    A.  Yes, I have.

6    Q.  Do you see Michael E. Peppel in the courtroom today?

7    A.  I do.

8    Q.  Could you point to him where he may be seated and describe

9    what he's wearing?

10   A.  He's at the table holding a pen with a -- looks like a

11   white shirt and a red tie.

12            MR. KELLER:  Your Honor, I believe the record should

13   reflect a correct identification of the defendant by this

14   witness.

15   Q.  Mr. Backus, when did you first meet Mr. Peppel?

16   A.  Sometime in the fall of 2010.

17   Q.  Could you describe the facts and circumstances which led

18   to that first meeting?

19   A.  Sure.  We were looking through our fund at investing in

20   HealthWarehouse.  We had several conversations with the CEO,

21   Lalit Dhadphale.  We were in the process of preparing our

22   counsel and their counsel some stock purchase agreements for a

23   Series B Preferred Stock.  We were -- I don't know exactly at

24   what point in the process, but we exchanged documents.  Lalit

25   sent me an email, called me up, and said he wanted to come

 1   visit.  I thought it was great.  So he came out to my office

 2   in Virginia with Mike Peppel, who I never heard of before, and

 3   introduced Mike to me as his co-founder of HealthWarehouse.

 4   Q.  Let me just make sure that we have the chronology of this

 5   first meeting correct.

 6       You, I believe, indicated that this occurred in the fall

 7   of 2010?

 8   A.  Yes.

 9   Q.  Do you know if at that point Mr. Peppel had entered guilty

10   pleas to fraud-related federal crimes at that point?

11   A.  I never heard of him before.  I met him that day for

12   lunch.

13   Q.  Did the issue of whether or not he had indeed been under

14   scrutiny for federal fraud charges come up during that

15   meeting?

16   A.  Yes.

17   Q.  Describe what Mr. Peppel told you about that.

18   A.  Sure.  So, Lalit brought Mike out to meet me, introduced

19   him as his co-founder of HealthWarehouse, and Mike proceeded

20   to tell me his story.  And I, first of all, I didn't know

21   there was a co-founder of HealthWarehouse.  I thought it was

22   just Lalit, because for, you know, months as we've been having

23   these discussions, he never brought Mike's name up to me.

24       Mike told me his story, and that --

25       You want the short version of the story he told me?

11

1  Q.  Yes, sir.

2  A.  Okay.  So, Mike told me that he was being persecuted by

3  the government for things that he didn't do at MCSi, which was

4  a former company that he ran.  He went through a song and

5  dance on sort of what happened there.  He said that he lost

6  control of the company; this was a company that was growing

7  very quickly that sort of burst along with a lot of other

8  companies during the tech bubble collapse which started in

9  March of 2000.  That he ultimately brought in some board

10  members.  He was fired by the board.  They then conducted what

11  he described to me as a witch hunt to go after him and to

12  basically hold someone accountable for the drop in revenue of

13  the company.  He said that he was held accountable, that the

14  government pursued him with the help of, I believe, the CFO

15  and other members of the board.  He told me a half dozen times

16  during that conversation that he did nothing wrong, he had

17  been fighting it because he had done nothing wrong, and he was

18  going to continue to fight it, and that was his story.

19  Q.  Now, during this meeting did the topic of an entity called

20  Cape Bear Partners ever come up?

21  A.  Yes.

22  Q.  What can you tell the Court about Cape Bear Partners and

23  what Mr. Peppel had to say about that?

24  A.  Sure.  Mike was -- so, first of all, I was caught by

25  surprise, you know, to meet a co-founder of the company and to

find out that he was under a cloud when we were about to make

a decision to invest a couple of million dollars into this

company.

Mike was explaining to me that even though he was under

this cloud, that shouldn't -- that shouldn't affect our

decision to invest in the company.

He explained to me that some of the restrictions that he

was under -- and I had no reason not to believe this -- were

that he had to have a modest salary.  I think the number

either he or Lalit used during that lunch was something no

more than $60,000 a year.  That he technically couldn't own

his shares of HealthWarehouse.  So he had put them in a

trust -- I think that was the word he used.  I don't think he

mentioned the word Cape Bear at that point, but he mentioned

that he put them in a trust so he didn't have technical

ownership of the shares, and also mentioned he would not be

able to be at HealthWarehouse -- or other companies -- a

director of the company or an officer of the company.  So,

that was part of his explanation to me as to why we should get

comfortable making the investment in the company even though

there was this cloud over him.

Q.  Did he explain or expound why he needed to put the shares

of HealthWarehouse in a trust?

A.  He was -- he had -- he had some story about the government

going after him and limiting his income and limiting his

1  assets, and, you know, if the assets were in his name or if he

2  made too much money, it would go to the government.

3  Q.  Is it fair to say that you performed due diligence after

4  this visit by Mr. Peppel and Lalit Dhadphale?

5  A.  Yes.

6  Q.  Ultimately, at the conclusion of your due diligence, did

7  your firm, through Atlantic Ventures, decide to invest in

8  HealthWarehouse.com?

9  A.  At that point in time, no.  We made the decision not to

10  invest because of the Series B documents we were pursuing.

11  But we ultimately invested in the company several months later

12  in December of 2010, after I received a call from Mr. Peppel

13  and Lalit Dhadphale who told me that they had an opportunity,

14  as they described, for us to buy shares directly from a

15  selling shareholder -- several selling shareholders; I think

16  it was Denny Smith, Wayne Corona, Denny Sutton and a couple of

17  other people -- and Mike worked basically to broker that

18  transaction.

19  Q.  As part of that transaction, did you find yourself joining

20  the Board of Directors of HealthWarehouse.com?

21  A.  There was an understanding when we invested in December of

22  2010 that I would join the board.  In fact, there was a voting

23  agreement that was signed, I believe, by -- by Cape Bear,

24  which Mike had Cape Bear sign, as well as by another holding,

25  I think it was Rock Creek, or something like that, which was,

1  I believe, a Smith entity, that said they would agree to vote

2  for me as long as I was nominated through a certain period of

3  time.

4      Mike and Lalit, frankly, dragged their feet on adding me

5  to the board, and my expectation was it was going to happen

6  immediately.  It ended up happening about eight months later

7  in August of 2011.

8  Q.  Now, the Cape Bear that you referenced, is this as time

9  went on the trust entity that he had referred to, apparently?

10  A.  Yes.

11  Q.  As time went on, what percentage of stock did Mr. Peppel's

12  trust entity, Cape Bear Partners, ultimately own of

13  HealthWarehouse.com?

14  A.  I think at the peak it was 12 percent.  It's probably a

15  little bit lower now.

16  Q.  Is it fair to say that the share price of

17  HealthWarehouse.com over time would fluctuate?

18  A.  Yes.

19  Q.  From the point in time that you first joined the board,

20  which I believe was August of 2011, until --

21      Well, what is your current status?  Are you still a member

22  of the board?

23  A.  No.  I resigned April 29th of this year.

24  Q.  All right.  So, approximately a year and a half time span?

25  A.  Yes.

1  Q.  What was the fluctuation of the share value of

2  HealthWarehouse.com?

3  A.  I think its low was about 80 cents a share.  I think its

4  high was around seven dollars and change.  There were about 14

5  -- at the peak there were about 14 million common shares

6  equivalents out there, so it had its peak about a hundred

7  million or more in value.

8  Q.  And Cape Bear, this trust account, accounted for what, 12

9  percent of the outstanding shares?

10  A.  Cape Bear at that time would have been about 12 percent or

11  about a value of about $12 million.

12  Q.  And that was the trust account of Mr. Peppel's shares,

13  apparently?

14  A.  That's how he described it to me, yes.

15  Q.  All right.  You joined the board in August of 2011.  Could

16  you describe to the Court your impressions of the role that

17  Mr. Peppel played in this publicly traded corporation known as

18  HealthWarehouse.com?

19  A.  He called the shots.

20  Q.  What do you mean "he called the shots"?

21  A.  He was the boss.  He was the guy who was on every phone

22  call with me and with Lalit.  You know, anything of substance

23  that the company covered -- whether it was raising money,

24  whether it was selling stock, whether it was M & A activity to

25  buy a company, you know -- which we bought several during the

16

```
 1   time I was an investor -- Mike took the lead on that.  In

 2   fact, I would say out of a hundred-plus phone calls I had with

 3   Lalit up through April of 2012, Mike was probably on 95 of

 4   those.

 5   Q.  Now, you have become aware that this Court sentenced

 6   Mr. Peppel on October 24th, 2011, correct?

 7   A.  Yes.

 8   Q.  Were you aware that as part of that punishment this Court

 9   had imposed a number of what are called conditions of

10   supervision?  Were you aware of that?

11   A.  At the time, no.  I am now.

12   Q.  Well, let me read a couple, and then I want to ask you

13   your opinion based on your observation of Mr. Peppel as to

14   whether or not you think he has complied with these.  Fair

15   enough?

16   A.  Okay.

17   Q.  "The defendant shall not be employed or act as Chief

18   Financial Officer, Chief Executive Officer, or as a board

19   member for any company or business while on supervised

20   release."

21       Did Mr. Peppel comply with that restriction?

22   A.  Well, his title, I believe, was Director of Operations.

23   In my interactions with him, he was the *de facto* CEO and CFO.

24   Q.  You've been a Chief Executive Officer in your career

25   previously?
```

1   A.  As well as a Chief Financial Officer.

2   Q.  How many times?

3   A.  CFO once.  CEO once.

4   Q.  Have you been a board member of any publicly traded

5   corporations?

6   A.  Yes.

7   Q.  How many corporations?

8   A.  Including HealthWarehouse, four.

9   Q.  Have you ever participated in the hiring of any Chief

10  Financial Officer?

11  A.  Yes.

12  Q.  Have you participated in the hiring of any Chief Executive

13  Officer?

14  A.  Yes.

15  Q.  Now, as you continued to sit on the Board of Directors of

16  HealthWarehouse.com, was there a requirement that periodic

17  public filings be made?

18  A.  Yes.

19  Q.  I want to direct your attention to the public filing

20  required to be filed with the Securities & Exchange Commission

21  for Fiscal Year 2011.  Do you remember that filing?

22  A.  Yes.

23  Q.  Was there any controversy that was presented to the Board

24  of Directors of HealthWarehouse.com on the run-up to preparing

25  and ultimately filing the 10-K report with the SEC for

1  HealthWarehouse.com for Fiscal Year 2011?

2  A.  Yes.

3  Q.  Could you describe what that controversy was?

4  A.  Sure.  So, the 10-K filing has a requirement that after

5  the end of each fiscal year, the company has 90 with an

6  extension period 105 days to file a consolidated result and a

7  detailed result of its financial condition.

8      It was getting to be late March, early April, we hadn't

9  made our filing.  I think some members of the board and me

10 were getting a little anxious about what was happening,

11 because you never want to miss a filing date on a public

12 filing.

13     I remember the first I heard there was a problem was I

14 received a phone call from Mr. Peppel and Lalit Dhadphale,

15 together, telling me that there were some -- there was some

16 accounting problems that the auditing firm -- a firm called

17 Marcum out of New York -- had encountered.  That they were

18 minor.  That they had to do with the fact that the company did

19 not properly code certain transactions that were personal

20 expenses as personal expenses.  That they were miscoded by

21 mistake by the Accounting Department as business expenses, and

22 that the number was trivial, it wasn't a big deal, but that I

23 would be getting a call from the auditors who wanted to talk

24 about that.

25 Q.  Did you get a call from the auditors wanting to talk about

1    that?

2    A.  Yes.

3    Q.  Tell us about that call.

4    A.  Well, they -- I believe it was -- they didn't want to just

5    talk to me.  They wanted to talk to all of the outside members

6    of the board, so -- the four members of the board who were not

7    Lalit Dhadphale -- so it was me, Youssef Bennani, Matthew

8    Stecker and Joseph Savarino.

9        We got a call that set up -- they briefed us on what they

10   found.  They said they found some accounting irregularities.

11   They said that it involved Lalit and Mike, who had used the

12   company credit card to charge personal expenses on, and that

13   the company misclassified those as business expenses, and that

14   they were -- they were unable to complete the audit because

15   the records were a mess, as they described them.

16       They told us that they would not be able to complete the

17   audit unless we -- we retained an independent audit firm to

18   reconstruct and reconcile all of the credit card statements at

19   least for 2011.

20       So, you know, based on their insistence we do that, we

21   hired a group called AMS that was sort of an accounting group,

22   a forensic accounting group, to reconstruct the records under

23   the auspices of Youssef Bennani, who was the sole member of

24   the Audit Committee, who worked with them and went through

25   millions of dollars of -- million-dollar-plus -- of credit

1  card statements to find the personal expenses.

2  Q.  Ultimately, what was the conclusion of the audit that was

3  completed by AMS?

4  A.  Well, they had -- they had two conclusions.  One was a

5  financial conclusion; the second one was a process conclusion.

6      The financial conclusion was that Mr. Peppel, from the

7  period of June 2009 through March of 2011, had inappropriately

8  used the company credit card to charge approximately $386,000

9  of personal expenses and charged them to the company -- and

10  that that number was actually increasing as the years went

11  on -- and for the first quarter of 2012, he had

12  inappropriately charged approximately $75,000 of personal

13  expenses on the company credit card.

14      The second conclusion they had was a process conclusion

15  where they noted that Mike Peppel, in particular, had undue

16  influence over the financial operations of the company.

17  Q.  As a board member of this publicly traded corporation,

18  what was your reaction when you were briefed on the results of

19  AMS's forensic audit of this situation?

20  A.  I was angry and pissed off.

21  Q.  Was this a topic of discussion amongst the board members?

22  A.  Yes.

23  Q.  What action, if any, was taken in response to this

24  revelation?

25  A.  The board members told Lalit that he had to get rid of

1  Mike.

2  Q.  And what was Mr. Dhadphale's response to that directive?

3  A.  Well, ultimately he pushed back for a while and said, you

4  know, that everything's not complete; you know, we have to

5  wait for the results to come in.

6      Ultimately, he sat down with Mike and he reported back to

7  the board that Mike resigned, that he allowed Mike to resign,

8  but simultaneously he came back to the board and said, "Mike

9  is such a critical element of this company, that we can't

10  succeed without him, and I want to put Mike into a role as a

11  consultant to the company with no financial oversight

12  whatsoever, and I want to give him an agreement to pay him

13  $25,000 a month for 24 months to do that."

14  Q.  Well, Mr. Backus, what was your reaction to that proposal

15  by the *de jour* Chief Executive Officer of HealthWarehouse.com,

16  Lalit Dhadphale?

17  A.  Well, my personal reaction -- I'll leave out the colorful

18  words -- were "You must be kidding me."

19  Q.  Tell the Court a little bit about what you understand as

20  to the history of Mr. Dhadphale and Mr. Peppel, how far back

21  they go.

22  A.  Well, so, Lalit describes Mike as his best friend in life,

23  and, you know, to my knowledge, they go back at least to the

24  late '90s when Mike was running I believe it was MCSi, and he

25  bought a company called Zengine, which Joe Savarino -- who is

1  on the HealthWarehouse board -- ran at the time, I believe was

2  CEO, and Lalit, I believe, was COO.  So their relationship

3  might have pre-dated that.  You know, that's my understanding

4  as to when it began.

5  Q.  Now, Mr. Peppel's resignation, my understanding, occurred

6  on or about April 18th, 2012.  Is that about right?

7  A.  Yeah, it was sometime in April.

8  Q.  What was your understanding as to what was to become of

9  Mr. Peppel's relationship involved with HealthWarehouse.com

10  following his -- and I'll use it in quotes -- "resignation,"

11  close quote, on April 18, 2012?

12  A.  My clear understanding was that he was going to have no

13  involvement whatsoever with HealthWarehouse.  In fact, Lalit

14  once again drove out to Virginia to meet with me.  We sat down

15  and we had a several-hour meeting just the two of us, and he

16  basically, you know, in polite words, threw Mike under the bus

17  in that meeting.  He said, you know, "Mike" -- "Mike led me in

18  the wrong direction.  I made mistakes.  I trusted him.  He let

19  me down.  I need to re-think the way I run this business."

20  You know, "Mike's" -- "Mike's strategy in hiring people was to

21  hire people that wouldn't cross him, that would do whatever he

22  wanted to do," you know.  "We need to change that.  We have

23  people we need to get rid of in the business and I'm going to

24  take care of that," and, you know, "You've got my word that

25  Mike will have nothing to do with this business going

 1  forward."

 2  Q.  Well, as time went forward, did that assurance -- was that

 3  played out?

 4  A.  It was played out, but it wasn't played out the way he

 5  committed to me it would play out.

 6  Q.  How did it play out?

 7  A.  Well, I know I can't tell you what conversations Mike and

 8  Lalit might have had along the way.  I can tell you that, you

 9  know, there were several things that happened that shocked me

10  where Mike, you know, jumped back into the front and center of

11  HealthWarehouse.

12      In the fall of 2012, as the company was looking to raise

13  additional capital, Lalit asked Mike to open up his Rolodex

14  and make introductions for the company.  And in January, late

15  January of this year, the company raised about three and a

16  half million dollars from people I don't know but from what

17  Lalit describes in board minutes as private investors, friends

18  and family of him and Mike.  He said in a board discussion

19  that Mike was responsible for raising at least half of the

20  money that came into the business, and that Mike and Cape Bear

21  had given personal guaranties to the investors that put in the

22  three and a half million dollars that they would -- you know,

23  they would basically take back the stock and -- stock --

24  back-stock the investment they made in the company.  And then

25  it came up again in a board meeting, I believe on

1  February 15th of 2013, where Lalit said at the board meeting

2  that he wanted to -- the company wanted to raise $500,000 in

3  debt and wanted to retain Mike as a placement agent

4  effectively and pay Mike a fee for raising that $500,000 in

5  debt.

6  Q.  As a board member and individual obviously extremely

7  experienced in the running of corporations in this country,

8  what problems arise when an individual such as Mr. Peppel --

9  who's under court restrictions and SEC restrictions -- serves

10  as the contact, the point man, the face man with potential

11  investors of the publicly traded corporation?

12  A.  Well, not much good is going to come out of that.  Mike,

13  you know, to my knowledge, from sitting in all of the board

14  meetings in 2011, had no official role with the company, so I

15  have no idea what he said to those prospective investors.

16      It worries me on what he said, given his background, and

17  the fact that he was not an official spokesperson for the

18  company.  It, you know, worries me just as much that we have a

19  CEO who was going to go out and ask Mike for help and involve

20  Mike in discussions and meetings without permission from the

21  board and that he was going to propose paying Mike a fee to

22  raise a second tranche of capital.

23          MR. KELLER:  If the witness could be handed what has

24  been marked as Government's Exhibit No. 7, please.

25  Q.  Can you identify what that document is, Mr. Backus?

 1  A.  It is the 2011 10-K which was filed in June of 2012.

 2  Q.  For what publicly traded corporation?

 3  A.  For HealthWarehouse.

 4  Q.  I'd ask you to turn -- and there's a reference in the

 5  upper right-hand corner -- pages X 1 to 138.

 6      Could you turn to page 6?

 7          MR. KELLER:  And with the Court's permission, if we

 8  could publish that on the screen?

 9          THE COURT:  That would be fine.

10  Q.  If you could just take a moment, Mr. Backus, to

11  hopefully --

12          MR. KELLER:  If we can enlarge the middle paragraph.

13  Q.  Do you see that portion on page 6 in front of you?

14  A.  Yes.

15  Q.  I'm going to direct your attention to the bottom -- oh, it

16  looks like the last two sentences of the first bullet

17  paragraph in the center of the page.  Do you see that?

18  A.  Yes.

19  Q.  Where it reads --

20      "The employee has voluntarily resigned from the

21      Company, repaid $235,000 of the outstanding balance, given

22      the Company a demand note, payable after December 1st,

23      2012, for the remaining balance of approximately $140,000,

24      and provided security for his repayment on the obligation.

25      See 'Related Party Transactions.'"

 1      Is that referring to Mr. Peppel?

 2   A.  Yes, it is.

 3   Q.  Is it fair to say that the American investing public

 4   relies on these publicly released filings?

 5   A.  Yes, they do.

 6   Q.  As an American investor, from your vantage point, what is

 7   the -- the impression that's left as to this employee

 8   resigning in his connection with HealthWarehouse.com?

 9   A.  Well, I think the language was purposely obfuscated by the

10   people who drafted it.

11   Q.  And who was the, as you say, people who drafted this?

12   A.  It was our General Counsel at the time, Art McMahon from

13   the Taft law firm.

14   Q.  All right.  Let's go to page 26 of the -- of that

15   document.  And I want to direct your attention to the

16   paragraph third from the bottom.  Do you see that?

17          MR. KELLER:  If we can enlarge that, please.

18   Q.  In the center of that paragraph, it reads:

19      "A failure in our internal controls could result in

20      material misstatements in our reported financial

21      information or misappropriation of our assets."

22      Do you see that?

23   A.  Yes.

24   Q.  Is that a red flag in the world of 10-Ks in Security

25   Exchange Commission filings?

1   A.  It's certainly not a customary disclosure, nor one we'd

2   like to see.

3   Q.  A serious statement?

4   A.  Yes.

5   Q.  What is the message sent out to the investors on that

6   sentence?

7   A.  We don't -- that we don't have a functioning accounting

8   department that can be trusted to roll up public quality

9   financials.

10  Q.  Let's turn to page 60, please.  I direct your attention to

11  the bottom paragraph; I believe the last two sentences.  Do

12  you see that?  Last two sentences of the bottom paragraph.

13  A.  Yes.

14  Q.  Does it read as described below:

15          " . . . management has identified the material

16      weaknesses in our internal control over financial

17      reporting, which is an integral component of our

18      disclosure controls and procedures.  As a result of those

19      material weaknesses, our management has concluded that as

20      of December 31st, 2011, our disclosure controls and

21      procedures were not effective."

22      Is that accurate?

23  A.  Absolutely.

24  Q.  Is that a red flag to the investing public?

25  A.  Yes.

28

1  Q.  Let's turn to page 66, please.  And this lists the

2  personal professional biographies of the board members and

3  management, does it not?

4  A.  Yes, it does.

5  Q.  Let's direct our attention to the center of

6  Mr. Dhadphale's biography.  Does it not read:

7      "Earlier in his career, Lalit founded Zengine, Inc.,

8      serving as Vice President of Product Development, Chief

9      International Officer and later as Chief Operating Officer

10     of Zengine, Inc. from founding in 1999 through its sale in

11     2002.  Under his day-to-day leadership, Zengine grew from

12     start-up to $30 million in annualized sales, achieving

13     profitability in the second quarter as a public

14     company."

15     Is that correct?

16  A.  Yes.

17  Q.  And let's turn to the next page, 67.  If we could focus in

18  on the professional biography of another board member, Joseph

19  Savarino.

20     Last sentence of his bio, does it read:

21      "Mr. Savarino was the President and Chief Executive

22      Officer of Zengine, Inc., a public company that was a

23      sell-side e-business software and service provider, from

24      1998 until its sale in 2002."

25     Is that correct?

29

1   A.  Yes, it is.

2   Q.  Let's turn to page 80.  Top paragraph.  Do you see that?

3   A.  Yes.

4   Q.  Talks about the company that we previously discussed,

5   Mr. Peppel's so-called trust company, Cape Bear Partners, does

6   it not?

7   A.  Yes, it does.

8   Q.  Does it not say:

9       "Cape Bear Partners, LLC, a more than 10 percent

10      stockholder of the Company, has agreed to personally

11      provide certain credit support for the Company's

12      obligations under the Development Loan, including a pledge

13      of shares of the Company Common Stock.  In consideration

14      of the Pledge, on August 31st, 2011, we issued to Cape

15      Bear a warrant to purchase 250,000 shares of our Common

16      Stock at an exercise price of $2.90 per share."

17      Could you explain what's going on here?

18  A.  I'll try.

19  Q.  Okay.

20  A.  It's quite complicated.

21      So at one point in 2011, Lalit and Mike came to me -- and

22  I assume they went to other board members as well -- and

23  explained why they were going to move the company from Ohio to

24  Kentucky.  They had several reasons.  Reason No. 1 was they

25  described the Ohio Bureau of Pharmacy as, like, Nazis and that

1  they were parking out in their parking lot, thinking that

2  HealthWarehouse was selling drugs out the side door and was

3  overly aggressive on enforcement.

4      No. 2, they said that the State of Kentucky was willing to

5  offer them a million dollars in grants and loans for

6  relocating the company to Kentucky and that they would pay

7  that million dollars up front and that was money that the

8  company needed.

9  Q.  And there was a requirement for collateral of that loan,

10 was there not?

11 A.  Well, this is where it gets very murky, because the

12 million dollars from the State of Kentucky never materialized,

13 to my knowledge, and it may still be out there but never

14 materialized under my watch, yet Lalit and Mike continued to

15 push to get warrants.  So this came up in several board

16 meetings where I think the first iteration was that they said,

17 "Well, the loan's not going to come through, so they don't

18 need collateral support.  But what we're going to do is, since

19 it's a recourse loan to the company, if we don't create a

20 certain number of jobs, that the company will have to pay back

21 the loan.  Mike and I will step in and guaranty that the

22 company doesn't have to do that."

23     And that was another reason for them to want to get each

24 250,000 shares of stock granted to them in the way of a

25 warrant.  I don't believe the company ultimately ever granted

1  warrants to Lalit or to Mike under this, because the million

2  dollars never came in.

3  Q.  Now, Mr. Backus, you had indicated that you recently

4  resigned from the board of HealthWarehouse.com, is that

5  correct?

6  A.  That's correct.

7  Q.  Did you prepare and submit a letter of resignation?

8  A.  Yes, I did.

9  Q.  Was that letter of resignation, in accordance with

10  Security and Exchange Commission rules, ultimately filed for

11  consideration, public disclosure?

12  A.  The company filed an 8-K which attached my resignation

13  letter to it.

14          MR. KELLER:  If the witness could be handed

15  Government's Exhibit Number 25, and ask him to take a look at

16  that.

17  Q.  Yes, sir.  Are you familiar with Government's Exhibit

18  Number 25, sir?

19  A.  Yes, I am.

20  Q.  What is it?

21  A.  It is the company's 8-K filing that attaches a cover note

22  saying they received my -- my letter of resignation.  They

23  attempted to summarize my concerns with the company, and then

24  they noted that they disagreed with everything I said, or

25  something that I said but didn't itemize it, and offered me

1  the opportunity to respond to that, and then attached my

2  letter.

3  Q.  Is it fair to say, Mr. Backus, you do not typically resign

4  from boards of directors lightly without serious consideration

5  and thought?

6  A.  Not at all.

7  Q.  Did you provide -- did you devote serious consideration

8  and thought to this decision?

9  A.  Yes, I did.

10  Q.  In your letter, did you outline your specific reasons why

11  you resigned?

12  A.  Yes, I did.

13  Q.  Does this appear in your letter?

14  A.  Yes, it does.

15  Q.  Could you read the second to last reason that you include

16  in your letter of resignation as to why you decided to step

17  down?

18  A.  Sure.  I cited the company, quote:

19      " ... continues its inappropriate relationship with Mike

20      Peppel -- a known felon, convicted of money

21      laundering and conspiracy to commit securities fraud,

22      who misappropriated for his personal use over $380,000

23      from the Company, and who continues to owe the Company

24      approximately $150,000 -- by continuing to work with

25      Mr. Peppel to raise both equity and debt for the Company."

1    Q.  Are you familiar with the term "transparency"?

2    A.  Yes.

3    Q.  Is that an important, crucial element in a publicly traded

4    corporation?

5    A.  It's essential to, you know, our free market system.

6    Q.  As a member of the board, were you made aware of the

7    extensive loans, personal loans, that Lalit Dhadphale had

8    provided to Mike Peppel?

9    A.  No.

10   Q.  Were you aware that on or about December 6 of 2011, which

11   was approximately seven weeks after he was originally

12   sentenced, that Mr. Peppel provided Mr. Dhadphale a promissory

13   note in the amount of $1.5 million?

14   A.  No.

15   Q.  That had never been discussed at any board meeting?

16   A.  No.  First I've heard of it.

17   Q.  Do you think that that would be a material fact that

18   should have been discussed, should have been revealed to the

19   board members?

20   A.  Yes.

21         MR. KELLER:  All right.  If the witness could be

22   handed Government's Exhibit No. 3, please.

23   Q.  Have you ever seen that document before, Mr. Backus?

24   A.  No, I haven't.

25   Q.  It purports to be a promissory note signed by Michael

1   Peppel to Lalit Dhadphale on December 6, 2011.  Do you see

2   that?

3   A.  Yes.

4   Q.  In the amount of $1.5 million.

5   A.  Yes.

6   Q.  Go down to, you know --

7           MR. KELLER:  If we could publish that?

8           THE COURT:  You may.

9   Q.  Looking at that document, Mr. Backus, what's the listed

10  interest rate for this $1,500,000 promissory note from

11  Mr. Peppel to Mr. Dhadphale, the Chief Executive Officer of

12  HealthWarehouse.com?

13  A.  Zero percent.

14  Q.  Now, I would like to show you a portion of a sworn

15  deposition that Mr. Peppel gave January 7th, 2013, in a

16  lawsuit involving Dennis Smith.

17      First of all, do you who Dennis Smith is?

18  A.  I've heard the name, but I've never met him.

19  Q.  Okay.  In a sworn deposition taken at the law offices of

20  Taft, Stettinius & Holster on January 7, 2013 --

21          MR. KELLER:  If the witness could be shown

22  Government's Exhibit 17, please.

23  Q.  And once you open that up, if you could direct your

24  attention to page 148, very bottom of that page, line 23.

25          MR. KELLER:  With the Court's permission, if we could

1   publish that?

2          THE COURT:  You may.  The page again, Mr. Keller?

3          MR. KELLER:  Your Honor, page 148, line 23.  Very

4   bottom.

5   Q.  Have you located that, Mr. Backus?

6   A.  Yes.

7   Q.  Okay.  Line 23 is a question:

8          "Okay.  Did you ever receive any shares of

9      HealthWarehouse in exchange for the work" --

10         MR. KELLER:  And it's on page 149, if you could pick

11  that up.

12  Q.  --  " ... for the work you did for the company?"

13         Answer:  "No, I have not."

14         Question:  "Have you ever been a shareholder of

15     HealthWarehouse?"

16         Answer:  "No, I have not."

17     Reading that, do you have any reaction as to how that

18  squares with conversations that you had with Mr. Peppel in the

19  fall of 2010?

20  A.  Directly contradicts what Mike told me firsthand.

21  Q.  No question?

22  A.  No question at all.

23  Q.  In your mind, is this something that should have been

24  revealed, well, to the board of directors?

25  A.  Which part?

1  Q.  Well, apparently he's not a shareholder and he told you

2  that he was a shareholder.

3  A.  I always believed he was a shareholder.  He co-founded the

4  company -- which is what he told me -- with Lalit, and he

5  moved his shares out of his name into the Cape Bear name, and

6  he explained to me why he did that.  So, yeah, I didn't feel

7  any additional explanation was needed by the board.  Mike told

8  me directly what he did and why he did it.

9  Q.  All right.  I guess the final topic would be Mr. Peppel's

10  activities after his resignation of April 18th, 2012.

11      As a board member, who was your ultimate responsibility

12  to?

13  A.  I'm sorry?

14  Q.  As a board member of a publicly traded company, who is

15  your ultimate responsibility to?

16  A.  The shareholders of the company.

17  Q.  As a board member of HealthWarehouse.com, do you have any

18  explanation as to why Mr. Peppel's cell phones -- his personal

19  cell phones for himself, his wife, his mother, his children --

20  may have been continued to be paid by HealthWarehouse.com all

21  the way through December of 2012?

22  A.  Sure hope they haven't been.

23  Q.  If they had been, do you think that would have been

24  something that the board should have been made aware of?

25  A.  Yes.  It is the shareholders' money.  It's not a piggy

```
 1   bank for Mike and Lalit to decide who they want to give money

 2   to.  This money belongs to the shareholders.  Mike was

 3   terminated from the company.

 4          MR. KELLER:  Your Honor, if I may have one moment,

 5   please?

 6          THE COURT:  You may.

 7      (Plaintiff's Counsel confer privately.)

 8          MR. KELLER:  Your Honor, I don't believe I have any

 9   further questions of Mr. Backus and tender him for

10   cross-examination.

11          THE COURT:  Thank you.

12                      CROSS-EXAMINATION

13   BY MR. DORNETTE:

14   Q.  Good morning, Mr. Backus.

15   A.  Hi.

16   Q.  I'm Stuart Dornette on behalf of Mr. Peppel.

17      Now, there was some testimony you just said about Cape

18   Bear and shares, you know, in the hands of Cape Bear.

19      Do you recall that?

20   A.  Yes.

21   Q.  You've reviewed the 10-Ks of the company before they were

22   filed, the exhibit you saw before?

23   A.  10-K, yes.

24   Q.  Yes.  And there is a description there about Cape Bear,

25   LLC.  You knew that Cape Bear, LLC was the entity that held
```

1  the shares that you and Mr. Keller were talking about, isn't

2  that correct?

3  A.  Yes.

4  Q.  And did you know that Cape Bear had held those shares

5  since the company was first formed?

6  A.  No.

7  Q.  Is that fact consistent with what you heard from

8  Mr. Peppel in 2010?

9  A.  No.

10 Q.  At the time the company was formed, a transfer of shares

11 to Cape Bear would have been prior to your conversation in

12 2010, isn't that correct?

13 A.  I don't know when it was formed, but I would assume so.

14 Q.  But you know the company was formed prior to your

15 conversation in 2010?

16 A.  Yes.

17 Q.  And as I understand the conversation, what you said

18 Mr. Peppel told you was that he had transferred the shares to

19 some entity prior to the time of that conversation, isn't that

20 correct?

21 A.  Yes, that's correct.

22 Q.  So, having those shares in Cape Bear at the origination of

23 the founding of the company would have been prior to that 2010

24 conversation, would it not?

25 A.  Sure.

1  Q.  Okay.  Now, over the course of time that you served on the

2  Board of Directors of HealthWarehouse, there were regular

3  meetings of that board?

4  A.  There were frequent meetings; I wouldn't call them

5  regular.

6  Q.  And, to your knowledge, was Mike Peppel ever a participant

7  at that board meeting?

8  A.  Yes.

9  Q.  As an invited guest?

10  A.  Yes.

11  Q.  Now, there was some testimony here with respect to the

12  2011 10-K; references to financial controls and weaknesses of

13  financial controls of the company.  Do you recall that?

14  A.  Yes, I do.

15  Q.  Those had a lot more to do than just Lalit Dhadphale's

16  credit card and Mike Peppel's credit card, did they not?

17  A.  Yes, they did.

18  Q.  And, in fact, the AMS investigation went into a lot of

19  additional areas beyond those two subjects, did it not?

20  A.  It went into a few other areas.  The primary focus was the

21  expense account issue, which was the issue that Marcum, the

22  accounting firm, flagged and insisted that we hire a firm like

23  AMS to do the forensic audit on.

24  Q.  Did you know -- let me back up.

25      Did you ever look at any of those credit card bills when

1  they came in?

2  A.  No.

3  Q.  That wasn't something that the board would get into?

4  A.  It's not something that I get on the board.  I was on the

5  Compensation Committee, not the Audit Committee.  Whether

6  Youssef Bennani, who was on the Audit Committee, did that, I

7  don't know.

8  Q.  And to this day you've never looked at those statements,

9  is that correct?

10  A.  That's correct.

11  Q.  AMS did review all of those, is that correct?

12  A.  Both AMS and Youssef Bennani reviewed all of those.

13  Q.  And based upon that review, AMS made certain

14  recommendations, is that correct?

15  A.  Yes.

16  Q.  And based upon its further review into other areas, it

17  made additional recommendations, is that correct?

18  A.  Yes.

19  Q.  And the board implemented those recommendations?

20  A.  Well, the board directed management to implement those

21  recommendations and some were implemented.  Some as of when I

22  resigned had yet to be implemented a year later.

23  Q.  Was one of the issues that Marcum raised the weakness of

24  the internal accounting staff in terms of size?

25  A.  It was, I think, both a quality and a quantity issue.

1  Q.  Quality of the personnel and the number of them?

2  A.  Correct.

3  Q.  Was it accurate to say that one of Marcum's conclusions

4  going into this review was that there had been too great a

5  growth of the company and the accounting function in-house had

6  not kept up with that?

7  A.  I don't know if it was too great a growth rate of the

8  company.  The company, you know, doubled in size through an

9  acquisition, you know, but didn't grow that dramatically or

10  adequately.

11  Q.  But the company's business was growing faster than the

12  accounting function could keep up with, isn't that correct?

13  A.  Yes, but it's not -- it's not a linear formula.  If you

14  add five percent of transactions, you don't add .5 percent of

15  people.

16      (Messrs. Dornette and Keller confer privately.)

17  Q.  Let me show you, Mr. Backus, what's been marked as

18  Defendant's Exhibit A and ask if you've seen that document?

19  A.  I don't recall seeing it.

20  Q.  Did you see a final report from AMS of the work that they

21  did?

22  A.  Yes, I did.

23  Q.  Did it have -- did it look like Exhibit A?

24  A.  No, it did not.

25  Q.  Did it have an attachment with observations and

```
 1   recommendations?
 2   A.  No, it did not.
 3   Q.  But you do note that there are 36 different observations
 4   and recommendations on the attached Exhibit A to Exhibit A?
 5   A.  It's the first I've seen it, so I'll take your word for
 6   it.
 7   Q.  If you look at the second page of Exhibit A, under
 8   Accounting Organization Operations -- you see that?
 9   A.  Yes.
10   Q.  In the middle of that paragraph:
11       "As a result of the latter, the accounting function has
12       not been able to keep up with the rapidly increasing scope
13       of HEWA's business."
14       Do you understand that?
15   A.  I have to read it first.  You want me to read it?
16   Q.  Yes.
17   A.  Okay.
18       (Witness reading the document.)
19   A.  Read it.
20   Q.  Did you understand it to be the indication that the
21   accounting function of HealthWarehouse has not been able to
22   keep up with the rapidly increasing scope of HealthWarehouse's
23   business?
24   A.  That's part of what they cite, yes.
25   Q.  And did you agree at the time that that was correct?
```

 1   A.  I've never seen this, so I didn't have an opportunity to

 2   agree or disagree with it.

 3   Q.  Did you understand at the time that AMS had reached that

 4   conclusion?

 5   A.  In September of 2012?

 6   Q.  Anytime after AMS concluded its work.

 7   A.  I read the report that they issued in April in May of 2012

 8   and the several drafts.  I haven't seen this before.

 9       One of the conclusions, you know, clearly was that we were

10   -- we had the wrong people and we didn't have enough people in

11   the Accounting Department.  And one of the fixes that Lalit

12   proposed and said he was going to implement was he was going

13   to hire a full-time CFO based in Kentucky because the current

14   CFO that we had was not based in Kentucky, and that he was

15   going to add, I believe, three additional people with the

16   right training.  And I believe we added, during my tenure, one

17   of those.

18       We added -- I'm sorry.  We added a CFO in September 2012

19   who resigned in February, left in April 2013, and I believe we

20   added one other person to the Accounting Department, so we

21   fell short of the goal of that in three good people.

22   Q.  And you see the next sentence on Exhibit A:

23       "The addition of at least two accountants and a full-time

24       CFO is recommended to keep pace with the increasingly high

25       volume of the accounting transactions"?

```
 1  A.  Yes.
 2  Q.  And did you understand at the time that employees of
 3  HealthWarehouse were using their personal credit cards to
 4  charge for business expenses?
 5  A.  I wasn't aware of that until the discussion came out
 6  around the AMS report.
 7  Q.  Did you understand at the time that it was company policy
 8  to permit those who had corporate credit cards to charge
 9  personal expenses of those charges and to those cards?
10  A.  Not at all.  Sorry.  I interrupted you.
11  Q.  You were aware that it was company policy to allocate
12  those charges when they were made to Employee Advance
13  accounts?
14  A.  I wasn't aware that HealthWarehouse ever had a policy
15  allowing people to charge personal expenses on a company
16  credit card.  If I were aware of it, I would have shut it down
17  because it's a terrible policy, and I did that at the company
18  where I was CFO back in the mid '80s.
19  Q.  So, you are familiar with circumstances in which that
20  policy is in play?
21  A.  I've seen it before and I shut it down.  It's an awful
22  policy.
23  Q.  Did AMS confirm for the board that in fact that was the
24  policy of HealthWarehouse at the time of its review in the
25  spring of 2012?
```

1  A.  I think they confirmed that that was the practice.  I'm

2  not sure it was a policy, and I don't believe the company ever

3  had a written policy -- at least not one that I was shown --

4  that said this was, you know, how it was supposed to work.

5          MR. DORNETTE:  Could you share with the witness

6  exhibit -- Government's Exhibit 6?

7          MR. KELLER:  Your Honor, in the meantime will we have

8  an opportunity to review Defendant's Exhibit A, which we've

9  never seen?

10          THE COURT:  Am I mistaken?  Were you not just given a

11  copy?

12          MR. DORNETTE:  No, Your Honor.  I did not have an

13  extra one.

14          THE COURT:  Okay.

15          MR. DORNETTE:  What I thought was a copy of that was

16  not a copy of that.

17          THE COURT:  Oh.

18          MR. DORNETTE:  The witness is done with it.

19      If I may?

20          THE COURT:  You may.

21          MR. DORNETTE:  My apologies, Your Honor.

22      (Mr. Dornette handing Mr. Keller the document.)

23  Q.  Mr. Backus, you've seen exhibit -- Government's Exhibit 6

24  before?

25  A.  Yes, I have.

1  Q.  And did you see it at the time in June of 2012?

2  A.  Yes.

3  Q.  Had you seen prior drafts of it earlier than that?

4  A.  Yes.

5  Q.  In fact, as early as the end of April?

6  A.  I don't recall the date, but it would be during that

7  period.

8  Q.  You see the second sentence of the memo from AMS?

9  A.  Yes.

10  Q.  And what does it say?

11  A.  "The policy of HealthWarehouse, Inc. (the Company) was to

12  treat personal expenses as Employee Advances."

13  Q.  Now, did you understand -- let me say it again.  Did you

14  understand at the time that AMS confirmed that that was

15  company policy?

16  A.  Well, company policy and what the company did are two very

17  different things.  So, I understand in writing that this is

18  how the company handled personal expenses, you know.  I do not

19  believe and I still don't believe that the company ever had a

20  policy that said, "This is how we handle personal charges on a

21  company credit card."

22  Q.  Now, you testified in questioning from the government that

23  there were $380,000 that AMS identified related to Mike

24  Peppel.  Is that correct?

25  A.  That's correct.

1   Q.   Is that number somewhere in Exhibit 6?

2   A.   I believe it is.  It's in the last paragraph on the last

3   page.  Or if you add the two numbers that Mike owes for this,

4   it's 235,000, plus 141,000, which is $376,000 that Mike agreed

5   that he owed the company.

6   Q.   Now, are you aware of the fact that prior to the review

7   that AMS was doing, there was an Employee Advance account in

8   which Mr. Peppel had a substantial debt outstanding to the

9   company?

10  A.   I don't understand the question.

11  Q.   Prior to AMS's work --

12  A.   Okay.

13  Q.   -- are you aware that there was an Employee Advance

14  account for Mr. Peppel?

15  A.   No.

16  Q.   And so you don't know that there was a substantial sum

17  already before AMS started their work that was due to the

18  company from Mr. Peppel?

19  A.   No.

20  Q.   And you don't know -- you haven't seen and the government

21  hasn't shared with you the financial statements that

22  Mr. Peppel provided to Probation that included a substantial

23  amount as of December of 2011 that he owed to HealthWarehouse?

24  A.   I've never seen anything like that.

25  Q.   And you haven't seen and the government didn't share with

1  you the financial statement provided to the Probation

2  Department that showed as of 2011 a substantial six-figure

3  amount due and owing to Lalit Dhadphale, have you?

4  A.  I never saw it, nor did the government share it with me.

5  Q.  The government only shared with you the promissory note

6  that was entered into that you testified about, is that

7  correct?

8  A.  No.  The first I saw that was here at the hearing.

9  Q.  Now, if you could refer back to Government's Exhibit 6, on

10  page 2 there's a discussion about Accounts Receivable.  Do you

11  see that?  Bottom of page --

12  A.  Yes.

13  Q.  That was one of the areas that Marcum asked that AMS

14  review, isn't that correct?

15  A.  Yes.

16  Q.  And that had nothing to do with credit card expenses for

17  Mike Peppel or Lalit Dhadphale, did it?

18  A.  Well, it had to do with credit cards.  These are customer

19  credit cards when people bought things from us online, so it

20  did have to do with credit card account reconciliations.

21  Q.  But it had nothing to do with corporate credit cards held

22  by Mr. Dhadphale or Mr. Peppel?

23  A.  I don't believe this part did, no.

24  Q.  And over on the fourth page, there's a section on

25  Inventory.  Do you see that?

1   A.  Yes.

2   Q.  And that didn't have anything to do with Mr. Dhadphale or

3   Mr. Peppel's credit cards, did it?

4   A.  I don't think that part covered the Millennium Wellness

5   inventory which was cited separately which did involve him.

6   This part, I think, is a separate inventory reconciliation.

7   Q.  And on the next page, there's a section on Accounts

8   Payable that was part of AMS's charge for Marcum, was it not?

9   A.  Actually, I don't know if that was the charge from Marcum.

10  The only part I remember Marcum specifically saying we needed

11  to go into was a reconciliation of the credit card accounts of

12  the company with regard to personal expenses.

13      I have no doubt that they had more detailed discussions

14  with Mr. Bennani who chaired the Audit Committee.  But as a

15  matter of the board, the discussions we had were higher level.

16  Q.  All right.

17          MR. DORNETTE:  Could you share with the witness

18  Government's Exhibit 5.1?

19  Q.  Show you what's been marked as Government's Exhibit 5.1

20  and ask if you recognize that document.

21  A.  Yes, I do.

22  Q.  And this was the letter that Marcum provided to the board

23  after the phone conversation, telephone conversation, you

24  testified about, is that correct?

25  A.  That's correct.

1   Q.  And this confirmed what they said in that telephone

2   conversation, did it not?

3   A.  Yes.

4   Q.  And this provided the road map essentially for AMS to do

5   its review, did it not?

6   A.  Probably.  I wasn't involved in the AMS assignment.

7   Q.  Well, let's go back to --

8       Do you still have Government's Exhibit 6?

9   A.  Uh-huh.  Yes.

10  Q.  At the top, what does it say -- describe itself as?

11  A.  It says, "AMS Procedural Memo, Response to Comments in

12  Marcum LLP Letter of April 17th."

13  Q.  So, Government's Exhibit 5.1 is the April 17th Marcum

14  letter, is that correct?

15  A.  Yes, it is.

16  Q.  Now, on page 2 of Government's Exhibit 5.1 there is a

17  discussion about Employee Advances, is that correct?

18  A.  I have to read it.  Which paragraph are you pointing to?

19  Q.  Down at the bottom at the heading in bold italics.

20  A.  Okay.

21      (Witness reading.)

22  A.  Yes.

23  Q.  And that does discuss the credit card issue for

24  Mr. Dhadphale and Mr. Peppel, is that correct?

25  A.  I just read the first paragraph and I don't think that's

1   correct, no.  It speaks to personal expenses on the Am Ex card

2   on behalf of Mike's wife Melanie Parsons, and it doesn't

3   mention Mike Peppel or Lalit Dhadphale in that paragraph.

4   Q.  That's fair.

5       The second page at the top talks about Accounts

6   Receivable, is that correct?

7   A.  The first paragraph at the top --

8   Q.  Yes.

9   A.  -- page 2?

10      Let me read it.

11      (Witness reading.)

12  A.  Yes, it highlights a few transactions.

13  Q.  And specifically it makes the comment that "Management was

14  unable to perform a complete reconciliation on a couple of

15  accounts due to their sheer volume."

16      Is that correct?

17  A.  I don't see where it says "sheer volume."  Does it say

18  that?

19  Q.  Could you read the first paragraph under Accounts

20  Receivable on page 3?

21  A.  I'm sorry; I was on page 2.

22  Q.  Sorry.

23  A.  Yes, what that speaks to is that there were literally tens

24  of thousands of transactions which were very difficult to

25  reconcile.

1  Q.  And that goes back to the quantity of accounting personnel

2  on the ground at HealthWarehouse, does it not?

3  A.  Well, it's a -- it's a quantity issue.  It's also a

4  process and a systems issue.  I mean, it's always much harder

5  to try to catch up with something after the fact than it is to

6  keep current with it.

7  Q.  The next item on Inventory:

8      "Management was unable to perform a complete

9      reconciliation of the 'Purchases Held' and 'Payable

10      Deposit' account due to their sheer volume."

11      Do you see that?

12  A.  Yes.

13  Q.  That also speaks to those two issues, does it not?

14  A.  It's sloppy accounting.  It's not keeping up with stuff,

15  you know, on a monthly basis or during trial balances on a

16  quarterly basis and then trying to play catch-up at year-end

17  with two employees.

18  Q.  And so adding additional personnel, putting a CFO on-site,

19  would certainly go to address those, is that not correct?

20  A.  Well, we had a CFO.  The CFO, you know, was not on-site

21  and clearly wasn't, you know, performing a good CFO job from

22  an oversight perspective.  Having more people certainly would

23  have helped.

24  Q.  And those references in the 10-K to the material

25  weaknesses in the financial systems, these issues on the

1    Accounts Receivable and Inventory would have given rise to

2    those comments as well, would they not?

3    A.  I think they're a subset of the material weakness noted in

4    the 10-K.

5    Q.  Would these issues on Accounts Receivable and Inventory

6    and Accounts Payable themselves have given rise to a material

7    weakness comment in the 10-K?

8    A.  Perhaps.  It's kind of beyond my pay grade.  I've never

9    been a trained CPA.

10   Q.  Now, the Accounts Receivable issues here and the Account

11   Payable issues here, none of those had anything to do with the

12   credit card issues you talked about, did they?

13       (Witness reading.)

14   A.  I don't know.  The Payables mention debits and credits

15   tying back to employees, so I don't know the answer with

16   respect to Accounts Payable.  But I would agree with you with

17   respect to Accounts Receivable and Inventory.

18   Q.  Now, the Revenue section, I think you said that referred

19   to Millenium Wellness, is that correct?

20   A.  Yes.

21   Q.  What was the Millenium Wellness?

22   A.  Well, something I never heard about until we went through

23   this in April.  I believe it was a company that somehow

24   involved Mike's wife and we were selling product, you know, on

25   behalf of Millenium Wellness, and no markup, so we made no

1  profit on it.  And we actually paid the shipping and the

2  holding cost on it, so it was -- was an SKU, stock-keeping

3  unit, in our inventory that we were selling on behalf of

4  Mike's wife's company.

5  Q.  And did you understand the relationship was -- gave

6  benefit to HealthWarehouse by putting its name before

7  physicians who were the purchasers of those products?

8  A.  Well, that was the spin that Lalit gave us when this

9  discovered.  He said that we're doing this, you know, at no

10  profit margin and we're paying the cost because it's good for

11  us from a cash flow perspective and it gets our name out

12  there.  Frankly, I think the board thought that was a load of

13  BS, and we told them to shut it down.

14  Q.  And was it shut down?

15  A.  Ultimately, yes.

16  Q.  How much were those costs that the company incurred on

17  that product?

18  A.  I think what AMS discovered was that the hard dollar costs

19  were tens of thousands of dollars, or, you know, ten percent

20  or so of sales:  About 30,000 on 300,000 sales, I believe.

21  Q.  Is $22,000 more accurate?

22  A.  I'd have to look at it, but it's -- it's in the tens of

23  thousands, so I wouldn't --

24      Whether it's 20,000 or 30,000, it's in that range.

25  Q.  Do you know what the advertising budget for

1  HealthWarehouse was in 2011?

2  A.  I don't know that I ever saw a budget for 2011, so I

3  certainly don't know what the advertising budget was.

4  Q.  Do you know how much was spent in 2011 on advertising?

5  A.  No, I don't.  All I know is most of it was spent on Google

6  ad words.

7  Q.  Wasn't it spent on a variety of avenues to get the name

8  out?

9  A.  Not -- not what Lalit told me.  Lalit told me point-blank

10  that we are building the consumer business using Google ad

11  words because we had a competitive advantage.  Because if you

12  recall, Google was caught letting illegal pharmacies advertise

13  on Google.  They paid a five-hundred-million-dollar fine to

14  the Department of Justice.  So, Google restricted the number

15  of people who could advertise to certified pharmacies.  And we

16  were the only online-only certified pharmacy, so we were able

17  to buy ad words very cost effectively.  So the way Lalit

18  described it to me, that's where our entire -- virtually our

19  entire ad ledger was going.

20  Q.  There wasn't money going to Bing?

21  A.  Well, Bing's another search engine, so that's the

22  equivalent.  When I say "ad words," I use that as a generic

23  for buying a pay-per-click on a search engine.

24  Q.  So it wasn't just --

25       What about Facebook?

1  A.  I don't remember him talking much about Facebook.  But

2  Facebook ads at that point in time, you know, anyone in the

3  industry would tell you were highly ineffective.

4  Q.  Foursquare?

5  A.  Wouldn't surprise me if we spent money there.  I never

6  heard about it before.  It would seem like a really dumb place

7  to put money on Foursquare, because Foursquare's all about a

8  place you're going into, and we are a virtual pharmacy that

9  you don't go into.  So if I were asked that, I would have

10  questioned why we were spending money there.

11  Q.  Twitter?

12  A.  Twitter's probably a little bit more viable.  But, again,

13  the value in what is -- well, Lalit explained it, and I agree

14  with him, in advertising, using pay-per-click words on the

15  search engines is we're able to buy the search term "generic

16  Zocor."  So we're able to basically cheaply find people who

17  are looking for us, as opposed to putting up a billboard, you

18  know, on a freeway, which is what you're doing on Facebook or

19  on Foursquare or on Twitter, hoping the right person stumbles

20  upon you.

21  Q.  Are you aware that during 2012 HealthWarehouse hired an

22  advertising firm in Cincinnati to try out some local ads?

23  A.  No, I'm not aware of that.

24        MR. DORNETTE:  Ms. Brown, could you share with the

25  witness, I don't think he still has it, Exhibit 7,

1    Government's Exhibit 7?

2    Q.  Let me ask you, Mr. Backus, to look at numbered page 115

3    of 138 on Exhibit 7.

4    A.  Which do you want me to look at first?

5    Q.  I'm sorry?

6    A.  115 and 138?

7    Q.  No.  115 of page 138.

8    A.  Oh.

9        (Witness reading.)

10   Q.  This is the 10-K that you said you reviewed, the 2011 10-K

11   that you reviewed, is that correct?

12   A.  Yes, it is.

13   Q.  And there is the disclosure there of the company expenses,

14   all advertising costs incurred, advertising expenses for the

15   year ending December 31, 2011, $865,946.

16       Do you see that?

17   A.  Yes.

18   Q.  Is that a number that is a level that you would expect to

19   see there?

20   A.  Yes.  It's about -- it's about, you know, 8- or 9 percent

21   of sales, so it's not out of line.

22   Q.  And if you could look at page 14 of Exhibit 7, under

23   category Marketing and Sales.

24   A.  Uh-huh.

25   Q.  There are online advertising campaigns focused on Search

1  Engines, Price Comparison and Engines and Social Networking?

2  A.  Uh-huh.  Yes.

3  Q.  So those are basic subjects that we talked about before.

4      Is it fair to say -- and I'll go back to what I stated --

5  is it fair to say that the company was trying a number of

6  different approaches for advertising and marketing and

7  expending advertising dollars to see what would work and what

8  wouldn't work?

9  A.  Well, they were trying a lot of online advertising things,

10 correct.  And what Lalit told me was what was working and

11 where they were spending the money was on, you know, finding

12 customers that are already finding you, which were the search

13 engines.

14 Q.  And $22,000 to reach physicians who were buying the

15 Millenium Wellness product would amount to 3 percent or less

16 of the advertising budget.  Isn't that not correct?

17 A.  Sure, if you think that's advertising expense.

18 Q.  Now, one of the things that New Atlantic Ventures had was

19 Series B Preferred Stock, is that correct?

20 A.  No, it's not correct.

21 Q.  Series C Preferred Stock?

22 A.  Yes, that's correct.

23 Q.  The Series B Preferred Stock was held by whom?

24 A.  That was a collection of people, so I don't know exactly.

25 This was the Series B that we were -- we actually had our law

1  firm write the documents on that we were about to invest in

2  until we were introduced to Mr. Peppel and the other

3  investors.  So, to my knowledge, it's at least two -- a Gary

4  Singer and Lloyd Miller -- but through some various entities.

5  I think there are some other investors as well.

6  Q.  And those principal entities would be HWH Lending and

7  MilFam?

8  A.  That sounds familiar, yes.

9  Q.  HWH Lending being your Mr. Singer's operation and MilFam

10  being Mr. Miller's operation?

11  A.  I think so, but I don't know either Mr. Singer or

12  Mr. Miller.

13  Q.  Have you ever met either of them?

14  A.  No.

15  Q.  And pursuant to their holdings they have the right -- just

16  as NAV has the right -- to designate a board member, is that

17  right?

18  A.  I can't speak to their right, I can speak to our right,

19  because I don't know what happened after we lost control of

20  the documents in the Series B and decided not to invest.

21      Our right is sort of a right.  You know, it's a right to

22  nominate someone, so long as we're a certain percent

23  shareholder.  It's not an absolute right to appoint a board

24  member.

25  Q.  Who is Mr. Stecker?

1  A.  Matthew Stecker.  He's a board member at HealthWarehouse.

2  Q.  And are you aware of the fact that he was a designated

3  board member by the Series B Preferred shareholders?

4  A.  Yes, I am.

5  Q.  So they did have the right to designate a board member?

6  A.  They designated one, yes.

7  Q.  Okay.  As of 2011, Mr. Singer and Mr. Miller also had some

8  senior secured promissory notes?

9  A.  Yes, they did.

10 Q.  That were due in January of 2013?

11 A.  I think there was -- I think there was a million dollars

12 that was due in December of 2012 and I think it was about two

13 million that was due in January of 2013.

14 Q.  With interest roughly 3.3 million together?

15 A.  It was three three three four, thereabouts.

16 Q.  Were you on the board at the time that those notes were

17 entered into?

18 A.  Yes.

19 Q.  What was the plan to pay off those notes?

20 A.  Well, so this was a -- this was a proposal that came to

21 the board from Mr. Peppel and from Lalit Dhadphale, and they

22 came to us saying that the company needed to buy back Denny

23 Smith's stock, that Denny was being adversarial to the

24 company; that he was threatening, you know, to lock the doors,

25 he was going to cut them off, that he was badmouthing the

1    company in the industry, that he was acting like a jerk --

2    their words -- and that we needed to buy him out because

3    otherwise we were no longer going to have credit with our

4    vendors, and that he was toxic.

5         And so Gary and Lloyd, as well as New Atlantic Ventures,

6    agreed to spend, I believe, about $4 million in buying back

7    stock from Denny Smith.  Gary and Lloyd, I believe, invested

8    about three million in a senior debt because we're a venture

9    capital fund, we're not able to do debt instruments, so we

10   didn't participate with them.  We created a Series C

11   Redeemable Preferred, so it was equity, not debt.  It did not

12   have voting rights.  It did not have board rights.  It was,

13   frankly, a bland and, unfortunately to us, benign instrument

14   that still sits out there.

15        The plan, as presented by Mr. Peppel and Mr. Dhadphale to

16   the board, was that we were going to be able to arbitrage

17   Denny's stock and that we were going to be able to buy it, and

18   I forget at what price exactly -- at the, you know, three- or

19   four-dollar, or two-fifty a share, at some price that was a

20   substantial discount to market, and that Mike and Lalit had

21   buyers lined up for the stock and they were going to be able

22   to resell the stock in a matter of months at a price closer to

23   the market price, so that not only would we not have debt

24   outstanding, we'd be able to pay back the $4 million, but we'd

25   make a profit on it.

1  Q.  So, the plan was to place equity in the marketplace and

2  raise equity in order to pay off that debt?

3  A.  That's correct.

4  Q.  Sometime over the succeeding 15 months -- 15 to 18 months?

5  A.  Well, the plan was actually shorter than that.  I remember

6  being very vocal at the board meeting because I didn't believe

7  that, you know, companies that were unprofitable should be

8  raising debt to repurchase equity from investors.  But I was

9  assured by Mr. Peppel and Mr. Dhadphale that they had

10  investors lined up, and we actually talked about getting a

11  transaction done by the end of the year, by the end of 2011.

12  So we're not talking about a 15-, 18-month period; we were

13  talking about a 90-day period.

14  Q.  The debt was 15- to 18 months out?

15  A.  Yes, but that was not the plan, and your question was

16  about the plan that the company presented to the board.

17  Q.  In the fall of 2012, the company was out trying to raise

18  equity, is that correct?

19  A.  The company was out trying to raise equity as soon as they

20  filed their 10-K.  So that effort started in June and it

21  continued through the fall, correct.

22  Q.  And there was some sense of urgency of getting that done

23  at that point, because this was a senior secured debt that had

24  a security interest over all the company's assets, did it not?

25  A.  Yes.

1   Q.  And if the security was called, foreclosed upon, that

2   would wipe out all of the common shareholders' holdings, would

3   it not?

4   A.  Potentially, yes.

5   Q.  And the preferred shareholdings of --

6   A.  As well.

7           MR. DORNETTE:  I don't know when you want to take a

8   break, Your Honor, but --

9           THE COURT:  Well, normally we would take a break

10  every hour and a half or thereabouts.

11      Is there anyone that finds that something they just cannot

12  do?

13      (No response.)

14          THE COURT:  I assume you have considerable additional

15  cross?

16          MR. DORNETTE:  Some more, Your Honor, and I'm fine to

17  keep it going.

18          THE COURT:  Why don't we finish cross if we can and

19  then we'll take a break.

20          MR. KELLER:  May I speak with Mr. Dornette for a

21  moment?

22          THE COURT:  Okay.

23      (Messrs. Keller and Dornette confer privately.)

24          MR. DORNETTE:  Your Honor, we --

25          THE COURT:  Is this timely?

Backus - Cross

64

1          MR. DORNETTE:  Yes, it is.

2          THE COURT:  All right.  We'll take a 15-minute break

3    from now until 11 o'clock.

4          THE CLERK:  All rise.

5       (At which time a recess was taken.)

6                              *   *   *

7    BEFORE THE COURT:                        (11:03 A.M.)

8          THE CLERK:  Please be seated.

9    BY MR. DORNETTE:

10   Q.  Mr. Backus, showing you what's been marked as Defendant's

11   Exhibit B, I'll ask if you recognize that document?

12   A.  Never seen it before.

13   Q.  This was part of the AMS investigation and an analysis of

14   the Millennium Wellness transactions.  I will represent that

15   to you.

16      If you look at the last page, there's an estimated cost of

17   freight and handling of the product of $14,500.

18      Do you see that?

19   A.  Yes.

20   Q.  And transaction fees associated with credit cards in the

21   amount of $8,161.

22      Do you see that?

23   A.  I do.

24   Q.  Did you understand at all what the relationship was with

25   Millennium Wellness, what the agreement was to do those --

1  that product through the website?

2  A.  To my knowledge, there was no formal agreement.  You know,

3  what was brought up to the board was that there was this

4  Millennium Wellness transaction, which was a related-party

5  transaction which, you know, heretofore we were -- I was not

6  informed about.  We discussed it at a board meeting and

7  decided that, you know, it was somehow, you know -- it was the

8  only product that we were selling, you know, at zero margin,

9  and because of the related nature to Mike, we needed to just

10  continue doing it.

11  Q.  Now, Exhibit B reflects in the second paragraph the

12  relationship -- well, in the first paragraph HealthWarehouse

13  entered into a business relationship with Millennium Wellness

14  in 2009 for resale of certain medical health implant kits.  Do

15  you see that?

16  A.  I haven't read it.  I can listen to you read it to me.

17  Q.  But you see that in the document?

18  A.  Which paragraph?

19  Q.  The first paragraph.

20     (Witness reading.)

21  A.  Yes.

22  Q.  And you did not know, I take it, when you joined the

23  board, that this relationship was in place?

24  A.  No.

25  Q.  "The relationship with Millennium" -- you see in the

1  second paragraph there --

2          "The relationship with Millennium has two basic

3      advantages for HealthWarehouse.  First, the shipments of

4      the Millennium products go directly to doctors.

5      HealthWarehouse believes that putting their name in front

6      of doctors who actually write pharmaceutical prescriptions

7      will enhance the recognition of the Company's brand among

8      the physicians."

9      Do you see that?

10  A.  I do.

11  Q.  And that, you said, it was something that you thought it

12  was after the fact given to the board?

13  A.  The only time I heard these two points were when we

14  discussed this at a board meeting and Lalit brought these two

15  points up as the reason we should keep doing Millennium

16  Wellness.

17      And I noticed that the date of this memo to file that

18  someone wrote, I don't know who wrote this, but the date of

19  the memo to file was sort of contemporaneous with when that

20  discussion with Lalit was.

21  Q.  Well, and it was contemporaneous with when AMS was doing

22  its work?

23  A.  Right.  The board discovered this.

24  Q.  And the second point is the timing of the cash flows from

25  sales transactions benefits HealthWarehouse.  There was a

1   timing issue on those?

2   A.   That's what it says, yes.

3   Q.   And you understood from Lalit that was in fact the case?

4   A.   He referenced it as such.  We never did an analysis to

5   understand that, but that was his representation, correct.

6   Q.   Were you aware of the fact that Millennium Wellness also

7   if a -- if dollars came in by check, that HealthWarehouse kept

8   those sums?

9   A.   If someone bought something from us by check?

10  Q.   Yes.

11  A.   We don't keep them forever.  I mean, you have -- you gave

12  a -- you know, you create a payable, you have cash that comes

13  in that goes under the general ledger.  You could have a

14  payable -- and I don't know the terms of the relationship when

15  we were supposed to pay, whether it was net 15 or net 30.

16  So -- but, I understand that we deposit the check.  We have

17  cash until, you know, we pay the vendor.

18  Q.   So, you did not understand that the business relationship

19  with Millennium Wellness included HealthWarehouse's keeping

20  for itself any payments that are received for the Millennium

21  Wellness implant kits that came by check as opposed to credit

22  card?

23  A.   Never heard of that before.  You're suggesting that if

24  someone bought the product with a check, it was free to us,

25  meaning we had -- we got to keep all the money?

1   Q.  I'm asking if that's what you understood.

2   A.  No.  If that's what you're telling me, that -- I never

3   heard of any business like that where you get to get something

4   at zero cost and sell it for a hundred percent profit.

5   Q.  Well, except that if those checks amounted to 500- or

6   $1500 a month, that goes a long ways towards covering that

7   $22,000 cost, does it not?

8   A.  It would be the oddest business relationship I've ever

9   heard of.

10  Q.  You mentioned related-party transactions.  Is that

11  something that the board needs to have special scrutiny

12  around?

13  A.  Absolutely.

14  Q.  And at a certain level those need to be disclosed in SEC

15  documents?

16  A.  Should be.  If they're material, yes.

17  Q.  Who is Karen Backus?

18  A.  My wife.

19  Q.  What services did she provide for HealthWarehouse?

20  A.  She was the broker that took over the sure, I believe, in

21  2011.

22  Q.  And she placed the D & O insurance in 2011?

23  A.  Yes.

24  Q.  She made a commission on that?

25  A.  She's a fixed salary, I think.  So the firm probably did.

69

1   Q.  That was never put in any of the SEC filings?

2   A.  I don't know if it was or was not.  It was a decision

3   Lalit made.  I introduced Lalit to Karen and said, "Feel free

4   to talk to her."

5       Their firm represents -- I think there's a program run by

6   the National Venture Capital Association called the Tech SURE

7   Program that gives underwriters of ventured-backed

8   companies -- which HealthWarehouse was as soon as we put money

9   into it -- special rates from insurers, as well as special

10  provisions in the insurance policies that are not available to

11  other people.  So I made the introduction.  It was up to Lalit

12  to decide if he wanted to go with that policy or not.

13  Q.  So that was not a board decision?

14  A.  No.  I was not even on the board when I made the

15  introduction to her.  So, I joined the board in August of 2011

16  and introduced -- I think I introduced them in early 2011,

17  after we made our investment in December of 2010.

18  Q.  And you don't know whether the business relationship with

19  Millennium Wellness from 2009 was a board decision or not?

20  A.  I was not on the board then.  Have no idea.

21          MR. DORNETTE:  Can you give the witness Exhibit 7

22  again, please?

23  A.  I have 7.

24  Q.  You still have it.  I'm sorry.

25      Could you look -- Exhibit 7 is the 2011 10-K.  Could you

1    look at page 84?  I think you talked about this during your

2    direct examination.

3        Specifically, it references down here on the bottom of

4    page 84 to "provision of fulfillment services at no charge to

5    a business partly owned by a member of his household."

6        Do you see that?

7    A.  Yes.

8    Q.  And that's a reference to the Millennium Wellness

9    transaction?

10   A.  It is.

11   Q.  And Management -- the next sentence reads:

12           "Management believes that providing these services

13       offered a reciprocal benefit to the Company because it

14       introduced it to doctors and customers who were not

15       otherwise aware of the Company."

16       Do you see that?

17   A.  Yes.

18   Q.  And, again, that was part of the 10-K that you reviewed

19   before it was filed?

20   A.  Yes.  That was management's belief.  The board ultimately

21   decided that that was not sufficient to continue that

22   transaction.

23   Q.  So, management made -- the board made the decision that

24   that transaction would be concluded at, I think you said, the

25   end of May, or something like that, 2000 --

A.   Yeah.  We wanted it wound down immediately.  I think
ultimately it didn't wind down until sometime in the fall, and
I don't know why.

Q.   Now, going to the fall, the secured debt was out there,
starting to fall due late December?

A.   I think December -- I think it was a million dollars due
December 31 and about two million was due, I believe,
January 15, 2013.

Q.   And you knew that Mr. Dhadphale and other members of
management were out talking to potential investors, isn't that
correct?

A.   I knew that Lalit and Eduardo were the two out talking to
different investors.  In fact, I introduced them to, I think,
four different equity investors and five different debt
investors to take out the debt.  So, I was actively involved
in trying to help them set up, you know, different places to
find capital.

Q.   And you know that some of the people they were looking and
talking to at the time were people who had been introduced to
them by Mike Peppel?

A.   No, I knew at the time that some of them were people that
Mike knew.  So, what Lalit represented was that, you know,
these are -- these are friends, these are people who -- who
owe Mike, who had done favors for Mike before and for me --
"for me" being Mr. Lalit speaking -- and he described it as --

 1   I think the words he used were, "No one wants to make this

 2   investment but we're calling in chips, and they're doing it

 3   because," you know, "we're really pushing to do it."

 4   Q.  Okay.  And when you say "We're really pushing," he's

 5   saying --

 6   A.  He's saying he and Mike --

 7   Q.  He and Mr. Peppel?

 8   A.  -- are really pushing it.  Right.

 9   Q.  And those contacts were going on through the fall?

10   A.  The company was trying to raise money through the fall,

11   right.

12   Q.  And, now, when did you learn that Mr. Singer and

13   Mr. Peppel had actually noticed a public sale of the

14   collateral?

15   A.  Mr. Singer and Mr. Miller?

16   Q.  Mr. Singer and Mr. Miller.

17   A.  There's a notice that came in -- I think it was at some

18   point in January.  It was -- I don't know the exact date.  I'm

19   guessing it was probably, like, after the note was due.  So

20   sometime, I'm guessing, after January 15th.  But it was the

21   January-February time frame.  Actually January time frame, not

22   February.

23   Q.  Let me show you, Mr. Backus, what's been marked as

24   Defendant's Exhibit C and ask you if this is the notice that

25   came in in the middle of January you referenced?

1   A.  Yes, it is.

2   Q.  And there's reference to a public sale that would be held

3   on Friday, February 15, 2013, in New York City?

4   A.  Yes, there is.

5   Q.  And this really is the first step in how to foreclose on

6   the assets that Mr. Miller and Mr. Singer had their secured

7   interest in, is that correct?

8   A.  I've never done a foreclosure, so I wouldn't know if it's

9   a first step or required step, or anything.

10  Q.  Okay.  Obviously, at this point there was no assurance

11  that the money could be raised in order to take out this loan,

12  isn't that correct?

13  A.  At this point Lalit --

14      This was a moving target, so Lalit started over the summer

15  and had raised about 4- or $500,000.  I believe towards the

16  end of the year he had $500,000 that came in from -- it was

17  Manny Friedman that went to Lalit, and Lalit had invested

18  personally.  I think in early January he was up to 1.3 or $1.5

19  million.  I think at this point he was not at the point where

20  he had the full three, three and a half million, because it

21  was an accumulated target, so I can't tell you on which day,

22  you know, how much he received.

23  Q.  If the transactions set out in Exhibit C, the public sale

24  of all the assets, had occurred, that would have wiped out any

25  of these investments, is that correct?

74

1  A.  Most likely, yes.

2  Q.  And it would have wiped out the investment of every one of

3  the shareholders of the company?

4  A.  If they took -- if the creditors took possession of the

5  assets it would have, yes.

6  Q.  And it would have likely meant that all the employees

7  would have lost their jobs, right?

8  A.  I don't know that.  I don't know if -- so I called Gary

9  after we got this letter, because we talked about it at a

10  board meeting and we said, "Look, as opposed to playing," you

11  know, "standoff with these guys, let's have a dialogue."

12      Lalit, you know, was unable or unwilling to talk to Gary

13  or Gary was unable or unwilling to talk to Lalit.  I made a

14  phone call, and Gary basically said, "Look, we'll," you know,

15  "we'll negotiate."  You know, "We'll do some things.  We'll

16  hold off for 30, 60, 90 days, but I want some additional board

17  control.  I want some more supervision of the company."  So

18  there was the opportunity for negotiations.  So I don't know

19  that your conclusion is necessarily correct.  I think when I

20  asked Gary, you know, Gary felt that there's a viable business

21  here, you know, properly managed.  I don't think his plan was

22  to wind it down and sell furniture.  I think his plan was to,

23  you know, dress it up and build it.  But you'd have to ask him

24  that.  That's what he told me.

25  Q.  And had you, in your discussions with Lalit over the fall,

1    offered to put additional money into the company?

2    A.  So, over the fall, there were several times when Lalit

3    asked me to do two things.  Number one was, we had this

4    Preferred C that was sitting on top of the equity stack.

5    Lalit was trying to raise Common.  And he said that the Common

6    shareholders were unwilling to invest unless we were willing

7    to convert our Preferred C into whatever financing happened.

8    And, you know, ultimately we went back and forth on what the

9    terms of that would be.

10        We agreed that we would convert our C.  I think we signed

11   the agreement at the end of October of 2012 so long as, number

12   one, a round was raised by the end of the year, because that

13   was his plan, because that's when the first million dollars

14   was due, and, number two, that our investment converted at the

15   exact same formula that the new investors came in.  So, if the

16   new investors came in at a dollar a share, you know, we would

17   convert to a dollar a share.  And what I told Lalit was, "To

18   the extent that you raise enough money to pay off the debt in

19   full" -- which I thought was about 3.5 million but your three

20   three or three four could be right -- I said, "We would, in

21   addition, put another $500,000 in capital that you could have

22   for working capital."  But I said, "We won't do that just to

23   pay off debt.  That we're venture capital investors.  We

24   invest money into a company to help it grow.  We don't put

25   money in the front door so that it can go that same day out

1    the back door to someone else."

2         So, my conditions were:

3         Number one, you have to raise enough money to pay off the

4    debt.  If you do, I put in another $500,000.

5         Number two, we will convert our Series C on the same terms

6    of the round.

7         So that was the -- wasn't really an offer.  It was a

8    verbal back-and-forth that was a negotiation, but that's what

9    I put out there for him.

10   Q.  You never told him the NAV was prepared to put 2- to

11   $3 million into the company?

12        MR. KELLER:  Your Honor, I'll object to this entire

13   stream of questions as to relevance as to the matter at hand.

14   I'm at loss as to how any of this area aids the Court in

15   reaching its ultimate decision under 18 USC 3553(a) factors.

16        THE COURT:  Mr. Dornette?

17        MR. DORNETTE:  Your Honor, we think that fighting a

18   battle about board control is not worthy of this Court as

19   well.  But as the government has introduced this issue here,

20   we are entitled to examine what the motivation of this witness

21   is to be here today, and that's exactly where I'm going.

22        THE COURT:  I'll overrule the objection.  I assume

23   it's going to be pertinent pretty soon.

24        MR. DORNETTE:  It will, Your Honor.

25   BY MR. DORNETTE:

1  Q.  Mr. Backus, you have had, for a long time, faith in this

2  business model?

3  A.  That's a question?

4  Q.  Yes.

5  A.  I have faith in the idea that there's a direct-to-consumer

6  online pharmacy, yes.

7  Q.  And there is value in the pharmacy licenses in 50 states

8  and in certification?

9  A.  I think there's value.  I don't know how much value there

10  is there.

11  Q.  And there's stickiness when customers who take

12  prescription -- generic prescription meds over a long period

13  of time, provide their prescriptions to HealthWarehouse, is

14  there not?

15  A.  For people on maintenance medications there is, yes.

16  Q.  Do you have any idea sitting here today who will be in

17  control of HealthWarehouse six months from now?

18  A.  No idea.

19  Q.  Do you understand the candidates for that include Gary

20  Singer and Lloyd Miller?

21  A.  I think -- I think the candidate today, if I had to

22  handicap it, would be Mike and Lalit and their friends, who

23  just bought half the company in January for three and a half

24  million dollars, and Gary and Lloyd who have offered to invest

25  more money in the company.  It won't be us, because we don't

1    have additional capital beyond, you know, hundreds of

2    thousands of dollars to invest in the company.

3    Q.  Were there, in that January time frame when you said you

4    talked to Mr. Singer, were there discussions as well about

5    involuntary bankruptcy for the company?

6    A.  With Mr. Singer?

7    Q.  Yes.

8    A.  I never talked to him about that, no.

9    Q.  Was there any discussions with anyone else about

10   involuntary bankruptcy for the company?

11        MR. KELLER:  Your Honor, again, I object.  I'm still

12   at a loss as to where this is going.

13        MR. DORNETTE:  Your Honor, this is directly

14   pertinent.

15        THE COURT:  I'll permit it.

16   A.  There was a board agenda, I think, sometime in late

17   December where one of the items that Lalit put out in the

18   board agenda was a discussion about bankruptcy and the

19   implications.  And the full board talked about that in the

20   December board meeting and I was part of that conversation, as

21   well as Art McMahon from the Taft law firm.

22   Q.  Did you ever have a conversation with Lalit in which you

23   said that NAV was prepared to put a million dollars into the

24   company post-bankruptcy in order to get a third of the

25   company?

1   A.  No.  We've never done that in our lives.

2   Q.  Now, you have, as you sit here today, no confidence in the

3   current board?

4   A.  I have no confidence in -- in the majority of the current

5   board, that's correct.

6   Q.  And no confidence in Lalit Dhadphale?

7   A.  I do not have confidence in him.

8   Q.  And you said so in the letter of resignation?

9   A.  Yes, and I said so on -- in several board meetings and

10  executive sessions of board meetings as well.

11  Q.  And you know that whatever you put in that letter of

12  resignation was going to make it into the SEC filings, did you

13  not?

14  A.  Yes, I did.

15  Q.  Do you have any --

16      Let me put it this way.  So your preference six months

17  from now would be that the current board of majority not be

18  there, is that correct?

19  A.  Are you asking for my personal preference or my preference

20  as a shareholder, as a former director, or in what role?

21  Q.  Any of those.

22  A.  Well, I think -- I think this company will be best served

23  with independent directors who don't owe loyalties to Mike or

24  Lalit and, frankly, don't owe loyalties to investors but have

25  independent board members.

1     The way we always structure our boards is -- when we have

2     the chance to structure them -- is management plus investors

3     plus outside board members, with neither management nor

4     investors having a majority of the board, but the outside

5     investor, the outside board member, always being a swing vote.

6     I think that's the best structure for any company.  I think

7     that's the best structure for this company.

8     Q.  And I don't know that what I heard you say in terms of the

9     options of who might be in control six months from now

10    included that option, did it?

11    A.  Well, "control" is a very fuzzy question.  You know, is it

12    control of who owns shares?  Is it control from who votes on

13    the board?  Is it control from who is the CEO?

14        So, I mean, what are you thinking here?

15    Q.  Mr. Miller and Mr. Singer have notified the company that

16    they intend to launch a proxy contest to take over control of

17    the board and to oust current directors with people close to

18    them, isn't that correct?

19    A.  What I saw them file was that they filed in Delaware,

20    asking for the company to hold a shareholders' meeting, which

21    it hasn't held in several years.  And the company responded

22    without asking the board.  So Lalit responded and said we're

23    going to hold a shareholders' meeting in our sweet time,

24    basically.

25        But to the extent they filed something about holding a

1   proxy fight, I don't recall seeing that.  I do recall seeing

2   the filing of the Delaware court, you know, demanding a

3   shareholder meeting.

4   Q.  I'll get to that in a second.

5       But in late February, early March, didn't HWH Lending,

6   Mr. Singer's entity, and MilFam, Mr. Miller's entity, advise

7   the company, notify the company, that prior to such meeting

8   the holders intended to nominate a slate of directors to

9   replace all or a portion of the company's board?  Do you

10  recall that?

11  A.  I don't recall that specifically, but there were letters

12  flying fast and furious at that time.

13          MR. KELLER:  Your Honor, again, we implore counsel to

14  at least tie in some relevance as to the activities, the role

15  of Mr. Peppel and lack thereof; otherwise, this seems to be a

16  wild good chase of the nth degree.

17          THE COURT:  Mr. Dornette, I'm really not seeing the

18  connection between this line of questioning and Mr. Peppel.

19          MR. DORNETTE:  Your Honor, there is, outside of this

20  courtroom, a battle for control of HealthWarehouse.

21  Mr. Dhadphale and others are on one side, the founders,

22  Mr. Singer and Mr. Miller are on the other side.  What we have

23  heard in the direct examination of Mr. Backus is right out of

24  the playbook of the other side.

25      So what I'm attempting to establish here is, number one,

1   the fact that there is that battle for control going on,

2   including a proxy fight, including two lawsuits in Delaware.

3   And much of the critical testimony that Mr. Backus has said

4   today is exactly what's in one of those lawsuits that was

5   filed in Delaware.

6           THE COURT:  Okay.

7           MR. DORNETTE:  And it ties back into the fact that

8   Mr. Backus has no confidence in the current management of the

9   company and wants, I believe, six months from now for the

10  Miller-Singer folks, whom the government has endorsed as well,

11  to have control of that.

12          THE COURT:  How does that affect what Mr. Peppel's

13  ultimate sentence should be?

14          MR. DORNETTE:  I think that's the reason why

15  Mr. Backus --

16      Once Mr. Peppel's actions were able to save the company by

17  exactly what Mr. Backus has described -- raising the capital

18  necessary in order to keep Mr. Miller and Mr. Singer from

19  being able to take over control of the assets through the sale

20  that they noticed in Exhibit C -- once they were successful in

21  fighting that off, Mr. Singer and Mr. Miller continued at it

22  and I believe Mr. Backus sided with them, because that was the

23  first point at which Mr. Backus started talking about reaching

24  out to the Government.

25          MR. KELLER:  Your Honor, admittedly the rules of

Backus - Cross

83

 1  evidence and procedure are greatly relaxed, but there is still

 2  a requirement of some relevance.

 3      Mr. Backus has no connection with either Mr. Miller or

 4  Mr. Singer.  Mr. Backus is no longer even a member of the

 5  board.  So this explanation that we just heard just absolutely

 6  makes no sense whatsoever.  It is a complete irrelevance to

 7  the matter at hand.  We object.

 8          THE COURT:  I will --

 9          MR. DORNETTE:  Your Honor, Mr. Backus, Mr. Singer,

10  Mr. Miller all want to see Mike Peppel in jail so he cannot

11  interfere with their ability to get this company.

12          THE COURT:  Because this is not a trial and because

13  the rules are almost suspended for a sentencing hearing, I'll

14  overrule the objection.

15  BY MR. DORNETTE:

16  Q.  Let me show you, Mr. Backus, what has been marked as

17  Exhibit D and ask if you recognize that document.

18  A.  Vaguely.

19  Q.  This was provided to you when you were a director --

20  A.  Yes.

21  Q.  -- of HealthWarehouse in years past?

22  A.  As I said, the letters were going fast and furious.  But

23  this is one of them.

24  Q.  But you said at the end of the second paragraph that one

25  of the things that HWH Lending and MilFam were doing was

84

1   notifying the company that prior to such meeting -- and this

2   is the meeting you talked about before -- the holders intended

3   to nominate a slate of directors to replace all or a portion

4   of the company's board.

5       Do you see that?

6   A.  I do.

7   Q.  Does that refresh your recollection that they indicated --

8   notified the company there would be a proxy contest to remove

9   the directors, the current slate of directors?

10  A.  Yes.  My comment earlier was that I didn't think they

11  filed that in court.  So they had filed in court demanding a

12  shareholder meeting.

13  Q.  And they also filed in the court -- or at least Mr. Singer

14  has filed in the court a lawsuit against the directors, isn't

15  that correct?

16  A.  Yes.  He sent me a copy of that.  I stepped off the board

17  by then.  It was just as an information copy.

18  Q.  You're not identified as a defendant in that case, is that

19  correct?

20  A.  I'm not.

21  Q.  One of the things that lawsuit attacks is the $500,000

22  that was the second round of funding that was raised by

23  Mr. Peppel's efforts -- through Mr. Peppel's efforts that you

24  testified about, is that correct?

25  A.  That -- probably.  I haven't spent a lot of time looking

1    at Mr. Singer's lawsuit.  I'm not on the board, I'm not named

2    in it, so I haven't spent a lot of time looking at a thick

3    legal document for fun.

4         MR. KELLER:  Your Honor, may I again voice another

5    objection?

6      Based on Mr. Dornette's proffer as to what Mr. Backus'

7    motivation or belief may or may not be, again we question what

8    relevance would that have if indeed --

9      Mr. Peppel apparently has no connection whatsoever.  He's

10   not the CEO.  He's not in management of HealthWarehouse.  What

11   on earth connection would the later events, the later

12   management decisions, the board control of this organization,

13   this publicly traded corporation have with Mr. Peppel, who

14   apparently the defense position is has absolutely no

15   connection whatsoever with this company, present or in the

16   future?

17        MR. DORNETTE:  Your Honor, that has not been our

18   position, as you know.

19        THE COURT:  At this point Mr. Peppel is a volunteer,

20   a good Samaritan, helping his friend Lalit.  Is that --

21        MR. DORNETTE:  He is.

22        THE COURT:  -- your position?

23        MR. DORNETTE:  He is.

24     His mother and now his children have a significant

25   interest in the company, to be sure, that he cares about.

1          THE COURT:  Can we just move on pretty promptly here?

2          MR. DORNETTE:  We will be moving on very promptly.

3     But may I ask the witness to take a look at the Complaint?

4          THE COURT:  You may.  For the record, I'll overrule

5     the objection at least at this point.

6          MR. DORNETTE:  Ms. Brown, can you share with the

7     witness Government's Exhibit 16?

8     Q.  Showing you what's been marked as Government's Exhibit 16,

9     I'll ask you is that the Complaint that Mr. Singer provided to

10    you?

11    A.  It appears to be.

12    Q.  And I notice that you're not a defendant in that

13    Complaint, even though you were a director at the time that

14    the actions set out in the Complaint relate to, is that

15    correct?

16    A.  That is correct.

17    Q.  If you could refer to -- starting on page 10, there's a

18    discussion there about the Melrose Loan Agreement.  Do you see

19    that?

20    A.  I do.

21    Q.  That was this subsequent financing that was brought to the

22    company after the 3.-whatever million dollars came in, in

23    January?

24    A.  It was the one that Lalit was trying to pay my commission

25    on, yes.

87

1  Q.  And on the board you voted in favor of doing the Melrose

2  Loan Agreement, is that correct?

3  A.  Yes.

4  Q.  Could you take a look at exhibit -- at page 13 and

5  specifically in paragraph 69.  You see the reference to:

6       " . . . Director Defendants are liable for their

7       sustained and systematic failure to maintain oversight

8       with respect to the Company's internal controls, enabling

9       a convicted felon to receive unauthorized advances and

10      other benefits from the Company and to function as the *de*

11      *facto* CEO of the Company, with a salary funneled to him by

12      Dhadphale."

13      Do you see that?

14 A.  I do.

15 Q.  That's pretty consistent with the testimony you've

16 presented here today, is it not?

17 A.  Partially.  I don't relate it to the three directors.

18 Q.  But you used the phrase *de facto* CEO?

19 A.  I used the phrase two-for-one, you know, where Mike said

20 that, you know, we're getting, you know, two CEOs for the

21 price of one.  I'm not sure I said *de facto.*  I wouldn't

22 dispute that.  He was acting as the *de facto* CEO.

23 Q.  And the -- I think the record will reflect you did use

24 that word, that term?

25 A.  I'm happy to use it.  It's true.

1  Q.  And it certainly is consistent with what Mr. Singer is

2  trying to do in this part of his attack on the current

3  management of HealthWarehouse, is that not correct?

4  A.  I can't guess as to what Mr. Singer's trying to do.  You'd

5  have to ask him that.

6  Q.  That is consistent with what he says here in this part of

7  his attack on the management of HealthWarehouse, is that not

8  correct?

9  A.  No.  I never talked about a salary funneled to him by

10  Dhadphale.  I mean, I could parse the language if you wanted

11  me to.

12  Q.  Saying ". . . unauthorized advances and other benefits

13  from the company and to function as the *de facto* CEO of the

14  Company"?

15  A.  Well, the first part is a 10-Q and a 10-K filing.  So, you

16  know, that's been in our public statements for a year now.

17      "*de facto* CEO," if he wants to use that word, he can use

18  it.  I can use it, too.  As can you.

19  Q.  And in the positions you've been in various organizations,

20  CEOs delegate to others around them, do they not?

21  A.  Yes.

22  Q.  Because they have to?

23  A.  Depends on the size of the company.  We invest in

24  companies that have five people in them and the CEO does

25  everything.

1  Q.  HealthWarehouse is not one of those companies.

2      You testified earlier that you recall the board meeting

3  date of February 15th?

4  A.  Yes.

5  Q.  Because that was the point at which the suggestion was

6  made that Mr. Peppel should receive some sort of compensation

7  for having helped the company find financing?

8  A.  Yes.

9  Q.  In the world in which you operate, that is a fairly

10  standard *quid pro quo*, is it not?  People who come in and help

11  you find financing get reimbursed for it?

12  A.  Two thoughts.  Number one, not for people who owe the

13  company $150,000, and, number two, not in violation of

14  securities law when the person is not a broker-dealer or

15  registered broker-dealer.  You know, companies can't pay

16  contingent fees to finders out there unless that person is a

17  registered broker-dealer, and to my knowledge Mike doesn't

18  have that certification.  I brought that up on the board call

19  and said, you know, number one, he stole money from us; number

20  two, he owes us money; number three, we'll be breaking the law

21  if we do this, so we can't do this.

22  Q.  Those broker-dealer requirements relate to equity, do they

23  not?

24  A.  I don't know.

25  Q.  And they don't relate to debt?

1  A.  Don't know.  We're in the world -- we're in the world of

2  equity, not debt.

3  Q.  But with respect to this transaction, this was a debt

4  transaction which money was being borrowed?

5  A.  It was.

6  Q.  Let me show you what's been marked as Exhibit E.  And I'll

7  ask you if this is an email you sent to members of the board

8  and others?

9  A.  Yes, it is.

10  Q.  And this is following the February 15th board meeting

11  you've talked about?

12  A.  Yes.  Several hours after it.

13  Q.  And this is your suggestion that we should let the

14  prosecutor know what happened at HealthWarehouse in 2012 for

15  purposes of re-sentencing?

16  A.  Yeah.  My comment here was it was poetically ironic that

17  on the day Lalit tried to pay Mike a commission to obtain some

18  debt, that I guess the appeals court, or whatever it is, came

19  down and said he needs to be re-sentenced.  It literally

20  happened an hour or two after our conversation.  So, I got the

21  link to that, I sent it out to the board, and I said, "Is this

22  really," you know, "the type person we want to enter into a

23  commission agreement with?  Instead, we should let the

24  government know what really happened at HealthWarehouse in

25  2012."

1  Q.  And you don't believe that what was said in the 10-Q, the

2  2011 10-Q, was a fair characterization of what happened?

3  A.  I think if any person in this room who didn't know Mike

4  Peppel, or didn't know the company, read it, they wouldn't

5  have a clue who we were referring to or exactly what happened.

6  And I don't think that's proper disclosure in an SEC document.

7  Q.  And you didn't make any objection about it at the time?

8  A.  At the time it was drafted by your law firm, by your

9  partner Art McMahon, I was unaware at the time in April of

10  2012, or May when he drafted that, that he was also where you

11  were representing Mike Peppel.  So, I'm not accusing you of

12  conflict or anything; I just thought, you know, that would be

13  something that as a new board member -- I had been on the

14  board for six months at that point -- that would have been

15  nice to know.  So I didn't focus on it.

16     My thought is that if company counsel drafts something,

17  that it's something that they vetted; they think it's

18  something that belongs in the public document.  It was

19  subsequently vetted by the accounting firm.  I didn't weigh in

20  at that point.  You know, once I learned about the

21  relationship between the General Counsel, your firm, in

22  representing Mike, you know, along with all the left and

23  right, you know, I can look at this through the rearview

24  mirror and say that this was not a proper disclosure.

25  Q.  In any of the papers you got from AMS, and you've see them

1  today, they talk about HealthWarehouse policy.  You recall

2  that?

3  A.  I do.

4  Q.  Following the HealthWarehouse policy, does that qualify as

5  stealing from the company?

6  A.  Yes.

7  Q.  And between April of 2011 and February 15th of 2012, you

8  never talked about this -- the credit card issue in terms of

9  Mike Peppel's stealing from the company, have you?

10  A.  Well, I joined the board in August of 2011.  I never even

11  knew.

12  Q.  February 15th of 2013.

13  A.  Say the question again from the dates.

14  Q.  Between -- between April of 2012 when AMS was doing its

15  work, AMS was doing its work that satisfied Marcum that the

16  issues, all the issues -- not just the credit card, but all

17  the issues had been resolved to Marcum's satisfaction, between

18  April of 2012 and February 15th of 2013, you never said -- you

19  never reached the conclusion and started talking about Mike

20  Peppel having stolen from the company?

21  A.  No.  I talked about it well before February 15.  We had a

22  series of board meetings when Mike's second note came due,

23  which I believe was in December of 2012, about What are we

24  going to do with this note?  It was triggered by, I believe, a

25  first draft of the 10-Q.  I'm not sure -- I think it was the

1   third quarter 10-Q where that disclosure that was originally

2   in the 10-K was amended to basically say -- again, in complex

3   accounting language -- that we're writing off the loan for

4   accounting purposes.  We're going to have it be a conflict

5   equity account.  We're not going to have it be a note

6   receivable anymore.

7       And I looked at that and said, you know, Why in the world

8   are we deciding we're not going to collect this, you know,

9   against Mike?

10      So the trigger for that was when the note came due in

11  December 2012, the first notice to me as a board member that

12  anything untoward was going on was when I saw the first draft

13  had the modification of that disclosure in the upcoming 10-Q.

14  Q.  Again, the record is very clear that starting on the 15th

15  of February, you're talking about theft, but nothing in the

16  AMS report reflects anything like that.  Nothing in the AMS

17  report reflects anything other than a policy, a policy that

18  you disagreed with, a policy that was modified afterwards, but

19  a HealthWarehouse policy that HealthWarehouse did not have

20  sufficient number of in-house accounting personnel to deal

21  with this issue, lots of issues.  Isn't that what the AMS

22  report said?

23  A.  No, it's not.  At the end of the AMS report, you'll notice

24  they say specifically that they were not asked by the company

25  or by Marcum to look for fraud.  They say that specifically in

1    the AMS report that they were only to do a reconciliation,

2    that their charter was not to look for fraud.  So if they

3    don't look for it, they're not going to come back and report

4    it.

5    Q.  And based upon what they report, Marcum was satisfied and

6    concluded its audit and the 10-K was filed?

7    A.  Correct.

8    Q.  Now, you're also the subject of a current investigation --

9    is that correct? -- by the board relating to your actions

10   while a board member?

11   A.  Yes.

12   Q.  And some of those allegations relate to your position or

13   NAV's position as a preferred shareholder at the same time

14   that you were a director seeking to further the interests of

15   the common shareholders, isn't that correct?

16   A.  They do.  Actually, no, they don't.

17   Q.  Well, it's in the Government's Exhibits.  We can look at

18   that.

19   A.  Okay.

20   Q.  The fact that there's an investigation going on regarding

21   you and your conduct as a director by the board, that wasn't

22   referenced by you in your resignation letter, was it?

23   A.  Yes, it was.  I'm happy to point it out to you, if you

24   want to bring it out.

25   Q.  The way in which things transpired in January and

1    February, the possibility that NAV might participate in some

2    sort of post-bankruptcy reorganization --

3    A.   There was never that discussion or possibility.  I don't

4    know where you got that from.  But we never had that

5    discussion.  We've never done that in 15 years of investing.

6    We never had that discussion with me at the board level saying

7    we will invest in a post-bankruptcy.  Ever.

8               MR. DORNETTE:  Nothing further, Your Honor.

9               THE COURT:  Mr. Keller?

10              MR. KELLER:  I'll try and be briefer than

11   Mr. Dornette.

12                       REDIRECT EXAMINATION

13   BY MR. KELLER:

14   Q.   Do you have Government's Exhibit 7 in front of you,

15   Mr. Backus?

16   A.   Which one?

17   Q.   No. 7.

18   A.   I've quite a collection.  Yes.

19   Q.   I'll ask you to turn to the last page.

20              MR. KELLER:  If you would put the last page on the

21   screen, please.

22   Q.   Once again, what is Government's Exhibit 7?

23   A.   It's the 10-K filing for 2011.

24   Q.   I apologize.  Government's Exhibit 6.  I beg your pardon.

25   Last page of Government's Exhibit 6.

1   A.  I've got that.  It's the AMS procedural memo.

2   Q.  All right.  This is the forensic accounting firm's

3   memorandum, correct?

4   A.  That's correct.

5   Q.  Last page, first full paragraph, first sentence.  You see

6   that?

7   A.  Yes.

8   Q.  Does it not read:

9           "Our review of that work was not intended to identify

10          cases of fraud but to ascertain the reasonableness of the

11          Company's accounting"?

12  A.  That's correct.

13  Q.  It goes on to say:  "We note" --

14          "We did note, however, that during the course of

15          2011, a shareholder/director/founder of the Company had

16          the company pay for, or reimburse him for, personal

17          expenses."

18          Who are they referring to?

19  A.  Either Lalit or Mike.

20  Q.  "We identified poor controls and a control environment

21          that did not question the spending of the founders."

22          Who were the founders?

23  A.  Mike Peppel, Lalit Dhadphale.

24  Q.  And at the end of the paragraph it goes on to say:

25          " . . . but also recognize that one of the founders,

1      Mr. Peppel, did exercise undue influence over the control

2      environment in the Company."

3      How did you interpret that statement?

4   A.  He had his way with the people in the Accounting

5   Department.

6   Q.  Next paragraph, second sentence:

7          "Management has taken steps to improve the control

8      environment, notably accepting the resignation of

9      Mr. Peppel, the transfer of Dan Biser out of the

10     accounting function, and implementing tighter controls

11     over the use and reimbursement of Company credit cards,

12     and a closer scrutiny/approval of the charges by the CFO."

13     Finally, last sentence of the report:

14         "Presently, $235,000 of the funds have been received

15     in repayment of Mike Peppel's debt and a promissory note

16     of approximately $141,000 has been given the Company by

17     Mr. Peppel."

18     You had indicated that you resigned from the board as of

19  April 29, approximately what, a week, week and a half ago?

20  A.  Of 2013.  So --

21  Q.  As of that date, Mr. Backus, is the company still owed the

22  $141,000 by Mr. Peppel?

23  A.  Yeah.  The number moves around a little bit based on some

24  -- some set asides.  I believe the company also was in the

25  process, when I stepped off the board, of foreclosing on about

1    40-some thousand shares of HealthWarehouse stock that Cape

2    Bear pledged as partial collateral for the loan, had a price

3    of 44 cents a share, so that was about a $16,000 set aside.

4    So, yeah, the number is probably 125, 140 now.

5    Q.  Mr. Dornette spent a considerable amount of time asking

6    you about Millennium Wellness, the company that was either

7    wholly or partially owned by Mike Peppel's wife?

8    A.  Yes, he did.

9    Q.  In your mind, would you characterize the arrangement for

10   the sale of devises sold to HealthWarehouse by Mr. Peppel's

11   wife as a -- would it be fair to characterize it as a

12   sweetheart deal?

13   A.  Well, I don't know of any other SKUs in the inventory that

14   we sold at cost.  That, to me, was the part that was unusual.

15   I don't care that, you know, his wife's company had a product

16   if people wanted to buy we made available.  But to sell at no

17   cost -- you know, you go out of business pretty quickly if all

18   of your products have that economic margin.  I'm sorry.  No

19   profit margin, not no cost.

20   Q.  So HealthWarehouse didn't make any money?

21   A.  No.  It cost us money.

22   Q.  Fair to say that in all likelihood Mrs. Peppel made money?

23   A.  I couldn't guess that.  I don't know.

24   Q.  All right.  You used the term Mike Peppel "stole."  That's

25   a harsh term.  Do you stand by that term?

A.   Absolutely.  Mike was making $5,000 a month, and in the

first three months of 2012, he had $25,000 a month in personal

expenses on the credit card that, you know, were not properly

accounted for.  If you're an officer and -- not an officer.

If you're a founder of a company and an important person in

the company, you have -- I believe you have to set a higher

standard than any other people do.  And for, you know, him to

not know that he's taking on his personal credit card five

times his monthly salary in personal expenses and not

reporting it proactively is just mind-blowing to me.

Q.   This credit card -- we'll use the generic term -- issue,

were there any other individuals, any other employers, any

other members of management of HealthWarehouse.com other than

Mr. Peppel and Lalit Dhadphale that had been implicated in

abusing corporate credit cards?

A.   Those were the only two that came to my attention on the

board through Marcum and through the AMS report.  I don't know

if there were any others, though.

Q.   Finally, Mr. Dornette had questioned you about this

internal investigation that I guess you are one of the

subjects of.  Do you recall that subject?

A.   Yes, I do.

Q.   Who was the individual who had requested that such an

investigation of yourself and --

     Who was the other subject of this investigation?

100

1    A.   Matthew Stecker.

2    Q.   Who requested that?

3    A.   Wayne Corona.

4    Q.   And who is Mr. Wayne Corona?

5    A.   Wayne, as of when I stepped off the board, was a

6    consultant to the company.  He formerly worked at Masters

7    Pharmaceutical.  I met Wayne once in the summer or fall of

8    2010 when we were doing due diligence on the company.  In

9    fact, when we bought stock from selling shareholders in the

10   summer of 2010, we stroked about a $300,000 check to Wayne to

11   buy some of his stock along with stock from Denny Smith and

12   Denny's son and a couple of other people, and I think I've had

13   one or two conversations with him since.

14   Q.   Now, you've also been questioned about this scramble to

15   come up with money to pay off the secured debt.

16   A.   Yes.

17   Q.   Three, three and a half million dollars?

18   A.   Yes.

19   Q.   Did Mr. Corona kick in any money to help with that effort?

20   A.   So, Mr. Corona had lent some money to the company over the

21   course of 2012, and once the financing was closed on about

22   February 1st, we had -- one of the topics of discussion at the

23   February 15th board meeting was having Mr. Corona convert his

24   approximately 6- or $700,000 -- in loans that he made to the

25   company -- into equity under the same terms for the company

 1  just raised 3.3 to 3.4 million.  So, Mr. Corona ended up

 2  getting out of that about 2.4 million shares.  He bought --

 3  you know, he bought about 10-, 11-, 12 percent of the company

 4  for $700,000.

 5  Q.  All right.  Were you aware that Mr. Corona and Mr. Peppel

 6  apparently -- Mr. Corona has loaned Mr. Peppel money?  Were

 7  you aware of that?

 8  A.  No.  That explains his letter, though.

 9  Q.  Is that a material fact that should have been revealed to

10  the board of directors, in your opinion?

11  A.  Absolutely, if we're going to bring him on board.  This

12  company -- the board was really clear, you know, after Mike

13  stole this money from the company, that we wanted nothing else

14  to do with Mike.  And to bring on someone who had, you know,

15  ongoing financial transactions to him -- I mean, this is the

16  first time I've heard of this, but -- I don't know why I

17  continue to be shocked, but I am.

18  Q.  Would you be surprised if, indeed, you were to learn that

19  Mr. Corona assisted in paying Mr. Peppel's rent on his

20  personal residence?

21  A.  Nothing surprises me now.  But --

22  Q.  To the tune --

23  A.  Never heard of that before.

24  Q.  -- to the tune of $5,000 a month.

25  A.  Unbelievable.

BACKUS    REDIRECT

102

1          MR. KELLER:  Your Honor, I have no further questions.

2          THE COURT:  Recross?

3          MR. DORNETTE:  Nothing.

4          THE COURT:  All right.  Counselors, is there any

5    reason for Mr. Backus to remain available for recall?

6          MR. KELLER:  Not on the part of the United States,

7    Your Honor.

8          MR. DORNETTE:  No, Your Honor.

9          THE COURT:  Okay.  Thank you, sir.  You may step

10   down.  You're excused.

11       (Witness excused.)

12          THE COURT:  It's noon, and I think it unlikely we're

13   going to wind up anytime very soon.

14       So, since there is no jury, I suggest that we take a

15   55-minute lunch break till 1 o'clock and resume at one.

16          THE CLERK:  All rise.

17       (At 12:05 P.M., the luncheon recess was taken.)

18                              *   *   *

19

20

21

22

23

24

25

AFTERNOON SESSION

BEFORE THE COURT:                                    (1:06 P.M.)

          THE CLERK:  Please be seated.

          THE COURT:  Mr. Keller, what's next?

          MR. KELLER:  Waiting for our next witness, Your

Honor.

          THE COURT:  Who are you to call?

          MR. KELLER:  At this time the United States calls to

the stand Mr. Eduardo Altamirano.

          THE CLERK:  Please raise your right hand.

     (Duly sworn by the Clerk.)

          THE CLERK:  Please be seated.

EDUARDO ALTAMIRANO

a witness herein, having previously been sworn, testified as

follows:

DIRECT EXAMINATION

BY MR. KELLER:

Q.  Good afternoon, Mr. Altamirano.  Could you please state

your full name for the record?

A.  My full name is Eduardo Altamirano.  A-L-T as in Tom -A-M

as in Mary -I-R-A-N as in Nancy -O.

Q.  What is your occupation, Mr. Altamirano?

A.  I'm currently unemployed.

Q.  Prior to your current period of unemployment what was your

occupation?

1  A.  I was previously CFO of HealthWarehouse.

2  Q.  Is it fair to say that you are here pursuant to a trial

3  subpoena that has been issued to you?

4  A.  That is correct.

5  Q.  Tell us a little bit about your education, if you would.

6  A.  Sure.  I graduated in 2003 from Southern Methodist

7  University.  I received a degree in International Studies in

8  finance and minor in French.

9  Q.  Tell us a little bit about your employment history prior

10 to coming to HealthWarehouse.com.

11 A.  Sure.  Shortly after graduation from university, I worked

12 at Credit Suisse in Mexico City, then UBS in New York.  Then

13 after, I worked starting at a peer-to-peer lending system with

14 a friend of mine, after which I joined a start-up

15 private-entry fund and then I came to -- went to ROTH Capital,

16 and then HealthWarehouse.

17 Q.  All right.  Could you tell the Court when you first were

18 approached by anyone connected with HealthWarehouse.com, a

19 firm presently based out of Florence, Kentucky?

20 A.  Actually, the contact came from the former place I at

21 worked at, ROTH Capital.  My former colleague, Al Longfield,

22 met Lalit Dhadphale at some point in 2010, and my first point

23 of contact was Lalit Dhadphale.

24 Q.  All right.  Now, as time went on did you come to know,

25 meet, an individual by the name of Michael E. Peppel?

1   A.  I did.

2   Q.  Do you see this person in the courtroom today?

3   A.  I do.

4   Q.  Could you point to where Mr. Peppel is located?  Tell us

5   where he's located, what he's wearing.

6   A.  He's approximately right in front of me.  He's wearing a

7   grey suit, tie, and glasses.

8   Q.  We have three gentlemen, one with glasses.  Which one is

9   Mr. Peppel?

10  A.  The one to Mr. Dornette's left.

11          MR. KELLER:  Your Honor, if the record could reflect

12  an accurate identification of the defendant by this witness?

13          THE COURT:  It will.

14  Q.  You had indicated that you most recently had been the

15  Chief Financial Officer at HealthWarehouse.com?

16  A.  Yes.

17  Q.  Did Mr. Peppel -- was he involved in any of the

18  negotiations, the discussions that ultimately led to you

19  agreeing to be employed by HealthWarehouse?

20  A.  Yes.

21  Q.  Describe what his role was.

22  A.  I had no knowledge of his title at the time, but between

23  he and Mr. Dhadphale, they were the ones that approached me

24  about a position working at HealthWarehouse.

25  Q.  Where were you employed prior to coming to

1   HealthWarehouse?

2   A.  I was at ROTH Capital Partners, a boutique investment

3   bank, that is located out of Newport Beach, California.  I was

4   based out of San Francisco, California.

5   Q.  Describe what role Mr. Peppel played in ultimately your

6   decision to come to HealthWarehouse.

7   A.  He was -- between he and Mr. Dhadphale, they were the

8   initial points of contact with, you know, approaching me about

9   a position here, and after which when I was made a formal

10  offer by Mr. Dhadphale, I agreed and accepted.

11  Q.  And did Mr. Peppel play any role in the formal offer that

12  was tendered to you?

13  A.  Not to my knowledge.

14  Q.  When did you first come to be employed by

15  HealthWarehouse.com?

16  A.  My starting date was May 1st, 2012.

17          MR. KELLER:  If the witness could be provided

18  Government's Exhibit 23, please.

19  Q.  Mr. Altamirano, that is a thick collection of documents.

20  If I could direct your attention -- it's about halfway through

21  that -- and it's what's called a Bates number at the bottom

22  right, in reference HEWA 383.  If you could find that.

23          MR. KELLER:  And I believe that for projection

24  purpose should be page 83.

25  Q.  And when you've located that document, please let me know.

1    Have you found it?

2  A.  Unfortunately, no.  You said 333?

3  Q.  383.

4    MR. KELLER:  Your Honor, if I may approach, I'd be

5  happy to provide him my copy of this to be of assistance.

6    THE COURT:  I'm not having any better success than

7  the witness finding the page.

8    (Mr. Keller handing a document to the witness.)

9    THE WITNESS:  Thank you.

10  Q.  Could you take a moment -- can you identify that email?

11  A.  That is an email that appears that I sent to Lalit on

12  March 20th, 2012.

13  Q.  And what's the nature of the email?

14  A.  So, I'm asking about the offer and had questions about

15  basically moving expenses, it appears here, options, vacation,

16  and a 401(K).

17  Q.  Now, in that email string does Mr. Peppel's name or email

18  anywhere appear?

19  A.  It does.

20  Q.  What role did Mr. Peppel play in that series of

21  communications via email between yourself and Mr. Dhadphale

22  and Mr. Peppel?

23  A.  It appears that he responded about the options, vesting

24  period, the moving expenses, vacation period, and the 401(K)

25  plan.

1  Q.  These are all items concerning your employment terms,

2  correct?

3  A.  That is correct.

4  Q.  What role did Mr. Peppel have as far as definitizing the

5  specific terms of your employment at HealthWarehouse at that

6  point?

7  A.  At this point I would say that I don't know what --

8      Basically, discussions transpired between Mr. Dhadphale

9  and Mr. Peppel.  But it was a confirmation of questions that I

10 had at this point.

11 Q.  And who ultimately confirmed the issues concerning those

12 terms of your employment?

13 A.  Mr. Peppel.

14         MR. KELLER:  If I may retrieve that back from the

15 witness, Your Honor?

16         THE COURT:  You may.

17 Q.  Now, Mr. Altamirano, what position were you initially

18 hired to fill at HealthWarehouse, I believe you indicated in

19 May of 2012?

20 A.  If I recall correctly, it was VP of Marketing and

21 Industrial Relations.

22 Q.  And Mr. Peppel played a role in that final hire, did he

23 not?

24 A.  He did.

25 Q.  So, he had some involvement with the ultimate decision on

1  you being hired?

2  A.  Is that a question?

3  Q.  Yes.

4  A.  I would discuss that again with Mr. Dhadphale, but the

5  dialogue that I had with him, he was involved.

6  Q.  Okay.  Now, ultimately you did become the Chief Financial

7  Officer.  Approximately at what point did that occur?

8  A.  It was in late September of 2012.

9  Q.  Late September 2012.

10     And when did you ultimately leave HealthWarehouse?

11  A.  I submitted a notice of resignation on February 21st,

12  2013.  I -- in noting my final date as April 15th, 2013.

13  Q.  Mr. Altamirano, according to my calculations, roughly a

14  five-month period, right?

15  A.  Roughly.

16  Q.  It's a relatively short period for an individual to serve

17  as a Chief Financial Officer, don't you think?

18  A.  Correct.

19  Q.  Let's talk about your relationship that you had with

20  Mr. Peppel during that tenure as Chief Financial Officer

21  between late September 20th and when did you ultimately depart

22  physically from employment.

23  A.  So, my relationship with Mr. Peppel was limited.

24  Basically over the course of the summer, I believe, if I

25  recall correctly, had limited interaction with him, attending

1    one or two functions, one of which was his daughter's high

2    school graduation, if I recall correctly.  He did assist with

3    introductions and with the raising of equity to pay off what

4    Mr. Backus mentioned earlier, the debt that was due.  And I --

5    my final date on basically the premises at HealthWarehouse was

6    April 9th, 2013.

7    Q.  How would you describe Mr. Peppel's overall role at

8    HealthWarehouse.com during your tenure as CFO?

9    A.  Again, I had limited interaction with him.  So, basically

10   I would just say that he assisted within the raising of funds,

11   and that's about it.

12   Q.  Was he a decision-maker in your view?

13   A.  Not in my view.  Not necessarily.  There's a possibility,

14   but not in my view.

15   Q.  Well, let's -- let's examine that.  You say there's a

16   possibility but not in your view.  What's that mean?  Was he

17   or was he not a decision-maker of key decisions at

18   HealthWarehouse.com when you were employed?

19   A.  He was not employed at HealthWarehouse when I joined

20   HealthWarehouse.

21   Q.  I understand that.

22       What was his role?  Did he have any involvement that you

23   observed while you were the CFO at HealthWarehouse?

24   A.  Yes.

25   Q.  And what was that role aside from raising funds?  Was that

1    it?

2    A.  To my knowledge, he should have had no other involvement

3    within the company.

4    Q.  In fact, did he have any other involvement?

5    A.  Yes.

6    Q.  And what was that other involvement?

7    A.  He -- I'll say this:  He made it -- an appearance during

8    -- at some point in January when I was scheduled to meet

9    Mr. Wayne Corona along with Brian Corona and Scott Yuhanick

10   and discussing wholesale.

11   Q.  Now, was this a meeting --

12       Now, you and I had talked -- correct me if I'm wrong -- up

13   in the Dayton U.S. Attorney's Office on, looks like, May 1st.

14       Do you remember that meeting?

15   A.  I do.

16   Q.  Do you remember discussing a meeting that occurred at the

17   Starbucks in Crestview Hills?  Does that ring a bell?

18   A.  That is correct.

19   Q.  When did that meeting take place between you and

20   Mr. Peppel?

21   A.  I believe the first week of January.

22   Q.  And you were at that time the Chief Financial Officer?

23   A.  That is correct.

24   Q.  Tell us about that meeting.

25   A.  I thought it was a useless and unnecessary meeting.

1  Q.  Well, that may be, but tell us what -- what the discussion

2  topics were.

3  A.  It was whether or not we continue with wholesale, a

4  division that I believed provided absolutely no economic

5  return to the company and was destroying company morale.

6  Q.  What was your view on the issue of wholesale versus retail

7  focus?

8  A.  Indirect conflict.

9  Q.  And your position that HealthWarehouse should focus in on

10 retail?

11 A.  When I came on at HealthWarehouse, I was sold on the idea

12 there was a consumer-based Internet pharmacy.  I believe that

13 that was its greatest source of returns.  It provided the

14 least amount of capital at risk, and I thought it was the most

15 valuable component for the company on a going-forward basis.

16 Q.  And what was Mr. Peppel's view?

17 A.  His view was essentially that wholesale would continue.

18 Q.  So you had a difference of opinion on that issue,

19 correct --

20 A.  Correct.

21 Q.  -- on that vision, on that strategy issue as to how

22 HealthWarehouse was going to go forward, fair enough?

23 A.  Yes.

24 Q.  Was it a heated conversation?

25 A.  Depends on how you look at it.

1  Q.  How do you look at it, Mr. Altamirano?

2  A.  Again, I thought it was worthless.

3  Q.  Were voices raised?

4  A.  People did get a little bit tense, you could say.

5  Q.  Did you ask yourself in your own mind Who is this guy

6  speaking to the Chief Financial Officer in that fashion when

7  apparently he had next to no role apparently in the company,

8  in the corporation?  Did that thought cross your mind?

9  A.  I thought he was a former employee, co-founder of the

10  company, and was voicing his -- his thoughts.

11  Q.  And this occurred when?

12  A.  This was the first week of January, to my recollection.

13  Q.  Of 2013?

14  A.  That's correct.

15  Q.  Now, were you aware, spinning the clock back, that

16  approximately, hmm, eight months prior, seven-, eight months

17  prior on about April 18th, 2012, Mr. Peppel submitted his

18  resignation as an employee of HealthWarehouse?  Did you know

19  that?

20  A.  I learned of it when my wife and I finally made the trek

21  out here.

22  Q.  So, what was his status when he had this conversation with

23  you at the Starbucks in Crestview Hills, Kentucky, when you

24  and he exchanged views of the strategy vision of

25  HealthWarehouse.com as either a retail or a wholesale company?

1  A.  He was not an employee of the company.

2  Q.  Okay.  All right.  Let's spin the clock back, I believe,

3  approximately a month prior, December 12th.  Do you remember

4  December -- excuse me -- December 2012?  Do you remember that

5  time frame?

6  A.  Roughly.

7  Q.  During that time frame did you have an occasion to review

8  some of the bills at HealthWarehouse.com?

9  A.  Yes.

10  Q.  More specifically, did you have an occasion to review some

11  of the cell phone bills that HealthWarehouse.com received and

12  was expecting to tender payment?

13  A.  Yes.  There was a meeting with Lalit Dhadphale and Marsten

14  Alfred at one point, who were managing the rising phone bills,

15  and it appeared that they were fairly excessive.  I noted that

16  anyone who is not an employee of HealthWarehouse needed -- and

17  at the beck and call, roughly, of the company, to be made

18  available at all times -- should not be having his or her cell

19  phone bill paid for.

20  Q.  And what did you discover going through the cell phone

21  bills in December 2012?

22  A.  At that point they were just excessively onerous, and just

23  anyone who was not an employee should not be on there.

24  Q.  Did you discover an individual or individuals related to

25  that person's family receiving cell phones paid by the

1  company?

2  A.  If I roughly recall, there were some individuals who

3  should not be on there.  I did not get their names

4  specifically, except for possibly one, and realized that again

5  that person should not be on there.

6  Q.  Did that person have a name?

7  A.  Yes.

8  Q.  What was this person's name?

9  A.  If I recall correctly, Marissa Corona -- sorry, Marissa

10  Peppel.

11  Q.  Were there any other individuals connected with the Peppel

12  family receiving a cell phone at the expense of

13  HealthWarehouse.com?

14  A.  Possibly.  I don't know the entire extent of that list.

15  Q.  And do you remember discussing this particular issue with

16  me up in Dayton, Ohio, May 1st, 2013?

17  A.  I do.

18  Q.  And in that room was Special Agent Marcia Gross.  Do you

19  remember that?

20  A.  Yes, I do.

21  Q.  What did you tell us then?

22  A.  I said that basically, again, any names that should not be

23  on there -- should not be on there, should not be there.

24  Q.  Do you remember telling us that Mike Peppel's name was on

25  there?

1  A.  Mike Peppel's name was discovered later on actually, yes.

2  Q.  What other family members were discovered later on

3  associated with Mr. Peppel?

4  A.  Actually, there were not family members.  There were two

5  other members who should not be on there, though.  Basically

6  should be eliminated from that list as well.

7  Q.  Let's focus in on Mr. Peppel, because you understand

8  that's what we're here to talk about.

9      Mr. Peppel's name was on it?

10 A.  Correct.

11 Q.  And who was the other Peppel family member?

12 A.  Again, I believe Marissa Corona -- sorry, Marissa Peppel.

13 Excuse me.

14 Q.  And what time frame was this?

15 A.  Excuse me.  This was -- Mrs. Peppel's name was -- in

16 December when I discovered that.

17 Q.  What is her name?

18 A.  Marissa Peppel, if I recall correctly.

19 Q.  Could it be Melanie Parsons?

20 A.  I don't recall seeing that name.

21 Q.  How many family members, do you recall talking to

22 Mr. Peppel, that ultimately you discovered were receiving cell

23 phones paid by HealthWarehouse?

24 A.  There was a list that Marsten Alfred had prepared at one

25 point.  And I don't remember what names were on there, but I

1    remember seeing a few names that were of the Peppel family on

2    that list.

3    Q.  And, again, just to make sure I'm crystal clear, what time

4    frame are we talking?  Is this December?  Is this January?

5    When is this?

6    A.  This is December.

7    Q.  Of 2012?

8    A.  Correct.

9    Q.  And this is approximately eight months after his supposed

10   resignation, right?

11   A.  Correct.

12   Q.  Okay.  What was your reaction when you learned of this?

13   A.  I was livid.

14   Q.  Why were you livid?

15   A.  When I came on, the company was bleeding approximately

16   $600,000 in operating cash flow.  I thought that no one -- I

17   mean anyone who's not involved directly with the company and

18   were -- and I was working my damndest hard to ensure the

19   financial profitability of the company, and this defeated that

20   purpose.

21   Q.  You were upset, obviously?

22   A.  Livid.

23   Q.  What steps did you take to rectify this particular

24   situation you discovered?

25   A.  I stated that all names who were -- all individuals who

1    are not, as I said earlier, direct employees of the company

2    should be eliminated from that list.

3    Q.  And was that done?

4    A.  Mostly.

5    Q.  Well, again, let's talk about the Peppel family.  Was it

6    done with respect to the Peppels?

7    A.  All but one.

8    Q.  And what was the one that it was not done?

9    A.  Mike Peppel.

10   Q.  All right.  Did you later have a conversation with

11   Mr. Peppel about the cell phones?

12   A.  In December there was a conversation.

13   Q.  And where did this conversation take place?

14   A.  To the best of my recollection, I was leaving the office

15   that day and he had called Scott Yuhanick on his cell phone,

16   and Mike Peppel asked to speak with me and I spoke with him,

17   and he was, to put it mildly, irate about his family getting

18   cut off from their cell phones.

19   Q.  Now, in your mind, what is the level of anger between

20   irate and livid?  What is the more extreme?

21   A.  I'll state that I'd never been spoken to in such a way by

22   anyone in a professional environment.

23   Q.  Now, again, at this point you were the Chief Financial

24   Officer?

25   A.  Correct.

1  Q.  And Mr. Peppel approaches you to speak about the cell

2  phone situation?

3  A.  Roughly, yes.

4  Q.  Okay.  Mr. Altamirano, we need to be precise.

5  A.  Yes.

6  Q.  Yes or no.

7  A.  Yes.

8  Q.  What did Mr. Peppel have to say to you?

9  A.  He said he was very irate at the fact his family had been

10  cut off, that his children had been cut off, that his mother

11  had been cut off, and effectively was very upset about that,

12  to which I replied that I was not the account manager and I

13  didn't understand why this has not been communicated to them.

14  Q.  You remember, again, at that infamous interview on May 1st

15  up in Dayton, we questioned you very precisely as to what you

16  recall, what the quotation was that you attributed to

17  Mr. Peppel.  Do you remember that?

18  A.  I do.

19  Q.  What did Mr. Peppel tell -- say to you at that point in

20  time on the subject of his cell phones being terminated on the

21  HealthWarehouse.com account?

22  A.  I'll paraphrase to the best of my knowledge and given the

23  expletive.  It was "Don't you ever make a decision without me

24  again."

25  Q.  Okay.  You remember when I asked you that, I asked you

1    twice and I wrote don't precisely what you told me.  Do you

2    remember that?

3    A.  Yes.

4    Q.  And I'm going to say --

5         MR. KELLER:  Again, I apologize to the Court in

6    advance.

7    Q.  -- but I want to make sure that you do or do not agree

8    with what my notes reflect.  Fair enough?

9    A.  Sure.

10   Q.  My notes indicated that you indicated that Mr. Peppel told

11   you, quote:  "Don't you ever make a fucking decision without

12   me again."

13        Is that accurate?

14   A.  Yes.

15   Q.  What was your reaction to that?

16   A.  Again, I'd never been spoken to in such an unprofessional

17   way on that basis, nor did I think he had the right to speak

18   to me in that sort of tone, especially given the fact of the

19   company's financial standing.

20   Q.  Well, given the fact, too, he wasn't even an employee, was

21   he?

22   A.  That's correct.

23   Q.  Was he your superior?

24   A.  No.

25   Q.  Did he act as if he was?

1    A.  He seemed to on that call.

2    Q.  All right.  Ultimately, you resigned.  You submitted your

3    notice in February of 2013, is that correct?

4    A.  Yes.

5    Q.  Did you submit a formal resignation letter?

6    A.  I did.

7         MR. KELLER:  Could the witness be handed Government's

8    Exhibit No. 11, please?

9    Q.  Take a moment and tell me if you can identify that.

10   A.  Yes.  It's an 8-K filing that was -- appears the date of

11   the report is February 21st, 2013.

12   Q.  And an 8-K filing, that's, in Security and Exchange

13   Commission lingo, that that's a public filing to the investing

14   public of America, correct?

15   A.  Correct.

16   Q.  Could you turn to page 3 of that?

17        MR. KELLER:  And if we could publish page 3, Nancy.

18   Q.  Can you identify what's page 3 of that exhibit?

19   A.  It is my letter of resignation that I submitted to Lalit

20   Dhadphale.

21   Q.  Let's direct your attention to the third paragraph.  Do

22   you see that?

23   A.  I do.

24        MR. KELLER:  Okay.  If we could enlarge that.

25   Q.  It reads:

1       "After speaking with you at length in person and via

2    email, I would like to reiterate that as the CFO, I do not

3    think I have been permitted to take the appropriate

4    measures that were or are necessary to solidify the

5    optimal financial position, nor have I been allowed to

6    exercise the full responsibilities required as an officer

7    of the company."

8    Do you see that?

9  A.  Yes.

10  Q.  Is that accurate?

11  A.  Yes.

12  Q.  Who prevented you from fully exercising your

13  responsibilities as a CFO?

14  A.  Lalit Dhadphale.

15  Q.  Did Mr. Peppel?

16  A.  I wouldn't be able to say yes or no.

17  Q.  Well --

18  A.  I took orders directly from Mr. Lalit, so I wouldn't be

19  able to say if Mr. Peppel had that.

20  Q.  Did Mr. Peppel have an influence on your resigning?

21  A.  Yes.

22  Q.  Do you recall after you had resigned you were contacted by

23  Mr. John Backus and he asked what it would take for you to

24  consider returning?  Do you remember that conversation?

25  A.  I do.

1  Q.  What did you tell him?

2  A.  I said, among various things, that the company should be

3  made private, that we move away from all matters related to

4  Mike Peppel, and that we get rid of wholesale.

5  Q.  So you were not prepared to work at HealthWarehouse as

6  long as Mike Peppel had any involvement, is that fair?

7  A.  I was not prepared under the circumstances.

8        MR. KELLER:  If the witness could be handed

9  Government's Exhibit No. 12, please.

10 Q.  If you could take a moment to examine Government's Exhibit

11 No. 12 and tell me if you can identify what that consists of?

12 A.  Yes.  It's a Transition Agreement and Release I was

13 provided by Lalit Dhadphale.

14 Q.  Can you tell the Court the context of how Mr. Dhadphale

15 ended up providing you this?  I assume he wanted you to sign

16 this?

17 A.  I would assume the same, yes.

18 Q.  Did you ever sign it?

19 A.  No.

20 Q.  Why did you not?

21 A.  I thought it was a disingenuous transition agreement given

22 the fact I had already been transitioning myself out of my

23 role of CFO for about a month and a half.

24 Q.  Now, I want to direct your attention to paragraph 6 of

25 this document.  I guess it's on page 5 of the exhibit.

1          MR. KELLER:  Can you zoom in on that?

2     A.  Six, you said?

3     Q.  It's really page 3 of the agreement but it's page -- I

4     apologize, page 5 numerically on the exhibit.

5          Looking at paragraph 6 of the proposed draft agreement, do

6     you see that?

7     A.  Yes, I do.

8     Q.  Non-Interference.  Do you see that?

9     A.  I do.

10    Q.  Was this an issue that bothered you, that was contained in

11    your proposed termination agreement?

12    A.  It did.

13    Q.  Why did it bother you?

14    A.  I'd never shown any inclination to operate in any other

15    way other than in the interests of the shareholders and

16    employees, and I thought this was a very disingenuous

17    paragraph.

18    Q.  Now, correct me if I'm wrong, Mr. Altamirano.  Doesn't

19    this paragraph -- assuming you signed it and agreed, which you

20    didn't -- but they wanted you to refrain from talking with

21    John Backus or Lloyd Miller or Karen Singer.  Is that fair?

22    A.  Yes, or any of their related parties or entities.

23    Q.  Did Mr. Dhadphale ever explain to you why he wanted you to

24    refrain from talking with these people upon your termination?

25    A.  No.

1   Q.  Does that seem odd to you?

2   A.  Given the context of the board discussions and everything

3  that was going on at the board level, yes and no.

4   Q.  How would you describe the inner workings of

5  HealthWarehouse.com, particularly the management?

6   A.  In what context?

7   Q.  Was it a well-oiled machine?  Was it functioning

8  professionally, or what?  Was it dysfunctioning?

9   A.  It was under-managed.

10   Q.  What's that mean?

11   A.  Basically, I think that the company needed to tighten up

12  its controls -- which have been made noted -- financially.  It

13  needed to tighten up its operating basis and needed to focus

14  on running the business.

15   Q.  Now, Mr. Dhadphale ultimately, I guess to put it bluntly,

16  fired you.  Is that fair?

17   A.  That's one way of looking at it.

18   Q.  Okay.  What's your perspective?

19   A.  On April 9th, he sent a letter requesting that I not

20  present myself on HealthWarehouse's grounds, its premises;

21  that I refrain from speaking with any employees; that I

22  refrain from speaking with anyone in any capacity or present

23  myself as a representative of HealthWarehouse.

24   Q.  Why was he upset with you?

25   A.  Largely because I did not sign this Transition Agreement.

1      MR. KELLER:  If I may have one moment, Your Honor?

2      THE COURT:  Yes.

3    (Plaintiff's Counsel confer privately.)

4    Q.  Last point I want to raise.  In conjunction with your

5    termination, was there a controversy between yourself and

6    Mr. Dhadphale concerning severance pay or reimbursement of

7    expenses that you had fronted?

8    A.  There was a question basically that there was a

9    longstanding agreement with Mr. Dhadphale and myself which was

10   reiterated on the morning of April 5th, 2013, that I and other

11   employees whose backpay and previously-approved expenses would

12   be paid for once the company had the means to do so.

13   Q.  And what happened?

14   A.  On April 5th, the company basically received clearance

15   from its bank that the half million that was pledged by

16   Melrose Capital had cleared, a payroll payment was processed

17   that afternoon, and that was roughly -- for that day.  I come

18   in on Monday morning, I realized that I was not included

19   within that payroll pay, along with two other employees, and

20   so basically I made corrections to that, made sure myself and

21   the other two employees were paid, and I made sure that all

22   expenses that were outstanding by employees were paid for.

23   Q.  And did Mr. Dhadphale take issue with that?

24   A.  He did, after I submitted an email thanking him and

25   acknowledging the payment.

1   Q.  And what did Mr. Dhadphale have to say?  What was his view

2   of your actions?

3   A.  He said that I was unauthorized to do so, and that

4   basically he responded in email that those -- that I've been

5   relieved of any sort of access to company accounts, or bank

6   for that matter, and any financial transactions.

7           MR. KELLER:  Your Honor, I don't believe I have any

8   other questions for Mr. Altamirano and tender him for cross.

9                          CROSS-EXAMINATION

10  BY MS. CORS:

11  Q.  Good afternoon, Mr. Altamirano.  My name is Jeanne Cors.

12  I'm one of the counsel for Mr. Peppel.  I just wanted to ask a

13  couple questions following up on your direct exam.

14      With respect to your inner actions with Mr. Peppel, am I

15  correct that during your tenure at HealthWarehouse those inner

16  actions were limited?

17  A.  Correct.

18  Q.  And during that time it was your view, was it not, and

19  your understanding and your experience that Mr. Dhadphale was

20  the CEO of HealthWarehouse, correct?

21  A.  Correct.

22  Q.  And you had no reason to believe Mr. Peppel was the CEO of

23  HealthWarehouse, correct?

24  A.  Correct.

25  Q.  I take it he never told you such, correct?

1   A.  Correct.

2   Q.  And with respect to the discussion at Starbucks regarding

3   the wholesale business, that was, I think you testified, a

4   concern of yours, correct?

5   A.  A large concern of mine, yes.

6   Q.  And you were concerned about the company being in that

7   line of business, correct?

8   A.  Yes.

9   Q.  But, in fact, there were others within the company who

10  disagreed with you, correct?

11  A.  Both agreed and disagreed, yes.

12  Q.  And that was just an internal dispute at the company as to

13  whether that line of business should be pursued or not, right?

14  A.  Yes.  But Mr. Peppel should not have had any involvement

15  in that discussion.

16  Q.  And I take it during this meeting Mr. Peppel never

17  suggested to you "I'm the CEO of the company and I'm going to

18  make the call," correct?

19  A.  No, but it was very belittling and condescending.

20  Q.  Understood.

21      So, in terms of the conversation, it was an uncomfortable

22  conversation with you, correct?  You didn't like how you were

23  treated, correct?

24  A.  I thought it was irrelevant.

25  Q.  Okay.  But you weren't led to believe during that

1    conversation that Mr. Peppel was acting as CEO of the company,

2    correct?

3    A.  Correct.

4    Q.  Now, during the end of 2012, the company was seeking to

5    raise capital, correct?

6    A.  It was.

7    Q.  And could you explain to me from your perspective why it

8    was important at that point in time for the company to raise

9    capital?

10   A.  The company, as stated by Mr. Backus' testimony earlier

11   today, had two notes outstanding with HWH Lending and MilFam

12   due on December 31st, 2012 and January 15th, 2013, in the

13   amount that approximated $3 million, plus interest.

14   Q.  Okay.  And those notes were coming due, correct?

15   A.  Yes.

16   Q.  And what was your understanding as to what would happen if

17   those notes weren't paid?

18   A.  The note holders, HWH Lending and MilFam, would largely

19   take over the company.

20   Q.  And when you say "take over the company," what does that

21   mean to you?

22   A.  Basically, it would be running it.

23   Q.  Okay.

24   A.  Controlling it.

25   Q.  And it could also mean, could it not, that they could

1   liquidate the company and recover any assets that are

2   available, correct?

3   A.  Correct.

4   Q.  Okay.  So there was a risk to the company that if those

5   notes weren't paid timely, that the assets of the company

6   could be sold, correct?

7   A.  The company had virtually no assets to sell, so I think

8   that that was a misstatement.

9   Q.  There was inventory, correct?

10  A.  Limited, yes.

11  Q.  And there were also -- there was value in licenses.  Could

12  those have been transferred, do you know?

13  A.  Possibly.

14  Q.  Okay.  So possible value in those.

15      And during this time period did Mr. Peppel provide

16  assistance to the company in helping them find potential

17  investors?

18  A.  He did.

19  Q.  And can you describe for me what you understand to be his

20  involvement in that process?

21  A.  He provided introductions and basically assisted with the

22  raising of funds through that -- those introductions.

23  Q.  And do you believe those funds could have been raised

24  without the assistance of Mr. Peppel at that point in time?

25  A.  We took a certain path that limited other options.  I

1  think that once that path was taken, basically it put us on a

2  certain course that we could not veer off.

3  Q.  So in terms of raising funds, there weren't other

4  alternatives in front of the company at that point in time

5  other than the individuals or companies who Mr. Peppel

6  introduced, correct?

7  A.  We were not exploring them, correct.

8  Q.  And from your perspective it was important, was it not,

9  that those funds were raised and the money was paid off?

10  A.  Acting in the best interest of the common shareholders,

11  yes.

12  Q.  And I take it you are appreciative for the work Mr. Peppel

13  put in to help the company in that instance, is that correct?

14  A.  I'm indifferent.

15  Q.  Okay.  I take it you are happy that the money was raised,

16  though, correct?

17  A.  Correct.

18  Q.  Okay.  Now, if you turn back to -- let me see.  It is

19  Government's Exhibit 11.

20  A.  Yes.

21  Q.  And if you could turn to -- I guess it's page 3 of that

22  exhibit, which is your resignation letter.  You testified

23  regarding the content of this letter and specifically

24  paragraph 3, correct?

25  A.  I did.

1  Q.  Now, in fact, following your submission of this letter,

2  did you have interviews individually with some of the board

3  members at HealthWarehouse?

4  A.  With all of them.

5  Q.  With all of them.

6      And do you recall during any of those interviews

7  indicating that, in fact, you regretted some of the language

8  you used in this letter and that you continued to have

9  confidence in the management of Lalit Dhadphale and others?

10  A.  I said that I regretted in terms that it was being

11  misconstrued, but basically I wish the company, as stated in

12  the last paragraph, the best of luck and success, along with

13  the board.

14  Q.  And, in fact, leading up to your resignation there was

15  some tension between you and management regarding preparation

16  of financials and other things, was there not, including

17  development of economic models, financial models?  Does that

18  ring a bell?

19  A.  Yes.

20  Q.  Okay.  And there was concern expressed to you, was there

21  not, as to the accuracy of some of the models that were being

22  developed?

23  A.  I was the one that expressed that concern.

24  Q.  Was not concern expressed to you as well regarding some of

25  the mock-ups you did and whether those were accurate?

1  A.  At one point in time.

2  Q.  Let's focus around the point in time when the company was

3  seeking to raise capital and get the $500,000 brought into the

4  company.

5      Do you recall any discussions at that time or concerns

6  raised regarding financial --

7  A.  Yes.  When the company was seeking to raise the half

8  million debt that it raised, yes.

9  Q.  And there were disputes internally at that point between

10  you and others as to what numbers should be included within

11  some of those models, correct?

12  A.  Correct.

13  Q.  If you could turn for me, please, to Exhibit 12.

14  A.  Yes.  I'm there.

15  Q.  And if you could go to that paragraph 6, the

16  Non-Interference paragraph.

17  A.  Yes.

18  Q.  And you recall you were asked by Mr. Keller about that

19  paragraph and possibly why that paragraph may have been

20  included in this draft, correct?

21  A.  Yes.

22  Q.  Okay.  And isn't it true that the rationale for including

23  this paragraph was that you had informed Mr. Dhadphale on

24  numerous occasions that, in fact, some of these individuals

25  identified here had made job offers to you?  Isn't that

1    correct?

2    A.  Yes.

3    Q.  Okay.  So, in fact, this paragraph was included based on

4    concerns that you may leave the company and immediately go to

5    work for some of these companies, correct?

6    A.  Yes.

7    Q.  Okay.  Now, you testified, I think, that your last day of

8    employment --

9        Was it April 8th?

10   A.  April 9th or 15th.  It depends on which way you look at

11   it.

12   Q.  Okay.  And then, in fact, you received a letter from

13   Mr. Dhadphale expressing some concerns about your performance

14   and asking that you conclude your service with the company,

15   correct?

16   A.  I don't recall.  Can you be a little bit more specific?

17   Q.  Okay.  What do you recall the basis of the communication?

18   What did Mr. Dhadphale express to you in writing?  What do you

19   recall?

20   A.  He expressed in writing on April 9th -- when I was meeting

21   with my lawyer reviewing the Transition Agreement, arriving at

22   approximately 4 P.M. that afternoon -- that I could no longer

23   be permitted to speak with other employers or a representative

24   of the company.

25   Q.  Now, in fact, didn't Mr. Dhadphale express concerns that

ALTAMIRANO - CROSS

135

1   on April 1st you had wired funds to yourself and paid yourself

2   payroll without proper authorization?

3   A.  I was properly authorized.

4   Q.  In fact, on April 1st, you wired yourself a total of

5   $53,367.07, correct?

6   A.  If I recall correctly, it's April 8th.  I think your notes

7   are incorrect there.

8   Q.  Okay.  So you wired yourself a total of $53,000?

9   A.  Myself and another employee, former employee, who was owed

10  approximately $23,000, and made checks payable to other

11  employees which were lesser amounts.

12  Q.  Okay.  Let's talk about the $53,000 to you.

13      You said this was authorized.  How was this authorized,

14  from your perspective?

15  A.  Lalit had basically approved all my expenses that had been

16  longstanding and he had verbally authorized that on April 5th,

17  that Friday morning, when we had coffee at Starbucks, and

18  basically this was just standard company procedure.

19  Q.  In fact, was it company policy that any wire that was to

20  be sent out had to be authorized through an email

21  communication with Mr. Dhadphale personally?  Isn't that

22  correct?

23  A.  I wasn't aware of that.

24  Q.  You're not aware of the policy to get authorization?

25  A.  Not the email, no.

1    Q.  On the day you wired this money to yourself, did

2    Mr. Dhadphale or anyone in senior management know that you

3    were engaging in that wire on that day?

4    A.  Yes.

5    Q.  Who knew you were engaging in that wire?

6    A.  Mr. Dhadphale.  We had spoken on April 5th.

7    Q.  And Mr. Dhadphale, in fact, in his communications to you

8    in writing, disagreed with your position, did he not?

9    A.  That was post the fact on April 8th.

10   Q.  So, in fact, in his writing to you he raised concerns

11   about the fact that you did engage in a wire out of the

12   company without authorization, correct?

13   A.  He did express it after the wire was sent and previously

14   approved.

15   Q.  And with respect to the payroll that you subsequently paid

16   yourself, that was -- what was the total?  Do you recall the

17   total amount you paid yourself in payroll?

18   A.  I asked Donna Quinones how much was owed to me.  She gave

19   me the amount of $38,000 and that was what I was paid.

20   Q.  In fact, wasn't a total of 41,500 paid to you in payroll

21   by you?

22   A.  If that's the amount that was paid.  I stated previously

23   that I will gladly reimburse the company funds that are due to

24   the company.

25   Q.  So, sitting here you can't state that in fact you only

1    paid yourself 38,000, correct?

2    A.  The company withheld my payroll stubs, so I cannot confirm

3    this.  I have repeatedly requested through my counsel that I

4    be provided with confirmation of payments that were made

5    supposedly in excess, and I've not received those amounts, and

6    I'm very shocked and disappointed that this is being withheld

7    from me.

8    Q.  And, in fact, it was Mr. Dhadphale's position that you

9    were not authorized to pay these funds to yourself at this

10   point in time either, was it not?

11   A.  That's incorrect.  At all points in time I was CFO of the

12   company and had authorization to pay payroll to employees.  On

13   April 5th, a transaction transpired which at best I would say

14   it was an oversight, and at worst it was targeting me and two

15   other employees from which I was withheld from payroll, and I

16   was simply seeking to make amends and correct that oversight,

17   at best.

18   Q.  And it was the company's position you were seeking to do

19   so without authorization, is that correct?

20   A.  That's incorrect.

21   Q.  Now, of the -- in total, how much money among payroll and

22   wire money did you pay yourself at that point, do you recall?

23   A.  So, approximately the 53,000 in expenses, and I received a

24   net amount to my account of approximately $20,000 and change.

25   Q.  So 53,300-some in expenses, another either thirty-eight or

1    forty-one five from the company?

2    A.  Correct.  I have no way to confirm that amount.

3    Q.  At that point in time how much working capital was sitting

4    in the company's accounts, do you know?

5    A.  There was approximately 400,000, if I recall correctly.

6    Q.  So 400,000 in working capital sitting in the company.  But

7    it's your position now that you were authorized on that single

8    day to wire and pay yourself in excess of a hundred thousand

9    dollars, correct?

10   A.  Yes.  It was our obligation both under state and federal

11   law.

12           MS. CORS:  Okay.  A moment, Your Honor.

13   Q.  Mr. Altamirano, I'd like to hand you what's been marked as

14   Exhibit F.

15   A.  Yes.

16   Q.  And have you seen this document before?

17   A.  Not in this format, no.

18   Q.  Okay.  Have you seen it in a similar format?

19   A.  Similar format, yes.

20   Q.  Okay.  And this is a communication to you from

21   Mr. Dhadphale on April 9th, correct?

22   A.  Yes.

23   Q.  And if you could look at the second paragraph for me,

24   please, and read that.  And feel free to read the whole

25   document if you'd like to read it.

1   A.  All right.  I'll read the second paragraph.

2       "This action is being taken by the Company to

3   immediately respond to your conduct yesterday morning

4   when you used your position as Chief Financial Officer of

5   the Company to wire Company funds to yourself (including

6   payroll payments to yourself through April 15, 2013)" --

7   Excuse me.  This is not the version that I received -- I

8   received April 30th, just so you know.

9   Q.  Okay.

10  A.  -- "and certain other employees in the amounts of" --

11  And these amounts have been left blank which were

12  previously provided to me --

13      " -- without any authorization from or knowledge of

14  the Company's management.  In fact, the Company only

15  became aware of these unauthorized actions as result of

16  your email dated April 8, 2013 at 11:04 a.m. Eastern Time

17  sent to my attention.  In that email you advised me of the

18  wires you had already sent, and misrepresented in that

19  same email that you were getting the authority to send

20  these wires.  As you are aware, you were immediately

21  advised both in writing and orally that you had no such

22  authorization" -- and in brackets state "[and were asked

23  to cause the immediate return of the funds to the

24  Company's account]"-

25  which is not true.

1  Q.  Does that paragraph accurately state, though, the position

2  that was expressed to you by Mr. Dhadphale subsequent to your

3  wiring in of the money and paying yourself?

4  A.  Lalit had stated, "No more wire, no more checks."

5  Q.  With respect to the communications you had with Mr. Peppel

6  regarding cell phone bills, were you involved in negotiations

7  with Mr. Peppel regarding his resignation from the company?

8  A.  I was not.

9  Q.  And are you privy to the terms of that resignation?

10  A.  I asked for permission to see them, but I was never

11  provided them.

12  Q.  So sitting here you don't have any knowledge as whether,

13  in fact, coverage of cell phone bills was included as part of

14  the terms of that resignation, correct?

15  A.  Correct.

16  Q.  Okay.  And when those cell phones were turned off, was

17  notice provided to Mr. Peppel in a time period provided within

18  which the phones would be turned off, or was this just kind of

19  an automatic off the HealthWarehouse bill?

20  A.  I would ask Marsten Alfred, the account manager.

21  Q.  Okay.  So you don't have any understanding as to whether

22  part of Mr. Peppel's anger may have been this was part of the

23  terms of his resignation without any notice all the cell

24  phones were turned off, correct?

25  A.  I can't confirm or deny.

1   Q.  Okay.  And with respect to this comment, statement, about

2   not making any decisions, in fact that statement could easily

3   be understood as Don't make any decision involving me without

4   me, my approval, or my input, correct?

5   A.  Possibly.

6   Q.  All right.  And, in fact, during that conversation, again

7   he didn't ever suggest that "I'm CEO of the company and you

8   need to take orders from me," correct?

9   A.  Correct.

10  Q.  And, in fact, the directives you took during your time at

11  HealthWarehouse were from Mr. Dhadphale, correct?

12  A.  Correct.

13          MS. CORS:  A minute, Your Honor?

14      (Defense Counsel confer privately.)

15          MS. CORS:  I have no further questions.  Thank you

16  very much.

17          THE COURT:  Mr. Keller?

18          MR. KELLER:  No further questions, Your Honor.

19          THE COURT:  Counselors, is there any reason for

20  Mr. Altamirano to remain available for recall?

21          MR. KELLER:  None from the United States.

22          MS. CORS:  No, Your Honor.  Thank you.

23          THE COURT:  Thank you, sir.  You may step down.

24  You're excused.

25              EXCERPTS OF PROCEEDINGS CONCLUDED

142

I N D E X

| PLAINTIFF'S WITNESSES: | Direct | Cross | Redirect |
|---|---|---|---|
| **JOHN C. BACKUS, JR.** | 6 | 37 | 95 |
| **EDUARDO ALTAMIRANO** | 103 | 127 | -- |

E X H I B I T S

|  | Identified |
|---|---|
| GX 7 | 24 |
| GX 25 | 31 |
| GX 3 | 33 |
| GX 17 | 34 |
| DX A | 41 |
| GX 6 | 45 |
| GX 5.1 | 49 |
| DX B | 64 |
| DX C | 72 |
| DX D | 83 |
| GX 16 | 86 |
| DX E | 90 |
| GX 23 | 106 |
| GX 11 | 121 |
| GX 12 | 123 |
| DX F | 138 |

-   -   -

C E R T I F I C A T E

        I, Mary Ann Ranz, the undersigned, certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


s/Mary Ann Ranz
Official Court Reporter